UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASHMI VIG ARORA, Individually and On Behalf of All Others Similarly Situated, | Case No. 2:20-cv-4140-EK-AKT |
| Plaintiff, | AMENDED CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| HDFC BANK LIMITED, ADITYA PURI, AND SASHIDHAR JAGDISHAN, | |
| Defendants. | |

Lead Plaintiff Meitav Dash Provident Funds and Pension Ltd. ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding HDFC Bank Limited ("HDFC Bank" or the "Bank"), analysts' reports and advisories about the Bank, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired HDFC Bank securities

between July 31, 2015 and July 10, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Bank and certain of its top officials.

2.      HDFC Bank was founded in 1994 and is based in Mumbai, India.  The Bank provides various banking and financial services to individuals and businesses in India, Bahrain, Hong Kong, and Dubai.  HDFC Bank operates in Treasury, Retail Banking, Wholesale Banking, Other Banking Business, and Unallocated segments, offering, among other services, various types of loans to millions of its retail borrowers, including personal and vehicle financing loans.

3.      HDFC Bank's auto and commercial vehicle loan segment comprises more than a quarter of its overall retail assets, and at least ten percent of its overall loan book.  Throughout the Class Period, Defendants touted the strength and stellar performance of its vehicle lending segment.  Defendants also assured investors that the Company had policies and procedures in place—including a Code of Ethics, a whistleblower policy, a Fraud Monitoring Committee, and internal controls—to prevent and uncover fraud.

4.      However, Defendants' statements were false and misleading because they misrepresented and/or failed to disclose that, 1) the Company did not have effective disclosure controls or procedures; 2) the Company did not have effective internal controls; 3) neither the Fraud Monitoring Committee nor the internal audit department operated effectively to prevent or uncover fraud; 4) as a result, beginning in 2015, Defendants engaged in improper lending practices in its vehicle financing business by bundling GPS navigation devices into borrowers' auto loans; 5) the Individual Defendants and senior management overseeing HDFC Bank's vehicle financing segment did not adhere to the Company's Code of Ethics; 6) the whistle blower policy did not

operate effectively to uncover or prevent fraud; 7) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Bank's financial condition and reputation; 8) the foregoing, once revealed, would likely invite regulatory scrutiny; and 8) as a result, the Bank's public statements were materially false and misleading at all relevant times.

5.      On July 13, 2020, during pre-market hours, *The Economic Times* published an article titled "HDFC Bank probes lending practices at vehicle unit."  That article reported that HDFC Bank had "conducted a probe into allegations of improper lending practices and conflicts of interests in its vehicle-financing operations involving the unit's former head."

6.      On this news, HDFC Bank's American Depositary Share ("ADS") price fell $1.37 per share, or 2.83%, to close at $47.02 per share on July 13, 2020.  The Company admitted to the wrongdoing on an investor call and in subsequent SEC filings.  Moreover, the Company terminated six executives and forced the retirement of the head of the vehicle financing unit, Ashok Khanna. CEO Defendant Aditya Puri "retired" three months later.  The Reserve Bank of India also began a prob into HDFC Bank's vehicle lending practices, and instructed HDFC Bank to turn over all data regarding its internal investigation and any steps taken to remediate the wrongdoing.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Bank's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered and the subsequent damages took place in this Judicial District.  Pursuant to HDFC Bank's most recent annual report on Form 20-F, as of March 31, 2020, there were 5,483,286,460 of the Bank's Equity Shares outstanding.  HDFC Bank's ADSs trade on the New York Stock Exchange ("NYSE"), with each ADS representing three of the Bank's Equity Shares.  Accordingly, there are presumably hundreds, if not thousands, of investors in HDFC Bank's ADSs located within the U.S., some of whom undoubtedly reside in this Judicial District.

11.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.    Plaintiff, as set forth in the certification previously filed with this Court, acquired HDFC Bank securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.    Defendant HDFC Bank is organized under the laws of India, with principal executive offices located at HDFC Bank House, Senapati Bapat Marg, Lower Parel, Mumbai 400013, India.  The Bank's securities trade in an efficient market on the NYSE under the ticker symbol "HDB."

14.     Defendant Aditya Puri ("Puri") has served as HDFC Bank's Managing Director from September 1994 until his retirement in October 2020.

15.     Defendant Sashidhar Jagdishan ("Jagdishan") served as HDFC Bank's Chief Financial Officer from before the start of the Class Period until August 2019.  Since then, Jagdishan has served as the Bank's Head of Finance, Human Resources, Legal & Secretarial, Corporate Communications, Administration, Infrastructure, and Corporate Social Responsibility, and is also designated as the "Change Agent of the Bank."  Jagdishan succeeded Defendant Puri as the Bank's Managing Director in October 2020.

