**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ASHMI VIG ARORA, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>HDFC BANK LIMITED, ADITYA PURI, and SASHIDHAR JAGDISHAN,<br><br>    Defendants. | Case No.: 2:20-cv-04140-EK-AKT |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 3

    The Defendants ................................................................................................................ 3

    The First *Economic Times* Article .............................................................................. 4

    The Second *Economic Times* Article ........................................................................ 4

    The 2020 Form 20-F ...................................................................................................... 4

    The Company's Stock Price Is Historically Volatile ................................................ 5

    The Allegations ............................................................................................................... 5

ARGUMENT ........................................................................................................................... 6

I.      THE LEGAL STANDARDS APPLICABLE TO THIS REFORM ACT CASE .............. 6

II.    PLAINTIFF FAILS TO ALLEGE AN ACTIONABLE MISSTATEMENT OR OMISSION ......................................................................................................................... 8

    A.    Plaintiff Pleads No Facts Reflecting That the GPS Bundling Impacted the Bank's Financial Condition, Much Less Materially So .................................. 9

    B.    Plaintiff Pleads No Facts Reflecting the Bank's Internal Controls were Deficient or that Statements Regarding those Controls were False ...................... 12

             Internal Controls and SOX Certifications ............................................................ 12

             "Code of Ethics" and Similar Policies ................................................................. 15

    C.    The Statements Regarding Offering Products and Loans Are Not Actionable ............................................................................................................... 17

III.   PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER ................ 19

    A.    The Complaint Fails to Plead Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness ............................................................. 20

    B.    The Complaint Fails to Plead a "Motive and Opportunity" to Commit Fraud ........................................................................................................................ 22

C.      A Holistic Analysis Demonstrates That a Non-Fraudulent Explanation Is More Compelling ................................................................................................ 23

IV.    THE COMPLAINT FAILS TO STATE A VIOLATION OF SECTION 20(a) .............. 25

CONCLUSION ................................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995).................................................................................12, 22

*Alaska Elec. Pension Fund v. Adecco S.A.*,
371 F. Supp. 2d 1203 (S.D. Cal. 2005)......................................................................9

*Barrett v. PJT Partners, Inc.*,
No. 16-CV-2841 (VEC),
2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017)............................................................13

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................................................................................................10

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)......................................................................23

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
No. 11 Civ. 4665 (PGG),
2014 WL 4832321 (S.D.N.Y. Sept. 28, 2014).....................................................21, 24

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)................................................................................17, 19

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l, Inc.*,
967 F. Supp. 2d 771 (S.D.N.Y. 2013)......................................................................23

*Cohen v. Capital One Funding, LLC*,
No. 19-cv-3479 (KAM) (RLM),
2020 WL 5763766 (E.D.N.Y. Sept. 28, 2020) ...........................................................3

*Das v. Rio Tinto PLC*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018)..................................................................18, 19

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v.*
*JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)................................................................... *passim*

*Fries v. N. Oil & Gas, Inc.*,
285 F. Supp. 3d 706 (S.D.N.Y. 2018)......................................................................24

*Gamm v. Sanderson Farms, Inc.*,
944 F.3d 455 (2d Cir. 2019)......................................................................................7

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)......................................................................................5

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)..........................................................................21, 22

*In re Aceto Corp. Sec. Litig.*,
    No. 2:18-cv-2425-ERK-AYS,
    2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019).................................................................8, 21

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017)................................................................................14

*In re Braskem S.A. Sec. Litig.*,
    246 F. Supp. 3d 731 (S.D.N.Y. 2017)..................................................................13, 17, 19

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
    No. 16 Civ. 3495 (AT) (BCM),
    2017 WL 4049253 (S.D.N.Y. June 28, 2017),
    *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*,
    729 F. App'x 55 (2d Cir. 2018) ................................................................................ *passim*

*In re Duke Energy Corp. Sec. Litig.*,
    282 F. Supp. 2d 158 (S.D.N.Y. 2003),
    *aff'd*, 113 F. App'x 427 (2d Cir. 2004).............................................................................11

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..................................................................... *passim*

*In re Hain Celestial Grp. Inc. Sec. Litig.*,
    No. 2:16-cv-04581 (ADS) (SIL),
    2020 WL 1676762 (E.D.N.Y. Apr. 6, 2020) .....................................................8, 16, 22, 25

*In re Health Mgmt.. Sys., Inc. Sec. Litig.*,
    No. 97 CIV. 1865 (HB),
    1998 WL 283286 (S.D.N.Y. June 1, 1998) ......................................................................23

*In re Henry Schein, Inc. Sec. Litig.*,
    No. 18-CV-01428 (MKB),
    2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) .................................................................22

*In re KeySpan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..............................................................................21

*In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.*,
    448 F. Supp. 2d 466 (E.D.N.Y. 2006) ................................................................................7

*In re PetroChina Co. Ltd. Sec. Litig.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015),
    *aff'd sub nom. Klein v. PetroChina Co.*,
    644 F. App'x 13 (2d Cir. 2016) ..........................................................................12, 13, 14

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)................................................................................17

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020).................................................................................................20

*Janbay v. Canadian Solar, Inc.*,
　　No. 10 Civ. 4430 (RWS),
　　2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ...........................................................9, 10, 12

*Lentell v. Merrill Lynch & Co.*,
　　396 F.3d 161 (2d Cir. 2005)......................................................................................7

*Lucas v. Icahn*,
　　616 F. App'x 448 (2d Cir. 2015) ...............................................................................20

*Masters v. GlaxoSmithKline*,
　　271 F. App'x 46 (2d Cir. 2008) ...............................................................................12

*Matrixx Initiatives, Inc. v. Siracusano*,
　　563 U.S. 27 (2011).......................................................................................................18

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v.*
　　*MDC Partners, Inc.*,
　　No. 15 Civ. 6034 (RJS),
　　2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)......................................................23

*Noel v. Wal-Mart Stores, E. LP*,
　　764 F. App'x 17 (2d Cir. 2019) .................................................................................3

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
　　153 F. Supp. 3d 628 (S.D.N.Y. 2015)...................................................................24

*Ressler v. Liz Claiborne, Inc.*,
　　75 F. Supp. 2d. 43 (E.D.N.Y. 1998),
　　*aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*,
　　189 F.3d 460 (2d Cir. 1999)......................................................................................22

*Rex & Roberta Ling Living Trust u/a Dec. 6, 1990 v. B Commc'ns Ltd.*,
　　346 F. Supp. 3d 389 (S.D.N.Y. 2018)...................................................................14, 16

*Rombach v. Chang*,
　　355 F.3d 164 (2d Cir. 2004)....................................................................................7, 16, 25

*Salim v. Mobile Telesystems PJSC*,
　　No. 19-CV-1589 (AMD) (RLM),
　　2021 WL 796088 (E.D.N.Y. Mar. 1, 2021)............................................................21, 24

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
　　531 F.3d 190 (2d Cir. 2008)......................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　　551 U.S. 308 (2007)................................................................................. *passim*

*Ulbricht v. Ternium S.A.*,
　　No. 18-CV-6801 (PKC) (RLM),
　　2020 WL 5517313 (E.D.N.Y. Sept. 14, 2020) .....................................................13, 18, 19

*United States SBA v. Feinsod*,
　　347 F. Supp. 3d 147 (E.D.N.Y. 2018) .....................................................................3