16.     Defendants Puri and Jagdishan are sometimes referred to herein as the "Individual Defendants."

17.     The Individual Defendants possessed the power and authority to control the contents of HDFC Bank's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of HDFC Bank's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with HDFC Bank, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

18.     HDFC Bank and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19.     HDFC Bank was founded in 1994 and is based in Mumbai, India.  The Bank provides various banking and financial services to individuals and businesses in India, Bahrain, Hong Kong, and Dubai.  HDFC Bank operates in Treasury, Retail Banking, Wholesale Banking, Other Banking Business, and Unallocated segments, offering, among other services, various types of loans to millions of its retail borrowers, including personal and vehicle financing loans.

20.     Revenues generated from HDFC Bank's auto and commercial vehicle loans are reported as part of the Bank's Retail Banking segment.  The vehicle loan unit accounted for approximately 10% of HDFC Bank's loan book throughout the Class Period.  Moreover, in its annual 20-F filings from 2015 through 2019 the Company reported that auto loans and commercial vehicle loans comprised ***more than a quarter*** of the Bank's "total retail assets." As of March 31, 2020, HDFC Bank's vehicle financing unit had total outstanding loans of Rs 1.2 lakh crore, or $16 billion dollars.

### Fraud Monitoring Committee

21.     During the Class Period, Defendants falsely assured investors that the Company had a Code of Ethics, whistleblower policies (both detailed below), as well as other policies and procedures in place to detect and prevent fraud.  Indeed, in each of its 20-F filings during the Class Period, Defendants represented that at the direction of the Reserve Bank of India ("RBI") HDFC Bank created a "Fraud Monitoring Committee," which the Company has explained in its annual 20-F filings is "exclusively dedicated to the monitoring and following up of cases of fraud" and states as its objective, "the effective detection of frauds and immediate reporting of the frauds and actions taken against the perpetrators of frauds to the concerned regulatory and enforcement

agencies."  Toward that end, the Company has made clear that the Fraud Monitoring Committee must:

> a.    identify the systemic lacunae, if any, that facilitated perpetration of the fraud and put in place measures to plug the same;
> b.    identify the reasons for delay in detection, if any, and report to top management of the Bank and the RBI;
> c.    monitor progress of investigation by the Central Bureau of Investigation/Police Authorities and recovery position;
> d.    ensure that staff accountability is examined at all levels in all the cases of frauds and staff side action, if required, is completed quickly without any loss of time;
> e.    review the efficacy of the remedial action taken to prevent recurrence of frauds, such as strengthening of internal controls; and
> f.    put in place other measures as may be considered relevant to strengthen preventive measures against frauds.

22.    Throughout the Class Period, ***Defendant Puri sat on the Fraud Monitoring Committee*** with only five other members, which met at least four times a year.  Defendants have always acknowledged that, "[s]ignificant fraud…would disrupt our revenue generating activities in the short-term and could harm our reputation and adversely impact our revenue-generating capabilities."

## Fraudulent Practices in HDFC Bank's Vehicle Financing Business

23.    Despite the aforementioned assurances, and as Defendants later admitted, from 2015-2019 they forcibly bundled GPS navigation devices, via an agreement with Mumbai-based firm Trackpoint GPS, into borrowers' auto loans often without their knowledge.  Each GPS device cost approximately Rs 18,000-Rs 19, 500.  These practices enabled the vehicle loan financing unit to hit sales targets as well as to track customers in the event of a loan default.  Indeed, Confidential Witness ("CW") 1, a sales manager for used cars employed by HDFC Bank and based out of Jabalpur from July 2016 until December 2018, confirmed receiving instructions from superiors to pitch GPS devices to customers and further confirmed that these superiors made clear the Company would use the GPS devices to aid in loan collections efforts.

24.     Investors first learned of Defendants' fraud in an *Economic Times* article published on July 13, 2020, which revealed that the Company had conducted an internal investigation into these improper lending practices.  The Company later admitted to the misconduct on an investor call and in a subsequent 20-F filing.  Regulatory scrutiny followed.  Days after the *Economic Times* article, the Reserve Bank of India asked HDFC Bank to turn over all the details of its internal investigation into the improper lending practices in the vehicle financing operation as well as any steps the Bank took to remedy issues identified during the investigation.

25.     In the wake of the vehicle financing scandal, HDFC Bank forced Ashok Khanna, the head of the Company's vehicle lending business, to retire in March 2020.  Though having reached the mandated age of retirement, Khanna had been previously granted two post-retirement extensions and had been under consideration for another extension at the time of his ouster.  The Company fired at least six other senior and mid-level executives involved in the fraud.

26.     Moreover, Defendant Puri did not receive a post-retirement extension, and retired in October 2020, three months after the market learned of Defendants' fraud.

### Compensation and Insider Sales

27.     While engaged in a four-year streak of improper lending practices, Defendants enjoyed lucrative compensation. Indeed, Defendant Puri is reportedly the highest paid banking executive in India.  HDFC Bank paid Defendant Puri total remuneration of Rs.151.0 million, Rs. 183.4 million, Rs. 207.9 million, Rs. 192.9 million, Rs. 258.8 million, and Rs. 275.6 million for fiscal years 2015-2020 respectively.