*Wyche v. Advanced Drainage Sys., Inc.*,
    710 F. App'x 471 (2d Cir. 2017) ...............................................................................22

*Zhong Zheng v. Pingtan Marine Enter. Ltd.*,
    379 F. Supp. 3d 164 (E.D.N.Y. 2019) ...................................................................21

## STATUTES, RULES, AND REGULATIONS

15 U.S.C. § 78j(b) ...........................................................................................................6, 10, 25

15 U.S.C. § 78t(a) ...................................................................................................................6, 25

15 U.S.C. § 78u-4(a) *et seq.* .................................................................................... *passim*

15 U.S.C. § 78u-4(b)(1) .............................................................................................................7

15 U.S.C. § 78u-4(b)(2)(A)...............................................................................................1, 8, 19

15 U.S.C. § 78u-4(b)(3)(A)........................................................................................................8

Fed. R. Civ. P. 9(b) ...........................................................................................................7, 8, 9

Fed. R. Civ. P. 12(b)(6)..............................................................................................................3

17 C.F.R. § 240.10b-5 ..................................................................................................................6

17 C.F.R. § 240.10b-5(b) .........................................................................................................18

## MISCELLANEOUS

XE.com Current and Historical Exchange Rate Tables,
    https://www.xe.com/currencytables/?from =USD&date=2020-07-20 ..............................11

## PRELIMINARY STATEMENT

This is a securities fraud class action against HDFC Bank Limited ("HDFC" or the "Bank") and two individuals, HDFC's retired Managing Director, Aditya Puri, and its current Managing Director Sashidhar Jagdishan. The claim by Lead Plaintiff Meitav Dash Provident Funds and Pension Ltd. ("Plaintiff") is based on a July 13, 2020 report in a newspaper in India, *The Economic Times*. According to the report, unidentified employees in HDFC's auto loan department had improperly included the cost of GPS devices within an unspecified number of auto loans ("GPS bundling"). The Complaint pleads that the Bank announced in July 2020 that it had conducted "an internal inquiry," determined that "certain employees" in the auto loan group had engaged in "misconduct . . . in violation of our code of conduct," and taken "disciplinary action with respect to the employees involved, including separation of services of certain employees."[1]

Plaintiff's claim is that the *Economic Times* report revealed not only code of conduct violations by certain employees, but also securities fraud. But Plaintiff's complaint entirely fails to plead a violation of the securities laws. When Congress enacted the Private Securities Litigation Reform Act (the "Reform Act" or "PSLRA"), it significantly heightened the pleading requirements for a securities class action complaint. For this complaint to survive this motion, the Reform Act requires Plaintiff to plead with particularity *facts* showing that Defendants made a false statement *to investors*, and that the statement was material. Plaintiff also must plead facts giving rise to a "strong inference" that the Defendants acted with "scienter," "a mental state embracing [an] intent to deceive, manipulate, or defraud."[2] Plaintiff has not come close to satisfying either of the Reform

---

[1] *See* Amended Class Action Complaint (the "Complaint" or "AC"), ¶ 80. Exhibits cited herein ("Ex. __") are attached to the Declaration of Paul C. Gross in support of Defendants' Motion to Dismiss the Complaint.

[2] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318-19 (2007) (citation omitted); 15 U.S.C. § 78u-4(b)(2)(A).

1

Act's heightened pleading standards.

With respect to falsity, Plaintiff fails to allege that the GPS bundling rendered the Bank's financial statements materially false or misleading in any way. The Complaint does not identify any inaccurate financial results and instead reflects that the GPS bundling was immaterial to the Bank's financial results. The *Economic Times*, in an article incorporated by reference into the Complaint, described it as "minuscule," and minuscule it was. For example, even assuming that *every* GPS device was improperly bundled (which the Complaint does not allege), in FY20 the amount of improper gain would have been no more than 0.12% of the auto loans issued that year.[3] Unable to plead the GPS bundling materially impacted the Bank's financial condition, Plaintiff instead alleges that general statements about the Bank's internal controls – such as its Ethics Code, Whistleblower Policy, and certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") – were false because those controls did not prevent or earlier detect the GPS bundling. Courts universally reject this type of securities fraud allegation. Moreover, the Bank has approximately *117,000* employees. That some employees in one department engaged in some misconduct (in an amount immaterial to the Bank's financial statements) does not mean the controls were deficient or otherwise render the Bank's statements about them false.

Plaintiff also has failed to plead the required strong inference of scienter. Indeed, there is not a word in the Complaint suggesting that either Mr. Puri or Mr. Jagdishan (collectively, the "Individual Defendants") knowingly or recklessly issued a false statement. For example, Plaintiff pleads no facts suggesting the Individual Defendants were involved in the GPS bundling, or were even aware of it before the internal inquiry leading to disciplinary action against the wrongdoers.

---

[3] The Bank's fiscal year ends on March 31. Thus, its 2020 fiscal year ("FY20") ended on March 31, 2020, a few months before the end of the putative class period (July 31, 2015 – July 13, 2020; the "Class Period").

2

The investigation and disciplinary measures *negate* an inference of scienter. While the Complaint generally asserts that the Individual Defendants sold stock, it fails to specify any stock sales by date or amount – most likely because the bulk of those sales occurred after the Class Period and therefore do not give rise to a strong inference of scienter.

For these reasons, the Complaint should be dismissed.

## STATEMENT OF FACTS

**The Defendants**. HDFC is a bank organized under the laws of India that was incorporated in 1994 and is based in Mumbai, India. AC ¶¶ 2, 13. It provides banking and financial services to individuals and businesses in India, Bahrain, Hong Kong, and Dubai. *Id*. Mr. Puri served as its Managing Director for 26 years until he retired in October 2020. *Id*. ¶ 14. Mr. Jagdishan was its CFO prior to becoming Managing Director after Mr. Puri's retirement. *Id*. ¶ 15.

As of March 31, 2020, HDFC had 5,416 banking outlets, over 56 million customers, and approximately 117,000 employees. Ex. 1 at 4, 29.[4] It has multiple business segments, including "Treasury, Retail Banking, Wholesale Banking, [and] Other Banking Business" and offers "loans to millions of its retail borrowers, including personal and vehicle financing loans." AC ¶¶ 2, 19.

---

[4] As a foreign private issuer, HDFC is only required to make one filing annually with the Securities and Exchange Commission, on Form 20-F. In deciding this motion, the Court may properly consider "sources [that] courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Cohen v. Capital One Funding, LLC*, No. 19-cv-3479 (KAM) (RLM), 2020 WL 5763766, at *6, *8 (E.D.N.Y. Sept. 28, 2020) (quoting *Tellabs*, 551 U.S. at 322); *see Noel v. Wal-Mart Stores, E. LP*, 764 F. App'x 17, 19-20 (2d Cir. 2019) (court may consider on motion to dismiss the complaint together with "materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint") (citation omitted). "Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss." *Cohen*, 2020 WL 5763766, at *6. The Court also may consider documents filed with the SEC and documents plaintiff possessed or relied upon. *United States SBA v. Feinsod*, 347 F. Supp. 3d 147, 157 (E.D.N.Y. 2018).

Relevant to this case is the auto loan aspect of Retail Banking, which comprises only approximately 10% of the Bank's overall loan book.  *Id*. ¶¶ 2-3, 20.