28.     During the Class Period, Defendant Puri also received net proceeds of approximately ***$22 million*** from sales of HDFC Bank securities.  Moreover, in July 2020, the same

month in which Defendants' fraud in the auto loan business belatedly came to light, ***Defendant Puri sold 95% of his equity stake in the Company for $137.8 million in proceeds***.

29.    During the Class Period, Defendant Jagdishan received net proceeds of $5.6 million from sales of HDFC Bank securities.  Ashok Khanna, the head of HDFC Bank's vehicle lending segment, similarly received net proceeds of $3.8 million from insider sales.

## Materially False and Misleading Statements Issued During the Class Period

30.    The Class Period begins on July 31, 2015, when HDFC Bank filed an annual report on Form 20-F with the SEC, for the quarter and year ended March 31, 2015 ("2015 20-F").  The 20-F is signed by Defendant Jagdishan.  Attached to the 2015 20-F were certifications signed by Defendants Puri and Jagdishan, acknowledging their review of the 20-F, their responsibility for "establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company," and certifying that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  Defendants Puri and Jagdishan certified that they:

> (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> (c)    Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of

the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting

31.     In the 2015 20-F, Defendants represented that, "We seek to establish a relationship with a retail customer and then expand it *by offering more products*. As part of our growth strategy we continue to expand our distribution channels so as to make it easier for the customer to do business with us." Defendants failed to disclose, that with regard to automobiles loans, "more products" included GPS devices that they forcibly bundled into automobile loans, often without the borrowers' knowledge, and in contravention of Company policy and relevant regulations prohibiting the Bank from engaging in non-financial businesses.

32.     Defendants issued additional statements in the 2015 20-F specific to HDFC Bank's vehicle financing business that did not reveal these practices, including:

> We offer loans at fixed interest rates for financing new and used automobile purchases. In addition to our general marketing efforts for retail loans, we market this product through our relationships with car dealers, direct sales agents, corporate packages and joint promotion programs with automobile manufacturers.

33.     The 2015 20-F reported that the book value of HDFC Bank's auto loans for 2015 was $7.8 billion, or 17.7% of the Company's total retail assets, while commercial vehicle and construction equipment finance retail credit products (which are reported together) totaled $4.9 billion, or 11.1% of the Company's total retail assets. In other words, collectively, the auto loans and commercial vehicle loan book values constituted *more than a quarter* of the Company's total retail assets.

34.     The 2015 20-F contained the description of the role and responsibilities of the Fraud Monitoring Committee set forth in ¶¶ 21-22 above. Moreover, Defendants stated that the Company had an internal audit department that was supposed to provide "independent assurance

of the effectiveness of governance, risk management and internal controls to achieve the Bank's

risk management and control objectives."

35.     The 2015 20-F also included a comprehensive description of "Controls and

Procedures," as follows:

> The Bank performed an evaluation of the effectiveness of the design and operation of its disclosure controls and procedures as of March 31, 2015. ***Based on this evaluation, our Principal Executive Officer and our Principal Financial Officer have concluded that our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act") are effective.***
>
> ***Based on this evaluation, our Principal Executive Officer and Principal Financial Officer concluded that our disclosure controls and procedures are effective as of March 31, 2015*** to provide reasonable assurance that the information required to be disclosed in filings and submissions under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Principal Executive Officer and Principal Financial Officer, as appropriate, to allow timely decisions about required disclosure.

36.     Regarding Defendants' internal control over financial reporting, the 2015 20-F

assured investors that, "Management assessed the effectiveness of our internal control over

financial reporting as of March 31, 2015. In conducting its assessment, management based its

evaluation on the framework in Internal Control—Integrated Framework issued by the Committee

of Sponsoring Organizations of the Treadway Commission (1992) (COSO). ***Based on its***

***assessment, management has concluded that our internal control over financial reporting was***

***effective as of March 31, 2015***."

37.     Defendants also represented in the 2015 20-F that the Company maintained a "Code

of Ethics," that applied to the Individual Defendants:

> We have a written code of ethics applicable to the Managing Director (Chief Executive Officer), the Chief Financial Officer and members of our senior management. We believe the code constitutes a 'code of ethics' as defined in Item 16B of Form 20-F. We will provide a copy of such code of ethics to any person

without charge upon request. Requests may be made by writing to shareholder.grievances@hdfcbank.com.

We also have a whistle blower policy that contains procedures for receiving, retaining and treating complaints received, and procedures for the confidential and anonymous submission by employees of complaints, regarding questionable accounting or auditing matters or conduct which results in a violation of law by the Bank or in a substantial mismanagement of the Bank's resources. Under this whistle blower policy, our employees are encouraged to report questionable accounting matters or any fraudulent financial information provided to our shareholders, the government or the financial markets, or any conduct that results in a violation of law by the Bank, to our management (on an anonymous basis, if employees so desire). Under this policy we have also prohibited discrimination, retaliation or harassment of any kind against any employee who, based on the employee's reasonable belief that such conduct or practices have occurred or are occurring, reports such information or participates in an investigation.