The First *Economic Times* Article.  On July 13, 2020, *The Economic Times* published an article titled "HDFC Bank probes lending practices at vehicle unit."  AC ¶¶ 5, 73.  The article reported that the Bank had "conducted a probe into allegations of improper lending" in its "vehicle-financing operation" that "followed issues thrown up by an internal audit of the [B]ank's vehicle-dealer lending, as well as allegations of conflicts of interest in the purchase of [GPS] for vehicles financed by the [B]ank[.]"  *Id.* ¶ 73 (quoting first *Economic Times* article); Ex. 7.  The article reported that "[a]fter the investigation, [Ashok] Khanna [who had headed that unit] retired at the end of March in line with his contract[.]" Ex. 7; *see* AC ¶¶ 73-75.

The Second *Economic Times* Article.  The Complaint also cites to a July 20, 2020 *Economic Times* article titled "Car loan probe: HDFC Bank terminates half a dozen employees for violating the code of conduct."  AC ¶ 78; Ex. 8.  The article reported that the Bank "terminated at least six senior and mid-level executives after an internal probe revealed that they violated the code of conduct and governance standards by indulging in practices seen as corrupt[.]"  AC ¶ 78 (quoting second *Economic Times* article); Ex. 8.  These disciplinary actions "pertain[ed] to practices at the auto loans department where some staff allegedly forced customers to buy . . . GPS devices bundling it with the car loan," and that "some customers were not even aware of purchasing such a product till [sic] the loan documents were checked."  Ex. 8.  The article further reported the Bank sold only "4000-5000" GPS devices per month, "costing Rs 18,000-19,000" per device – a "minuscule portion of the bank[']s portfolio[.]"  *Id*.

The 2020 Form 20-F.  On July 31, 2020, the Bank filed its Form 20-F for FY20 and disclosed the following:

> In May 2020, following an internal inquiry we determined that certain employees received unauthorized commissions from a third-party vendor of GPS products, with whom we have an agreement to offer GPS devices to our auto loan customers. The personal misconduct of these employees is in violation of our code of conduct and governance standards and we have taken disciplinary action with respect to the employees involved, including separation of services of certain employees.

Ex. 1 at 41.  The Form 20-F reflects that auto loans are reported as a subset of "Total [R]etail [A]ssets."  *Id.* at 10.  In FY20, auto loans comprised only 13.3% of Total Retail Assets, and Total Retail Assets represented only 44.9% of Total Bank Assets.  *Id.* at 10, 74.  In other words, *all* auto loans represented only 10% of the Bank's overall loan book (AC ¶ 20) and less than 6% of its total assets.  Plaintiff does not allege the percentage of these auto loans that included improper GPS bundling, but admits that it was only a fraction (*id.* ¶¶ 23, 78).

**The Company's Stock Price Is Historically Volatile**.  HDFC's American Depositary Shares ("ADS") are traded on the New York Stock Exchange.  AC ¶ 10.  On Friday, July 10, 2020, the price for those securities closed at $48.39.[5]  Ex. 9.  On Monday, July 13, 2020, the price fell only 2.83%, or $1.37 per share, to close at $47.02.  *Id.* ¶ 76.  This is the loss Plaintiff seeks to recover.  *Id.* ¶¶ 76-77.  While Plaintiff alleges this dip was caused by the *Economic Times* report (*see id.*), similar price movements were not uncommon for HDFC's ADS.  For example, the closing price moved up or down by at least 3% between trading days more than 50 times in the year preceding the July 13 dip; on 25 days, it changed by 5% or more.  *See* Ex. 9.  Only five trading days after the July 13 dip that marks the end of the Class Period the price had more than recovered, closing at $51.51.  *Id.*  HDFC ADS trade at over $74 today.  *See id.*

**The Allegations**.  The Complaint primarily alleges that misconduct by rogue employees in one small corner of the Bank rendered false Defendants' statements about the Bank's internal

---

[5] *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) ("[T]he district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment.").

controls and SOX certifications, allegedly because the misconduct revealed that the Bank did not (according to Plaintiff) have "effective disclosure controls or procedures" or "effective internal controls[.]" *E.g.*, AC ¶¶ 4, 38, 44-45, 47. Plaintiff alleges each SOX certification signed by Defendants during the five-year Class Period is false because of the GPS bundling by auto loan department employees. *Id.* ¶¶ 38, 47, 55, 63, 72.[6] Plaintiff also alleges that Messrs. Puri and Jagdishan falsely certified they "[e]valuated the effectiveness of the company's disclosure controls and procedures[.]" *Id.* ¶¶ 30(c), 35, 44, 52, 60, 68.[7] Due to the foregoing, Plaintiff claims the Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5). *Id.* ¶¶ 1, 8.

## ARGUMENT

### I.     THE LEGAL STANDARDS APPLICABLE TO THIS REFORM ACT CASE

To state a claim under Section 10(b) and Rule 10b-5, Plaintiff must plead specific facts demonstrating that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (citation omitted).

---

[6] The challenged Forms 20-F are for the fiscal years ended March 31, 2015 (AC ¶ 30); March 31, 2016 (*id.* ¶ 39); March 31, 2017 (*id.* ¶ 48); March 31, 2018 (*id.* ¶ 56); and March 31, 2019 (*id.* ¶ 64).

[7] Plaintiff's allegations concerning certain innocuous statements about the offering of products and loans at fixed rates are discussed in Section II.C. Plaintiff ends the Complaint's "Substantive Allegations" section with two incidents of "regulatory attention" HDFC received in India after the Class Period. AC ¶¶ 81-83. One concerns "incidents of outages in internet banking/mobile banking/payment utilities . . . due to a power failure in the primary data center" (*id.* ¶ 82) and the other relates to a fine the Bank received in 2021 for violating "the regulator's interim directions when [the Bank] invoked securities pledged by [a] stockbroker" (*id.* ¶ 83). These paragraphs have absolutely nothing to do with the claims in this case. Plaintiff's effort to smear HDFC with purported "[o]ther [i]nstances of HDFC [m]isconduct [t]riggering [r]egulatory [a]ction" reflects the weakness of the securities fraud claims it has unsuccessfully attempted to plead.

6

The Reform Act, 15 U.S.C. §§ 78u-4(a) *et seq.*, applies here and imposes "strict" pleading requirements which are "applied 'assiduously.'"[8]  A "complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud."  *ECA*, 553 F.3d at 196.  As the Second Circuit has noted, the particularity requirements imposed by the Reform Act "comports with the stated intent and public policy rationale" to "deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 464 (2d Cir. 2019) (citation omitted); *see Tellabs*, 551 U.S. at 313 (noting Congress' concern that "if not adequately contained", securities fraud actions "can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law").

To plead falsity, "the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" 15 U.S.C. § 78u-4(b)(1).  Where, as here, a complaint is pleaded on information and belief (AC at 1), "the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *see also Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so"); *Gamm*, 944 F.3d at 462 ("Rule 9(b) and the PSLRA require a securities fraud complaint to . . . '(4) explain why the statements were fraudulent.'") (citation omitted).