38.      The foregoing statements in the 2015 20-F were false and misleading because, 1) the Company did not have effective disclosure controls or procedures; 2) the Company did not have effective internal controls; 3) neither the Fraud Monitoring Committee nor the internal audit department operated effectively to prevent or uncover fraud; 4) as a result, beginning in 2015, Defendants engaged in improper lending practices in the Bank's vehicle financing business with forced bundling of GPS navigation devices into borrowers' auto loans; 5) the Individual Defendants and senior management overseeing HDFC Bank's vehicle financing segment did not adhere to the Company's Code of Ethics; 6) the whistle blower policy did not operate effectively to uncover or prevent fraud; 7) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Bank's financial condition and reputation; and 8) the foregoing, once revealed, would likely invite regulatory scrutiny.

39.      On July 29, 2016, Defendants filed an annual report on Form 20-F with the SEC, for the quarter and year ended March 31, 2016 (the "2016 20-F"), which attached the same certifications signed by Defendants Puri and Jagdishan set forth in ¶ 30.

40.     In the 2016 20-F, Defendants represented that, "We seek to establish a relationship with a retail customer and then expand it *by offering more products*. As part of our growth strategy we continue to expand our distribution channels so as to make it easier for the customer to do business with us." Defendants failed to disclose, that with regard to automobiles loans, "more products" included GPS devices that they forcibly bundled into automobile loans, often without the borrowers' knowledge, and in contravention of Company policy and relevant regulations prohibiting the Bank from engaging in non-financial businesses.

41.     Defendants issued additional statements in the 2016 20-F specific to its vehicle financing business that did not reveal these practices, including:

> We offer loans at fixed interest rates for financing new and used automobile purchases. In addition to our general marketing efforts for retail loans, we market this product through our relationships with car dealers, direct sales agents, corporate packages and joint promotion programs with automobile manufacturers.

42.     The 2016 20-F reported that the book value of HDFC Bank's auto loans for 2016 was $8.9 billion, or 16.9% of the Company's total retail assets, while commercial vehicle and construction equipment finance retail credit products (which are reported together) totaled $5.58 billion, or 10.6% of the Company's total retail assets. In other words, collectively, the auto loans and commercial vehicle loan book values constituted *more than a quarter* of the Company's total retail assets.

43.     The 2016 20-F contained the description of the role and responsibilities of the Fraud Monitoring Committee set forth in ¶¶ 21-22 above. Moreover, Defendants stated that the Company had an internal audit department that was supposed to provide "independent assurance of the effectiveness of governance, risk management and internal controls to achieve the Bank's risk management and control objectives."

44.     The 2016 20-F also included a comprehensive description of "Controls and Procedures," as follows:

> The Bank performed an evaluation of the effectiveness of the design and operation of its disclosure controls and procedures as of March 31, 2016. ***Based on this evaluation, our Principal Executive Officer and our Principal Financial Officer have concluded that our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act") are effective.***
>
> ***Based on this evaluation, our Principal Executive Officer and Principal Financial Officer concluded that our disclosure controls and procedures are effective as of March 31, 2016*** to provide reasonable assurance that the information required to be disclosed in filings and submissions under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Principal Executive Officer and Principal Financial Officer, as appropriate, to allow timely decisions about required disclosure.

45.     Regarding Defendants' internal control over financial reporting, the 2016 20-F assured investors that, "Management assessed the effectiveness of our internal control over financial reporting as of March 31, 2016. In conducting its assessment, management based its evaluation on the framework contained in the Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013). Based on its assessment, ***management has concluded that our internal control over financial reporting was effective*** as of March 31, 2016."

46.     Defendants also made the same representations in the 2016 20-F regarding the Company's "Code of Ethics" and "whistle blower policy" set forth in ¶ 37.

47.     The foregoing statements in the 2016 20-F were false and misleading because, 1) the Company did not have effective disclosure controls or procedures; 2) the Company did not have effective internal controls; 3) neither the Fraud Monitoring Committee nor the internal audit department operated effectively to prevent or uncover fraud; 4) as a result, beginning in 2015,

Defendants engaged in improper lending practices in the Bank's vehicle financing business with forced bundling of GPS navigation devices into borrowers' auto loans; 5) the Individual Defendants and senior management overseeing HDFC Bank's vehicle financing segment did not adhere to the Company's Code of Ethics; 6) the whistle blower policy did not operate effectively to uncover or prevent fraud; 7) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Bank's financial condition and reputation; and 8) the foregoing, once revealed, would likely invite regulatory scrutiny.

48.     On July 31, 2017, Defendants filed an annual report on Form 20-F with the SEC, for the quarter and year ended March 31, 2017 (the "2017 20-F"), which attached the same certifications signed by Defendants Puri and Jagdishan set forth in ¶ 30.

49.     In the 2017 20-F, Defendants stated as follows with regard to its auto loan business:

> We offer loans at fixed interest rates for financing new and used automobile purchases. In addition to our general marketing efforts for retail loans, we market this product through our relationships with car dealers, direct sales agents, corporate packages and joint promotion programs with automobile manufacturers.