Scienter refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (citation omitted).  A plaintiff must "state with particularity facts giving

---

[8] *See In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466, 477 (E.D.N.Y. 2006) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005)); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 366 (E.D.N.Y. 2013).

rise to a strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(A); *see Tellabs*, 551 U.S. at 314, 323-24.  The Reform Act's heightened requirements for scienter pleading go beyond Rule 9(b), which permits intent to be "alleged generally," and require the court to consider inferences favorable to the defendant.  *In re Aceto Corp. Sec. Litig.*, No. 2:18-cv-2425-ERK-AYS, 2019 WL 3606745, at *3, *8 (E.D.N.Y. Aug. 6, 2019); *Tellab*s, 551 U.S. at 321, 324 (explaining that the "'strong inference' standard 'unequivocally raise[d] the bar for pleading scienter'" (citation omitted) and "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.").  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *In re Hain Celestial Grp. Inc. Sec. Litig.*, No. 2:16-cv-04581 (ADS) (SIL), 2020 WL 1676762, at *8 (E.D.N.Y. Apr. 6, 2020) (same).

The Reform Act provides that a complaint not meeting these requirements "shall" be dismissed.  15 U.S.C. § 78u-4(b)(3)(A).

## II.    PLAINTIFF FAILS TO ALLEGE AN ACTIONABLE MISSTATEMENT OR OMISSION

The Complaint alleges an unspecified number of Bank employees bundled an unspecified number of GPS devices with an unspecified number of auto loans for an unspecified number of Bank customers, without those customers' consent.  AC ¶¶ 4-6, 23-26, 73-77, 80.  But this is not a consumer fraud case, and pleading employee misconduct is not the same as pleading securities fraud.  To plead *securities fraud*, Plaintiff must satisfy the Reform Act's high bar for pleading facts showing that Defendants made a materially false statement or omitted a material fact, and did so with scienter, in connection with the purchase or sale of securities.  *ECA*, 553 F.3d at 197.  Plaintiff has not come close to pleading such facts.

8

Plaintiff has pleaded no facts reflecting that the GPS bundling had any impact on the Bank's financial condition, let alone a material impact. Plaintiff also has pleaded nothing to suggest the Bank's internal controls were inadequate or that statements about those controls were misleading. The absence of these facts means Plaintiff has failed to satisfy the Reform Act's requirements for pleading a false statement.

**A.    Plaintiff Pleads No Facts Reflecting That the GPS Bundling Impacted the Bank's Financial Condition, Much Less Materially So**

Plaintiff contends that GPS bundling was "foreseeably likely to have a material negative impact on the Bank's financial condition" (AC ¶¶ 4, 38), but it pleads no facts reflecting such an impact. The Complaint alleges only that auto and commercial vehicle loans comprised more than a quarter of the Bank's "total retail assets" from 2015 through 2019 and that the "vehicle loan unit accounted for approximately 10% of HDFC Bank's loan book throughout the Class Period." *Id.* ¶ 20. But this tells nothing about the impact, if any, of the GPS bundling on the Bank's financial condition. Pleading the size of the *segment* is not a substitute for pleading how the alleged wrongdoing impacted that segment, as the Reform Act and Rule 9(b) require.[9]

Similarly, relying on the *Economic Times* article, the Complaint alleges that "errant employees started forcefully bundling [GPS devices] with car loans to meet sales targets[.]" AC ¶ 78 (quoting second *Economic Times* article); Ex. 8. But the Complaint fails to identify: (i) what

---

[9] *See Gentiva*, 932 F. Supp. 2d at 367 (plaintiff must plead "the materiality of the alleged overstatements in light of the defendant's total financial picture" as defendants are "entitled to be appraised of the approximate amount of overstatement involved") (citations omitted);; *see Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *4 (S.D.N.Y. Mar. 30, 2012) (plaintiffs must plead "'at the very least some level of detail about the improper accounting alleged to underlie misleading statements' such as 'the date of the transaction at issue, the amount of the allegedly overstated revenue . . . and a basis for believing the accounting may have been fraudulent'") (citation omitted); *see also Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203, 1214 & n.2 (S.D. Cal. 2005) (plaintiffs are required to plead that "accounting fraud was material to the company's overall financial condition"; plaintiff failed to plead "the amount of . . . revenue inflation" or quantify "the impact" on financial statements).

9

those "sales targets" purportedly were at any point during the five year Class Period; (ii) how the improper GPS sales caused those "sales targets" to be met; (iii) the total unauthorized GPS charges for the five year Class Period; or, most critically; and (iv) the materiality and impact, if any, on financial reporting at any time point.  Without such facts, the Complaint is simply inadequate. *E.g.*, *Janbay*, 2012 WL 1080306, at \*4.

Plaintiff's inability to plead facts demonstrating the GPS rendered the Bank's statements about its financial condition false is fatal to its claims.  So too is the Complaint's failure to plead that any impact the GPS bundling may have had on the Bank's financial condition was material. To state a 10(b) claim a "plaintiff must establish that the defendant . . . made a *materially* false statement or omitted a *material* fact" (citation omitted); "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly* altered the 'total mix' of information made available."  *ECA*, 553 F.3d at 197 (emphases added) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).  "The materiality of allegedly false financials may not be pled in a conclusory or general fashion; a complaint must contain allegations tending to demonstrate the materiality of the alleged overstatements *in light of the defendant's total financial picture*."  *Gentiva*, 932 F. Supp. 2d at 367 (emphasis added) (citation omitted).  This Complaint fails that test.

The news report on which the Complaint relies suggests any financial impact of the GPS bundling was trivial "in light of the [Bank's] total financial picture"; in fact, the July 20 *Economic Times* article described the amount to be "minuscule."  Ex. 8.  The July 20 *Economic Times* article (AC ¶ 78; Ex. 8) refers to the total costs of the "4000-5000" GPS devices sold per month – *not just the ones that customers did not authorize* – in the amount of "Rs 18,000-19,000" monthly.  *Id.*  Giving Plaintiff the benefit of the doubt – that the *higher amount* was sold (5000

devices sold monthly for a total of 19,000 INR per month according to the *Economic Times*) – and that *all* of the devices sold were *unauthorized* (contrary to the Complaint's allegations), and for purposes of this motion only, the annual cost of bundled GPS devices is approximately $15,200,000 USD.[10]  Accordingly, assuming based on the July 20 *Economic Times* article on which Plaintiff relies that 5000 devices were sold monthly for 19,000 INR each in FY20, bundled GPS devices represented a mere one-tenth of one percent (0.12%) of the Bank's Total Auto Loans and less than *two-one-hundredths of one percent (0.016%)* of Total Retail Assets (which are, in turn, less than half of the Bank's Total Assets, *see* p. 5, *supra*).  *See* Ex. 1 at 10.  These comparisons persisted throughout the Class Period.[11]

These trivial amounts represent an even more minute fraction than what courts repeatedly have held to be immaterial as a matter of law.  *See ECA*, 553 F.3d at 203-04 (affirming dismissal where despite mischaracterization of transactions to conceal a transaction involving collaboration with Enron, "[c]hanging the accounting treatment of approximately 0.3% of JPM Chase's total assets from trades to loans would not have been material to investors" (citation omitted); and acknowledging "alleged misrepresentation relating to less than two percent of defendant's assets . . . could be immaterial as a matter of law").[12]  The small temporary drop in HDFC's stock

---

[10] Assuming an exchange rate of 74.8 INR/USD, the published rate of exchange on July 20, 2020, the date of the *Economic Times* article setting forth the value of bundled GPS devices.  *See* XE.com Current and Historical Exchange Rate Tables, https://www.xe.com/currencytables/?from =USD&date=2020-07-20.  The calculation of estimated annual cost of GPS devices assumes, for purposes of this motion only, the accuracy of allegations reported in the July 20, 2020 *Economic Times* article, which Plaintiff incorporates by reference into the Complaint. Ex. 8; AC ¶ 78.  As with all allegations in the Complaint, the Bank's assumption of their truth for the purposes of this motion is not, and should not be construed as, an admission of their accuracy for any other purpose.