These statements did not reveal that Defendants forcibly bundled GPS devices into their automobile loans, often without the borrowers' knowledge, and in contravention of Company policy and relevant regulations prohibiting the Bank from engaging in non-financial businesses.

50.     The 2017 20-F reported that the book value of HDFC Bank's auto loans for 2015 was $11.1 billion, or 17.7% of the Company's total retail assets, while commercial vehicle and construction equipment finance retail credit products (which are reported together) totaled $7.09 billion, or 11.3% of the Company's total retail assets.  In other words, collectively, the auto loans and commercial vehicle loan book values constituted ***more than a quarter*** of the Company's total retail assets.

51.     The 2017 20-F contained the description of the role and responsibilities of the Fraud Monitoring Committee set forth in ¶¶ 21-22 above.   Moreover, Defendants stated that the Company had an internal audit department that was supposed to provide "independent assurance of the effectiveness of governance, risk management and internal controls to achieve the Bank's risk management and control objectives."

52.     The 2017 20-F also included a comprehensive description of "Controls and Procedures," as follows:

> The Bank performed an evaluation of the effectiveness of the design and operation of its disclosure controls and procedures as of March 31, 2017. Based on this evaluation, our Principal Executive Officer, Mr. Aditya Puri, and our Principal Financial Officer, Mr. Sashidhar Jagdishan, have concluded that our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), **are effective to provide reasonable assurance that the information required to be disclosed in filings and submissions under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Principal Executive Officer and Principal Financial Officer, as appropriate, to allow timely decisions about required disclosure**.

53.     Regarding Defendants' internal control over financial reporting, the 2017 20-F assured investors that, "Management assessed the effectiveness of our internal control over financial reporting as of March 31, 2017. In conducting its assessment, management based its evaluation on the framework contained in the Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013). Based on its assessment, **management has concluded that our internal control over financial reporting was effective as of March 31, 2017**."

54.     Defendants also made the same representations in the 2017 20-F regarding the Company's "Code of Ethics" and "whistle blower policy" set forth in ¶ 37.

55.     The foregoing statements in the 2017 20-F were false and misleading because, 1) the Company did not have effective disclosure controls or procedures; 2) the Company did not have effective internal controls; 3) neither the Fraud Monitoring Committee nor the internal audit department operated effectively to prevent or uncover fraud; 4) as a result, beginning in 2015, Defendants engaged in improper lending practices in the Bank's vehicle financing business with forced bundling of GPS navigation devices into borrowers' auto loans; 5) the Individual Defendants and senior management overseeing HDFC Bank's vehicle financing segment did not adhere to the Company's Code of Ethics; 6) the whistle blower policy did not operate effectively to uncover or prevent fraud; 7) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Bank's financial condition and reputation; and 8) the foregoing, once revealed, would likely invite regulatory scrutiny.

56.     On July 25, 2018, Defendants filed an annual report on Form 20-F with the SEC, for the quarter and year ended March 31, 2018 (the "2018 20-F"), which attached the same certifications signed by Defendants Puri and Jagdishan set forth in ¶ 30.

57.     In the 2018 20-F, Defendants stated as follows with regard to its auto loan business:

> We offer loans at fixed interest rates for financing new and used automobile purchases. In addition to our general marketing efforts for retail loans, we market this product through our relationships with car dealers, direct sales agents, corporate packages and joint promotion programs with automobile manufacturers.

These statements did not reveal that Defendants forcibly bundled GPS devices into their automobile loans, often without the borrowers' knowledge, and in contravention of Company policy and relevant regulations prohibiting the Bank from engaging in non-financial businesses.

58.     The 2018 20-F reported that the book value of HDFC Bank's auto loans for 2015 was $13.59 billion, or 16.9% of the Company's total retail assets, while commercial vehicle and construction equipment finance retail credit products (which are reported together) totaled $9.1

billion, or 11.4% of the Company's total retail assets.  In other words, collectively, the auto loans and commercial vehicle loan book values constituted ***more than a quarter*** of the Company's total retail assets.

59.     The 2018 20-F contained the description of the role and responsibilities of the Fraud Monitoring Committee set forth in ¶¶ 21-22 above.   Moreover, Defendants stated that the Company had an internal audit department that was supposed to provide "independent assurance of the effectiveness of governance, risk management and internal controls to achieve the Bank's risk management and control objectives."

60.     The 2018 20-F also included a comprehensive description of "Controls and Procedures," as follows:

> The Bank performed an evaluation of the effectiveness of the design and operation of its disclosure controls and procedures as of March 31, 2018. Based on this evaluation, our Principal Executive Officer, Mr. Aditya Puri, and our Principal Financial Officer, Mr. Sashidhar Jagdishan, have concluded that our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), ***are effective to provide reasonable assurance that the information required to be disclosed in filings and submissions under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Principal Executive Officer and Principal Financial Officer, as appropriate, to allow timely decisions about required disclosure***.