[11] *See* Exs. 1 at 10; 2 at 10; 3 at 10; 4 at 9; 5 at 9; 6 at 9.

[12] *See In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 161-62 (S.D.N.Y. 2003) ("The undisputed portions of the Company's financial statements referenced in the Complaint establish that an inflation of $217 million in the Company's revenues . . . amounts to about *0.3% of . . .* total revenues for that period – an immaterial percentage as a matter of law [and] minuscule") (emphasis

price (AC ¶ 76) also suggests that investors viewed the GPS bundling as immaterial.

**B.      Plaintiff Pleads No Facts Reflecting the Bank's Internal Controls were Deficient or that Statements Regarding those Controls were False**

Because Plaintiff cannot plead a material impact on the Bank's financial condition, it is forced to rely on allegations that the GPS bundling by rogue employees means various statements about the effectiveness of the Bank's internal controls were false.  None of the statements Plaintiff challenges is actionable.

**Internal Controls and SOX Certifications**.  Plaintiff alleges the Bank "did not have effective disclosure controls or procedures" or "effective internal controls" (AC ¶¶ 4, 38, 47, 55, 63, 72) and therefore the Individual Defendants' SOX certifications in each Form 20-F for FY15 through FY20 regarding those controls were false (*id.* ¶¶ 30, 35, 39, 44, 48, 52, 56, 60, 64, 68).[13] As an initial matter, this conclusory allegation is not supported by pleaded facts.  *See In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359-60 (S.D.N.Y. 2015) (dismissing claim arising from bribery scheme as complaint did not identify defects in controls over financial reporting or "how or why . . . controls were inadequate" and "[t]herefore, Plaintiffs have not

---

added), *aff'd*, 113 F. App'x 427 (2d Cir. 2004); *Janbay*, 2012 WL 1080306, at *7 ("[T]he $5.76 million Sunvalley sale, which constituted only 0.9% of CSI's 2009 revenue and 2.7% of its 3Q09 sales, is immaterial as a matter of law."); *Masters v. GlaxoSmithKline*, 271 F. App'x 46, 50-51 (2d Cir. 2008) (holding that potential loss of 3% of revenue concealed by alleged misstatements was immaterial because it did not "threaten the commercial viability" or "pose a significant risk to the total future earnings"); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 51-52 (2d Cir. 1995) (finding that alleged misstatements were immaterial as a matter of law, in part because they affected "less than 1% of IMCERA's total sales").

[13] *See also* AC ¶¶ 30, 36-37, 45, 51, 53, 59, 61, 69 (each certification purportedly falsely stated that: "[b]ased on [signer's] knowledge, the financial statements . . . fairly present in all material respects the financial condition, results of operations and cash flows"; "internal control[s] over financial reporting [were] designed" to "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements . . . in accordance with generally accepted accounting principles"; and falsely "[e]valuated the effectiveness of the company's disclosure controls and procedures").

established that the Company's statements concerning its internal control over financial reporting were false"), *aff'd sub nom. Klein v. PetroChina Co.*, 644 F. App'x 13 (2d Cir. 2016). Plaintiff does not identify any specific controls that allegedly failed, or "how or why [any particular] controls were inadequate." Further, each Form 20-F included the certification from HDFC's independent registered accounting firm that it performed an audit and concluded internal controls over financial reporting were effective; Plaintiff does not allege how the auditors got it wrong. *See, e.g.*, Ex. 6 at 122, 171 and Ex. 1 at 193.[14]

Plaintiff alleges that the Individual Defendants' SOX certifications falsely stated that they had "[e]valuated the effectiveness of the company's disclosure controls and procedures" and found those controls sufficient. AC ¶ 30. The Complaint pleads no facts, however, reflecting that the evaluations described in the certifications were not performed.[15] Further, a SOX certification is not a certification of compliance by all personnel with all appliable laws. *See Ulbricht v. Ternium*

---

[14] *See PetroChina*, 120 F. Supp. 3d at 359 (notwithstanding that company officials had engaged in bribery, there was no "claim that PetroChina failed to evaluate its internal controls or disclose any weaknesses to its auditors", "that the certifying officers neglected to inform PetroChina's auditor of any relevant fraud", that PetroChina had "flawed internal controls over *financial reporting*" or any explanation "how or why PetroChina's internal controls were inadequate"; thus, complaint failed to establish that company's statement about adequate internal controls was false); *Gentiva*, 932 F. Supp. 2d at 370-71 ("The Plaintiff has not alleged any facts pertaining to the Company's internal structure for financial reporting, much less that [Gentiva] lacked adequate internal controls . . . [nor does] the Plaintiff . . . challenge the Defendants' accounting in any of the SEC filings.") (citation omitted); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 758 (S.D.N.Y. 2017) ("[Complaint] lacks any concrete factual allegations that Braskem had deficient internal controls governing its financial reporting.").

[15] *See Gentiva*, 932 F. Supp. 2d at 370-71 (no facts that actions identified in certifications were not in fact undertaken; "'lack of controls . . . [are] conclusory . . . without any factual support'" and "cannot survive this motion to dismiss") (citation omitted); *Barrett v. PJT Partners, Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at *6 (S.D.N.Y. Sept. 8, 2017) (fact that "rogue employees" defrauded investors does not show the falsity of statements in SOX certifications that controls were evaluated and shown effective and that there was no awareness of material weakness in internal controls); *Braskem*, 246 F. Supp. 3d at 757-58 (rejecting allegations based on false SOX certifications where "allegations as to the company's deficient financial controls and accounting were wholly conclusory").

13

*S.A.*, No. 18-CV-6801 (PKC) (RLM), 2020 WL 5517313, at \*11 (E.D.N.Y. Sept. 14, 2020) (finding "no false statement claim" based on SOX certifications where the alleged fraud did not involve management); *see also PetroChina*, 120 F. Supp. 3d at 359.  Nor could it be in a company with 117,000 employees.  Indeed, *the Bank expressly warned investors that* "*internal control over financial reporting may not prevent or detect misstatements*."  Exs. 1 at 133; 2 at 133; 3 at 133; 4 at 132; 5 at 124; 6 at 121 (emphasis added).

It also is not enough to allege, as Plaintiff does here, that controls were ineffective because the GPS bundling misconduct – which, at most, impacted only a small slice of the auto loan business that itself was only 10% of the Bank's overall loan business (AC ¶¶ 20, 23) – was not discovered earlier.  *Id.* ¶¶ 4, 38.  In fact, Courts expressly reject reliance on hindsight to plead ineffective controls or misleading SOX certifications.  *See Rex & Roberta Ling Living Trust u/a Dec. 6, 1990 v. B Commc'ns Ltd.*, 346 F. Supp. 3d 389, 405 (S.D.N.Y. 2018) (rejecting allegations that "controls must have been deficient because they may have failed to detect some weaknesses in its financial reports or disclosures" where company did not "purport to guarantee that [the] controls will perform perfectly in every instance but instead speak to reasonable assurance or reasonable certainty") (citation omitted).[16]  *In re Deutsche Bank Aktiengesellschaft Securities Litigation* is instructive.  That bank had a history of noncompliance with anti-money laundering policies and procedures, leading to agreements with government regulators.  No. 16 Civ. 3495 (AT) (BCM), 2017 WL 4049253, at \*2 (S.D.N.Y. June 28, 2017), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018).  The bank stated it had

---

[16] *See also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 648 (S.D.N.Y. 2017) (explaining that SOX certifications not actionable and "allegations that those [internal] controls must have been deficient because they may have failed to detect some weaknesses in its financial reports or disclosures in some instances, are not sufficient").