61.     Regarding Defendants' internal control over financial reporting, the 2018 20-F assured investors that, "Management assessed the effectiveness of our internal control over financial reporting as of March 31, 2018. In conducting its assessment, management based its evaluation on the framework contained in the Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013). ***Based on its assessment, management has concluded that our internal control over financial reporting was effective as of March 31, 2018***."

62.     Defendants also made the same representations in the 2018 20-F regarding the Company's "Code of Ethics" and "whistle blower policy" set forth in ¶ 37.

63.     The foregoing statements in the 2018 20-F were false and misleading because, 1) the Company did not have effective disclosure controls or procedures; 2) the Company did not have effective internal controls; 3) neither the Fraud Monitoring Committee nor the internal audit department operated effectively to prevent or uncover fraud; 4) as a result, beginning in 2015, Defendants engaged in improper lending practices in the Bank's vehicle financing business with forced bundling of GPS navigation devices into borrowers' auto loans; 5) the Individual Defendants and senior management overseeing HDFC Bank's vehicle financing segment did not adhere to the Company's Code of Ethics; 6) the whistle blower policy did not operate effectively to uncover or prevent fraud; 7) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Bank's financial condition and reputation; and 8) the foregoing, once revealed, would likely invite regulatory scrutiny.

64.     On July 31, 2019, Defendants filed an annual report on Form 20-F with the SEC, for the quarter and year ended March 31, 2019 (the "2019 20-F"), which attached the same certifications signed by Defendants Puri and Jagdishan set forth in ¶ 30.

65.     The 2019 20-F reported that the gross book value of HDFC Bank's auto loans for 2019 was $13.76 billion, or 15.2% of the Company's total retail assets, while commercial vehicle and construction equipment finance retail credit products (which are reported together) totaled $10.79 billion, or 11.9% of the Company's total retail assets.  In other words, collectively, the auto loans and commercial vehicle loan book values constituted ***more than a quarter*** of the Company's total retail assets.

19

66.     With respect to HDFC Bank's auto loans, the 2019 20-F represented, in relevant part, that the Bank "offer[s] loans at fixed interest rates for financing of new and used automobile purchases;" that, "[i]n addition to [HDFC Bank's] general marketing efforts for retail loans, [the Bank] market[s] [its] offerings at various customer touch points such as authorized dealers, direct sales agents, [its] banking outlets and the phone banking channel, and from [its] digital touch points;" and that HDFC Bank "believe[s] that [it is] the leader in the auto loan segment, having established [its] presence over almost two decades."

67.     With respect to HDFC Bank's commercial vehicle loans, the 2019 20-F represented, in relevant part, that the Bank "provide[s] secured financing for commercial vehicles . . . along with working capital, trade advances, bank guarantees, and transaction banking services, among others," including "both traditional and digital, to entities engaged in the . . . transportation businesses;" that, "[i]n addition to funding domestic assets, [the Bank] also extend[s] financing for imported assets for which [it] open[s] foreign letters of credit and offer[s] treasury services, such as forward exchange covers;" that the Bank "coordinate[s] and collaborate[s] with original equipment manufacturers including their authorized dealers to jointly promote [the Bank's] financing options to their clients;" and that the Bank has "a strong market presence in the commercial vehicle . . . financing business."

68.     With respect to HDFC Bank's disclosure controls and procedures, the 2019 20-F represented, in relevant part, that "[t]he Bank performed an evaluation of the effectiveness of the design and operation of its disclosure controls and procedures as of March 31, 2019;" that, "[b]ased on this evaluation, [the Bank's] Principal Executive Officer, [Defendant] Puri, and [the Bank's] Principal Financial Officer, [Defendant] Jagdishan, have concluded that [the Bank's] disclosure controls and procedures . . . are effective;" that such disclosure controls and procedures were

effective to "provide reasonable assurance that the information required to be disclosed in filings and submissions under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms;" and that "such information is accumulated and communicated to [the Bank's] management, including [the Bank's] Principal Executive Officer and Principal Financial Officer, as appropriate, to allow timely decisions about required disclosure."

69.    With respect to HDFC Bank's annual report on internal control over financial reporting, the 2019 20-F represented, in relevant part, that "[m]anagement assessed the effectiveness of [the Bank's] internal control over financial reporting as of March 31, 2019;" that, "[b]ased on its assessment, management has concluded that [the Bank's] internal control over financial reporting was effective as of March 31, 2019;" and that such internal control over financial reporting "provide[s] reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles" ("GAAP"), including policies and procedures that "pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect transactions and dispositions of [the Bank's] assets," that "provide reasonable assurance that transactions are recorded as necessary to permit the preparation of financial statements in accordance with [GAAP], and that [the Bank's] receipts and expenditures are being made only in accordance with authorizations of [the Bank's] management and directors," and that "provide reasonable assurance regarding the prevention or timely detection of unauthorized acquisitions, use or dispositions of [the Bank's] assets that could have a material effect on the financial statements."