"significantly strengthened its internal controls to prevent exactly the type of money laundering" that was contemporaneously occurring in Russia while allegedly failing to disclose "serious and systemic failings in their systems and controls against money laundering[.]" *Id*. at *3. The court rejected allegations the SOX certifications were false. *Id.* at *5-6. The Court found that Plaintiff "allege[d] neither facts showing that the descriptions of the processes were false or misleading at the time they were included in the public statements, nor facts showing that the processes were not followed." *Id*. at *7 (citation omitted). The same is true here.

**"Code of Ethics" and Similar Policies**. Plaintiff alleges each of the Bank's Forms 20-F during the class period "assured investors that the Company had policies and procedures in place – including a Code of Ethics, a whistleblower policy, a Fraud Monitoring Committee, and internal controls – to prevent and uncover fraud." AC ¶ 3.[17] Plaintiff alleges the GPS bundling made these statements false and misleading. *See, e.g.*, *id.* ¶¶ 21, 30, 35-38. These allegations fail for several reasons.

*First*, and perhaps most importantly, Plaintiff cites no representation by Defendants that "assured investors" that the Bank's "policies and procedures" would "prevent and uncover fraud." AC ¶ 3. Far from it – *the Forms 20-F said the opposite:*

> Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness for future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

---

[17] *See* AC ¶ 43 (Bank maintains an internal audit department to provide "independent assurance of the effectiveness of governance, risk management and internal controls"); *id.* ¶ 37 (Bank maintains Code of Ethics and a whistleblower policy encouraging reporting of "questionable accounting matters or any fraudulent financial information" and prohibiting "retaliation"); *id.* ¶ 21 (Bank maintains Fraud Monitoring Committee "exclusively dedicated to the monitoring and following up of cases of fraud" involving amounts of Rs. 10 million and above); *id.* ¶¶ 39-47 (2016 Form 20-F); *id.* ¶¶ 48-55 (2017 Form 20-F); *id.* ¶¶ 56-63 (2018 Form 20-F); *id.* ¶¶ 64-72 (2019 Form 20-F).

15

Ex. 3 at 133.[18]  This is not surprising; as noted above, it would be impossible to guarantee investors that potential employee conduct issues could never occur in a company with 117,000 employees and 5,416 outlets.

*Second*, while the Complaint contains lengthy block quotes from the Forms 20-F (*e.g.*, AC ¶¶ 30, 35, 37), it simply pronounces the block-quoted statements false without any effort to show *how* they were false.[19]  Courts routinely reject such conclusory pleading lacking in specificity. *Rombach*, 355 F.3d at 174 (a complaint "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so").  *See also Deutsche Bank*, 2017 WL 4049253, at *5 (rejecting "large block quotations taken directly from [the bank's] annual reports [and] codes of ethics" and conclusory, non-specific assertions that they were "falsely made", which were repeated multiple times in the complaint to "cover all of the allegedly material misrepresentations"; noting this manner of pleading has been "squarely rejected" by the Second Circuit) (citation omitted).

*Third*, in this Circuit statements about the mere existence and purpose of internal controls, including ethics and integrity policies, are "aspirational" – but *not actionable*.  *See ECA*, 553 F.3d at 205-06 (bank's statements about its "'highly disciplined' risk management" and "reputation for integrity'" are "no more than 'puffery' which does not give rise to securities violations" and *did*

---

[18] Exs. 1 at 133; 2 at 133; 4 at 132; 5 at 124; 6 at 121; *see Hain*, 2020 WL 1676762, at *11 (noting the court need not accept allegations that are contradicted by documents cited); *Rex & Roberta*, 346 F. Supp. 3d at 404-05 (despite criminal investigation of controlling shareholder's use of insider information, Code of Ethics statement that "employees 'must comply with all applicable laws and regulations' and 'are expected to observe high standards of business and personal ethics'" makes "'no guarantees that the code [will] be followed,'" and contains no "'representations of historical compliance'") (citation omitted).

[19] *See* AC ¶ 38 (statements in 2015 20-F were false and misleading because "the Company did not have effective disclosure controls or procedures"; "did not have effective internal controls"; Committee did not "operate[] effectively to prevent or uncover fraud"; "did not adhere to the . . . Code of Ethics"; whistleblower policy "did not operate effectively").

not "*amount to a guarantee that its choices would prevent failures in its risk management practices*") (emphasis added); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) ("[S]tatements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery'" and "explicitly aspirational, with qualifiers such as . . .'should.'").[20]

## C.   The Statements Regarding Offering Products and Loans Are Not Actionable

Plaintiff also challenges two innocuous statements from the Bank's Forms 20-F for the years 2015 through 2018:

> "We seek to establish a relationship with a retail customer and then expand it by offering more products.  As part of our growth strategy we continue to expand our distribution channels so as to make it easier for the customer to do business with us."  AC ¶¶ 31, 40; Exs. 5-6.

> "We offer loans at fixed interest rates for financing new and used automobile purchases.  In addition to our general marketing efforts for retail loans, we market this product through our relationships with car dealers, direct sales agents, corporate packages and joint promotion programs with automobile manufacturers."  AC ¶¶ 32, 41, 49, 57; Exs. 3-6.

The most recent of these statements was published on July 25, 2018 – nearly *two years* before the *Economic Times* article that ends the Class Period.  *See* AC ¶¶ 56-57.  Plaintiff pleads

---

[20] *See Braskem*, 246 F. Supp. 3d at 741-42, 748, 754-55 (despite long-running criminal bribery scheme, investigations, prosecutions, and imposition of a prison sentence for a significant stakeholder, and 20% stock drop, statements regarding the code of ethics and standards of conduct, including commitment to "integrity," "compliance with the laws," and "fundamental values such as transparency [and] ethics" were "inherently aspirational," "inactionable," "immaterial puffery", and insufficiently specific for an investor to rely upon) (citations omitted); *Gentiva*, 932 F. Supp. 2d at 370-71 (finding statements "that the compliance program was 'robust' or 'best-of-class' and that the company's financial reporting was 'very conservative' . . . constitute corporate puffery rather than actionable misrepresentations") (citation omitted); *Deutsche Bank*, 2017 WL 4049253, at *6 ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them'") (citation omitted); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 401 (S.D.N.Y. 2016) (statements about corporate integrity and legal compliance are puffery and "too general to cause a reasonable investor to rely on them").

no facts from that time period demonstrating these statements were false when made, as the Reform Act requires. Nor does Plaintiff allege that the Bank did *not* want to establish a relationship with retail customers; did *not* want to expand that relationship by offering more products; did *not* want to make it easier for the customer to do business; or did *not* want to offer loans at fixed interest rates or market its relationships with car dealers, etc.