70.     The 2019 20-F further assured investors that "[t]here were no changes in [HDFC Bank's] internal controls or in other factors that could, or are reasonably likely to, materially affect these controls during the period covered by th[e] [2019 20-F]."

71.     The 2019 20-F contained the same statements regarding the Company's purported "Code of Ethics" and "whistleblower policy" set forth in ¶ 37; as well as the same statements describing the role and responsibilities of the Fraud Monitoring Committee set forth in ¶¶ 21-22.

72.     The foregoing statements in the 2019 20-F were false and misleading because, 1) the Company did not have effective disclosure controls or procedures; 2) the Company did not have effective internal controls; 3) neither the Fraud Monitoring Committee nor the internal audit department operated effectively to prevent or uncover fraud; 4) as a result, beginning in 2015, Defendants engaged in improper lending practices in the Bank's vehicle financing business with forced bundling of GPS navigation devices into borrowers' auto loans; 5) the Individual Defendants and senior management overseeing HDFC Bank's vehicle financing segment did not adhere to the Company's Code of Ethics; 6) the whistle blower policy did not operate effectively to uncover or prevent fraud; 7) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Bank's financial condition and reputation; and 8) the foregoing, once revealed, would likely invite regulatory scrutiny.

**The Truth Begins to Emerge**

73.     On July 13, 2020, during pre-market hours, *The Economic Times* published an article titled "HDFC Bank probes lending practices at vehicle unit."  That article reported, in relevant part, that HDFC Bank had "conducted a probe into allegations of improper lending practices and conflicts of interests in its vehicle-financing operation involving the unit's former head;" that the Bank "decided against proceeding with an earlier proposal to extend the

employment of Ashok Khanna, an 18-year veteran at the bank, after the investigation was completed;" that "[t]he vehicle financing unit [Khanna] headed had outstanding loans of more than Rs 1.2 lakh crore ($16 billion) as of March 31;" that "[t]he result of the investigation isn't public, but it followed issues thrown up by an internal audit of the [B]ank's vehicle-dealer lending, as well as allegations of conflicts of interest in the purchase of global positioning systems for vehicles financed by the [B]ank," according to sources without disclosing what the probe uncovered; and that "Khanna, who was 63 at the time of leaving the bank in March, had been due to step aside at the age of 60 but had been receiving extensions since 2017," which "was due in part to the importance of the unit he headed, which accounts for more than 10% of the total loan book."

74.    *The Economic Times* article also reported that HDFC Bank had acknowledged and confirmed the investigation, stating, in relevant part, that "[a] representative of HDFC Bank confirmed there had been an investigation into the vehicle-financing unit but declined to give details," and that, "[i]n an emailed statement, [the Bank's representative] said Khanna had retired in March in line with the terms of his employment contract."  The HDFC Bank representative further advised that "[t]he [B]ank has a well-established process of investigating every complaint that it receives and takes actions as appropriate," and that, "[i]n the said instance as well, the [B]ank has followed the due process."

75.    Additionally, according to *The Economic Times* article, "Khanna declined to comment on the investigation, referring questions on the subject to the [B]ank," and "[h]e denied that any extension to his contract had been proposed, adding that he had retired from the [B]ank in March as planned.

76.    On this news, HDFC Bank's ADS price fell $1.37 per share, or 2.83%, to close at $47.02 per share on July 13, 2020.

77.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Bank's securities, Plaintiff and other Class members have suffered significant losses and damages.

### Post-Class Period Developments

78.    On July 20, 2020, *The Economic Times* published another article titled "Car loan probe: HDFC Bank terminates half a dozen employees for violating the code of conduct."  The article disclosed that HDFC Bank had "terminated at least six senior and mid-level executives after an internal probe revealed that they violated the code of conduct and governance standards by indulging in practices seen as corrupt," citing three people familiar with the matter.  The article further reported that the terminations "pertain[d] to practices at the auto loans department where some staff allegedly forced customers to buy . . . GPS devices bundling it with the car loan," and that "some customers were not even aware of purchasing such a product till the loan documents were checked."  According to the article, "[t]hese errant employees started forcefully bundling these products with car loans to meet sales targets and potentially track borrowers in the event of a default."  HDFC Bank "has a tie-up with Trackpoint GPS to sell these devices," but "did not respond to a detailed questionnaire seeking comments."

79.    Other than skeletal statements by Defendant Puri during an investor call on July 18, 2020 admitting to the misconduct in the auto loan business segment, and referencing the termination of employees and "retirement" four months prior of the head of that business segment, Ashok Khanna, Defendants have not provided any additional detail regarding the timing and results of their internal investigation into the matter.