Instead, Plaintiff appears to allege these statements were misleading because they did not disclose the GPS bundling misconduct. According to the Complaint, the phrase "offering more products" necessarily was referring to GPS devices that were "forcibly bundled into automobile loans, often without the borrowers' knowledge[.]" AC ¶ 31. And, the statement about "offer[ing] loans at fixed interest rates" allegedly was "specific to HDFC Bank's vehicle financing business that did not reveal these [GPS bundling] practices[.]" *Id*. ¶ 32. These allegations make no sense. On their face, the statements about "offering more products" or "offer[ing] loans" made no reference to GPS devices, to charging customers for GPS devices, or to income obtained from those devices. The Complaint pleads no facts supporting Plaintiff's irrational interpretation of these sentences.

Moreover, an omission is actionable only when disclosure is "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading[.]'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). Thus, "[r]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as what was revealed would not be so incomplete as to mislead." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 808 (S.D.N.Y. 2018) (citation omitted); *see also Ulbricht*, 2020 WL 5517313, at *7. The offering of "products" or "loans" statements did not make any reference to GPS devices in general; did not suggest that no bundling had occurred or that income was attributable to GPS

18

devices; and did not deny that GPS bundling occurred. *See Ulbricht*, 2020 WL 5517313, at *8 (finding no "obligation to disclose the bribery scheme" where the defendants' statements do not "attribut[e] [the Transaction's] success to a particular cause") (citation omitted); *Braskem*, 246 F. Supp. 3d at 756; *see also Das*, 332 F. Supp. 3d at 808 (where defendants did not attribute their success in obtaining mining contracts to any particular cause, "Defendants did not 'have a freestanding legal duty to disclose the bribery scandal, no matter how unseemly the scandal was and no matter how significant the scandal would have been to the market'") (quoting *Braskem*). Thus, these innocuous statements were not false for failing to disclose the alleged existence of the GPS bundling misconduct.[21]

## III.    PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER

The Complaint's failure to plead specific facts giving rise to the required strong inference of scienter is an independent basis for dismissal. To survive a motion to dismiss, a securities fraud plaintiff must plead "with particularity" and, "with respect to each act or omission alleged to violate" the securities laws, "facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-

---

[21] Nor did the Bank have a standalone obligation to disclose the misconduct at the time it discovered the issue and launched the investigation. It is well established that companies do not have a duty "to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac*, 752 F.3d at 184 (citation omitted). Courts follow this jurisprudence even where, *unlike here*, large scale wrongdoing has occurred. *See Deutsche Bank*, 2017 WL 4049253, at *2, *8 (notwithstanding facilitating "thousands of transactions that resulted in money being laundered out of Russia," a "company is not obligated to disclose uncharged illegal conduct even as it discloses 'assertions about integrity and transparency' and 'statements about regulatory investigations'") (citation omitted); *Braskem*, 246 F. Supp. 3d at 742, 752 (rejecting reliance on the code's anti-bribery prohibitions to allege an actionable statement notwithstanding a "multibillion dollar money laundering and corruption scandal"; where "undisclosed corporate malfeasance" is alleged, disclosure is not required "except where doing so was necessary to prevent the corporation's *other* statements from being misleading"); *see also Ulbricht*, 2020 WL 5517313, at *2, *8 (despite "numerous" arrests as part of "large-scale bribery investigation", company's statements about its subsidiary's sale to the Venezuelan government "d[id] not create a duty to disclose the alleged bribe[s]" given by the company to government officials to reach favorable sale terms).

4(b)(2)(A); *Lucas v. Icahn*, 616 F. App'x 448, 450 (2d Cir. 2015) (scienter allegations "must give rise to a strong inference of fraudulent intent") (citation omitted). In this Circuit, a plaintiff may plead scienter either by (1) alleging that a defendant had the motive and opportunity to commit fraud or (2) producing "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198.

Plaintiff has not sufficiently pleaded either aspect of this test. Indeed, the Complaint contains no allegations regarding the Individual Defendants' state of mind or knowledge of the employee misconduct. It does not even include the "Facts Demonstrating Scienter" section commonly found in securities fraud complaints. The absence of facts giving rise to the required strong inference of scienter dooms this Complaint.[22]

## A. The Complaint Fails to Plead Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

In an attempt to plead scienter, it is common for securities class action complaints to include allegations and references to documents or "confidential witnesses". Here, Plaintiff does not even try. The Complaint simply fails to identify any internal documents or witness statements suggesting that either Individual Defendant knew about the GPS bundling prior to the internal investigation. The sole confidential witness ("CW") – mentioned in a single sentence – does not mention either Individual Defendant, let alone provide facts giving rise to strong inference of scienter. AC ¶ 23.[23] Plaintiff does not plead a single fact suggesting the Individual Defendants

---

[22] Because Plaintiff fails to allege scienter as to Defendants Puri and Jagdishan, Plaintiff also fails to allege scienter as to HDFC. *See Jackson v. Abernathy*, 960 F.3d 94, 98-99 (2d Cir. 2020); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

[23] The CW does not even claim knowledge of improper GPS bundling. The CW makes only the unremarkable allegation that "a sales manager for used cars employed by HDFC Bank and based out of Jabalpur from July 2016 until December 2018, confirmed receiving instructions from superiors to pitch GPS devices to customers and further confirmed that these superiors made clear

20

participated in the GPS bundling misconduct.  To the contrary, the Complaint alleges that upon learning of the GPS bundling, the Bank "conducted an internal investigation" and disciplined wrongdoers.  *Id.* ¶¶ 24, 80.  Plaintiff offers no explanation why Messrs. Puri and Jagdishan – the purported securities fraudsters – would cause the Bank to investigate the GPS bundling if they were involved in the rogue employees' scheme.  This fact alone *negates* scienter.[24]

The only "circumstantial evidence" pleaded is the Individual Defendants' "positions" and "access to material information."  AC ¶ 17.  Such allegations are wholly insufficient to allege scienter.  *See In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 387 (E.D.N.Y. 2003) ("[M]ere allegations defendants were senior executives and [thus had] access to inside information [is] insufficient" to establish scienter).  Scienter also may not be inferred from the mere fact that the Individual Defendants signed the SOX certifications.  *Aceto*, 2019 WL 3606745, at *8 (signing of SOX certification, without more, is insufficient in absence of "facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements") (citation omitted).[25]

---

the Company would use the GPS devices to aid in loan collections efforts."  AC ¶ 23.  This type of allegation is plainly insufficient to establish scienter.  *See Gentiva*, 932 F. Supp. 2d at 379 ("In sum, 'even confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants claimed against in the case, or else that the witness was privy to the individual defendants' knowledge.'" (quoting *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011))).

[24] *See Salim v. Mobile Telesystems PJSC*, No. 19-CV-1589 (AMD) (RLM), 2021 WL 796088, at *14 (E.D.N.Y. Mar. 1, 2021) ("[T]he fact that [MTS] commenced an internal investigation tends to undermine any inference of scienter.") (citation omitted); *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11 Civ. 4665 (PGG), 2014 WL 4832321, at *23-24 (S.D.N.Y. Sept. 28, 2014) (that company conducted an internal investigation of bribes in violation of the Foreign Corrupt Practices Act, engaged outside counsel, voluntarily informed DOJ and SEC, suspended employees, and terminated CFO "tends to undermine any inference of scienter").

[25] *See Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019) ("[C]ourts in this circuit regularly hold that the signing of a SOX certification, without more, is insufficient to plead scienter.").