80.    On July 31, 2021, in the Company's 20-F for the fourth quarter and fiscal year 2020, Defendants ***admitted to having already conducted an internal investigation and concluded***

*that there had been fraud in its vehicle lending business by May 2020.*  The Company has yet to reveal the timing of the investigation, the details of the investigation, or the timing of the whistleblower complaints that purportedly led to the investigation:

> In May 2020, following an internal inquiry we determined that certain employees received unauthorized commissions from a third-party vendor of GPS products, with whom we have an agreement to offer GPS devices to our auto loan customers. The personal misconduct of these employees is in violation of our code of conduct and governance standards and we have taken disciplinary action with respect to the employees involved, including separation of services of certain employees.

### Other Instances of HDFC Misconduct Triggering Regulatory Action

81.    Defendants' proclivity for misconduct drawing regulatory attention is not limited to machinations in its vehicle lending business.

82.    For example, on December 2, 2020, RBI issued an order with regard to "certain incidents of outages in internet banking/mobile banking/payment utilities of the bank over the past two years, including the recent outages in the bank's internet banking and payment system on November 21, 2020, due to a power failure in the primary data center."  The RBI order requires HDFC to stop all launches of digital business generating activities planned under its program Digital 2.0, stop other proposed business generating IT applications, and stop sourcing of new credit card customers.  RBI also insisted HDFC examine the lapses and fix accountability.  Banks in India are required to have business continuity processes in place to deal with outages like this. Nevertheless, the November 2020 outage was not the only such outage HDFC customers suffered. Similar outages occurred in December 2019 and November 2018.  Despite Company assurances, Defendants failed to adequately fix these "technical glitches," ultimately necessitating the intervention of regulator RBI.

83.    Then on January 22, 2021, HDFC announced that SEBI (the Securities Exchange Board of India) levied a fine against HDFC for violating the regulator's interim directions when it

invoked securities pledged by stockbroker BRH Wealth Kreators.  The penalty included Rs 1 crore and a direction to transfer Rs 158.68 crore along with 7% interest per annum into an escrow account until the issue is reconciled.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired HDFC Bank securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Bank, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

85.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, HDFC Bank securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by HDFC Bank or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

86.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

87.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

88.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of HDFC Bank;

- whether the Individual Defendants caused HDFC Bank to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of HDFC Bank securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

89.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

90.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- HDFC Bank securities are traded in an efficient market;

- the Bank's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Bank traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Bank's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold HDFC Bank securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

91.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

92.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

93.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

94.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

95.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of HDFC Bank securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire HDFC Bank securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

96.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for HDFC Bank securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about HDFC Bank's finances and business prospects.

97.     By virtue of their positions at HDFC Bank, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

98.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of HDFC Bank, the Individual Defendants had knowledge of the details of HDFC Bank's internal affairs.

99.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of HDFC Bank.  As officers and/or directors of a publicly-held bank, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to HDFC Bank's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of HDFC Bank securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning HDFC Bank's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired HDFC Bank securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

100.     During the Class Period, HDFC Bank securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of HDFC Bank securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of HDFC Bank securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of HDFC Bank securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

101.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

102.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Bank's securities during the Class Period, upon the disclosure that the Bank had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

103.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.   During the Class Period, the Individual Defendants participated in the operation and management of HDFC Bank, and conducted and participated, directly and indirectly, in the conduct of HDFC Bank's business affairs.  Because of their senior positions, they knew the adverse non-public information about HDFC Bank's misstatement of income and expenses and false financial statements.

105.   As officers and/or directors of a publicly owned bank, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to HDFC Bank's financial condition and results of operations, and to correct promptly any public statements issued by HDFC Bank which had become materially false or misleading.

106.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which HDFC Bank disseminated in the marketplace during the Class Period concerning HDFC Bank's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause HDFC Bank to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of HDFC Bank within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of HDFC Bank securities.

107.   Each of the Individual Defendants, therefore, acted as a controlling person of HDFC Bank.  By reason of their senior management positions and/or being directors of HDFC Bank, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, HDFC Bank to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of HDFC Bank

and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

108.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by HDFC Bank.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  February 8, 2021                              Respectfully submitted,

                                                      POMERANTZ LLP

                                                      */s/ Tamar A. Weinrib*
                                                      Jeremy A. Lieberman
                                                      Tamar A. Weinrib
                                                      600 Third Avenue, 20th Floor
                                                      New York, New York 10016
                                                      Telephone: (212) 661-1100
                                                      Facsimile: (917) 463-1044
                                                      jalieberman@pomlaw.com
                                                      taweinrib@pomlaw.com

                                                      POMERANTZ LLP
                                                      Patrick V. Dahlstrom

10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

POMERANTZ LLP
Jennifer Pafiti
(*pro hac vice* application forthcoming)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Facsimile: (917) 463-1044
jpafiti@pomlaw.com

*Attorneys for Plaintiff*

COHEN & MIZRAHI LLP
Daniel C. Cohen
Edward Y. Kroub
Moshe O. Boroosan
300 Cadman Plaza West, 12th Floor
Brooklyn, New York 11201
Telephone: (929) 575-4175
Facsimile: (929) 575-4195
dan@cml.legal
edward@cml.legal
moshe@cml.legal

*Additional Counsel*