**B.      The Complaint Fails to Plead a "Motive and Opportunity" to Commit Fraud**

To plead motive and opportunity, a plaintiff must allege that defendants "benefitted in some concrete and personal way from the purported fraud[.]" *ECA*, 553 F.3d at 198 (citation omitted). Although it never says so directly, the Complaint appears to suggest that the Individual Defendants benefited by selling HDFC ADS while the GPS bundling misconduct was ongoing.  AC ¶¶ 28-29. Plaintiff's "stock sales" allegations do not come close to satisfying the Second Circuit's pleading standards. *See Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d. 43, 58 (E.D.N.Y. 1998) ("The mere fact that insider stock sales occurred does not suffice to establish scienter.") (citation omitted), *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999).

To support a strong inference of scienter, a defendant's stock sales must be "unusual" in "timing" and "percentage of shares sold[.]" *Wyche v. Advanced Drainage Sys., Inc.*, 710 F. App'x 471, 473 (2d Cir. 2017) (citing *Acito*, 47 F.3d at 54).  When considering whether specific stock sales are unusual, courts consider the amount of net profits realized; percent of holdings sold; change in volume of sales; whether sales occurred soon after defendants made knowingly misleading statements; whether sales occurred shortly before corrective disclosure; and whether sales are made pursuant to trading plans. *In re Henry Schein, Inc. Sec. Litig.*, No. 18-CV-01428 (MKB), 2019 WL 8638851, at *20 (E.D.N.Y. Sept. 27, 2019); *see Hain*, 2020 WL 1676762, at *16.  This Court cannot undertake the required analysis because *none* of this information is pleaded in the Complaint.  Plaintiff provides no specific dates for any sale or any information to facilitate a comparison of the sales to the value of the holdings that the Individual Defendants retained during the Class Period. *See Gentiva*, 932 F. Supp. 2d at 381; *see also Glaser*, 772 F. Supp. 2d at 587 (no scienter where plaintiff fails to allege overall percentage changes in defendants' holdings).  The absence of this information renders Plaintiff's stock sales allegations meaningless.

22

While lacking the facts the Second Circuit requires, the Complaint does allege that Mr. Puri received $22 million and Mr. Jagdishan received $5.6 million from sales of HDFC ADS "[d]uring the Class Period." AC ¶¶ 28-29. But the Class Period is five years long. *Id.* ¶ 1. Plaintiff fails to plead the dates of these sales or even whether the sales were before or after the GPS bundling misconduct was discovered. Plaintiff also alleges that "in July 2020, the same month in which Defendants' fraud . . . came to light, Defendant Puri sold 95% of his equity stake in the Company[.]" *Id.* ¶¶ 28-29. Plaintiff does not allege whether this "July 2020" sale was before or after the *Economic Times* article on July 13 that ends the Class Period. *Id.* This hole in the Complaint is significant because stock sales after the so-called "truth" is revealed are not suspicious or supportive of scienter.[26] Additionally, a July sale by Mr. Puri would be only a few months before his retirement from the Bank. *Id.* ¶ 6. Such sales are not inherently suspicious, and do not raise a strong inference of scienter.[27]

## C.   A Holistic Analysis Demonstrates That a Non-Fraudulent Explanation Is More Compelling

The Court must assess Plaintiff's scienter allegations not only individually but also "holistically," taking "into account plausible opposing inferences" that could weigh against a

---

[26] *See N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, No. 15 Civ. 6034 (RJS), 2016 WL 5794774, at *19-20 n.9 (S.D.N.Y. Sept. 30, 2016) (sale of 1.842 million shares after revelation of alleged fraud "cuts against an inference that [defendant] sold stock illegally during the Class Period").

[27] *See Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 412 (S.D.N.Y. 2020) ("[T]hat a CEO upon retiring from his position would choose to sell some of his shares is not inherently suspicious."); *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l, Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013) (founder and former chairman's liquidation of most of his shares not suspicious; "compelling, non-culpable explanation" was his retirement); *In re Health Mgmt.. Sys., Inc. Sec. Litig.*, No. 97 CIV. 1865 (HB), 1998 WL 283286, at *6 n.3 (S.D.N.Y. June 1, 1998) (no inference of scienter where defendant sold 81.9% of his holdings "most likely on account of the fact that he resigned" and "was divesting himself of his shares").

finding of scienter.  *Tellabs*, 551 U.S. at 326, 336.[28]  Here, a holistic review and the "plausible opposing inferences" undermines the required strong inference of scienter.

As explained herein, there are no facts pleaded showing the Individual Defendants' participation in the GPS bundling, an activity that was immaterial to the Bank's financial statements by any measure.  The challenged statements are innocuous and aspirational.  And, the Complaint pleads that when alerted, Defendants commenced an investigation and the wrongdoers were disciplined and terminated.  AC ¶ 25 ("HDFC Bank forced Ashok Khanna . . . to retire in March 2020."); ¶ 78 (Bank "terminated at least six senior and mid-level executives after an internal probe revealed that they violated the code of conduct and governance standards") (quoting second *Economic Times* article) (Ex. 8); ¶ 80 ("[W]e have taken disciplinary action with respect to the employees involved, including separation of services of certain employees.").  These facts *negate* scienter.  *See Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 722 (S.D.N.Y. 2018) (that company terminated founder and CEO upon his receipt of Wells Notice and commenced investigation "undermines scienter").[29]

Given these *pleaded* facts, the non-fraudulent explanation is more compelling than Plaintiff's theory of securities fraud.  The more plausible inference here is that misconduct by some bad actors in one corner of a massive international bank went undetected for a period of time –

---

[28] *See Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 653 (S.D.N.Y. 2015) (the "court should examine all of the facts alleged collectively or 'holistically' (without parsing individual allegations), and take into account any inference concerning scienter – supporting *or opposing* – which can be drawn from the complaint. . . . [T]he critical inquiry is: [w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference? . . . If not, the case may be dismissed.") (emphasis added) (citations omitted); *see also ECA*, 553 F.3d at 198.

[29] *See City of Brockton*, 2014 WL 4832321, at *33 ("[T]hat Avon announced that it was commencing an internal investigation . . . *supports an inference that Defendants had not been aware of inadequacies* in Avon's compliance programs before learning of the potential violations.") (emphasis added); *Salim*, 2021 WL 796088, at *14 (same).

without the Individual Defendants' knowledge and with an immaterial impact on the Bank's financial condition – and was addressed swiftly and appropriately when discovered. Those facts do not support a securities fraud claim.

## IV.    THE COMPLAINT FAILS TO STATE A VIOLATION OF SECTION 20(a)

Because Plaintiff fails to state a primary violation under Section 10(b), the Complaint "cannot establish control person liability under Section 20(a)" and therefore the Section 20(a) claim also must be dismissed. *Gentiva*, 932 F. Supp. 2d at 390; *Hain*, 2020 WL 1676762, at *17 (citing *Rombach*, 355 F.3d at 177-78).

## CONCLUSION

For the reasons stated, the Complaint should be dismissed.

Dated: April 9, 2021                         Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*s/ Caz Hashemi*
Caz Hashemi (admitted *pro hac vice*)
Rodney G. Strickland, Jr. (admitted *pro hac vice*)
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300
Facsimile: (650) 493-6811
chashemi@wsgr.com
rstrickland@wsgr.com

Sheryl Shapiro Bassin
Paul C. Gross
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
sbassin@wsgr.com
pgross@wsgr.com

*Counsel for Defendants HDFC Bank Limited, Aditya Puri, and Sashidhar Jagdishan*

25