UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ASHMI VIG ARORA, Individually and On Behalf of All Others Similarly Situated, <br><br>                           Plaintiff, <br><br>         v. <br><br> HDFC BANK LIMITED, ADITYA PURI, AND SASHIDHAR JAGDISHAN, <br><br>                     Defendants. | Case No. 2:20-cv-4140-EK-AKT |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 2

ARGUMENT ........................................................................................................................ 9

   I.   Applicable Standards .................................................................................................... 9

   II.  The Complaint Adequately Alleges Falsity .................................................................. 10

      A.  The Complaint Adequately Alleges Materiality ........................................................... 11

      B.  Defendants' Statements Regarding Their Vehicle Financing Business and Growth Strategies Misled Investors and are Actionable. ..................................................... 14

      C.  Defendants' SOX Certifications and Statements Regarding the Effectiveness of Internal Controls Misled Investors and are Actionable ................................................... 15

      D.  Defendants' Statements Regarding the Fraud Monitoring Committee, Internal Audit Department, Code of Ethics, and Whistleblower Policies Collectively Misled Investors and are Actionable ................................................................................................. 17

   III.  The Complaint Adequately Alleges Scienter ................................................................ 18

      A.  The Complaint Adequately Alleges Defendants' Recklessness ................................... 19

      B.  The Complaint Adequately Alleges Corporate Scienter ............................................. 24

      C.  The Complaint Adequately Alleges Defendants' Motive ........................................... 25

   IV. CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................................9, 19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................................9, 19

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)............................................................................25

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)...........................................................................................13

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010).......................................................................11, 17

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000).......................................................................................13, 14

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16CIV3495ATBCM,
    2017 WL 4049253 (S.D.N.Y. June 28, 2017) ..............................................................17

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017).............................................................................21

*In re Forest Labs. Sec. Litig.*, No. 05-cv-2827 (RMB),
    2006 WL 5616712 (S.D.N.Y. July 21, 2006) ...............................................................19

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 353 (E.D.N.Y. 2013) ...........................................................................21

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009)............................................................................24

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003)..............................................................................9

*In re NTL, Inc. Sec. Litig.*,
    347 F. Supp. 2d 15 (S.D.N.Y 2004)................................................................................18

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)........................................................................16, 17

*In re Sadia, S.A. Sec. Litig.*,
  643 F. Supp. 2d 521 (S.D.N.Y. 2009)...........................................................................21

*In re Salix Pharms., Ltd.*, No. 14-cv-8925 (KMW),
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)...............................................................19

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)........................................................................................9, 25

*In re Scottish Re Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007)..........................................................................16

*In re Symbol Techs., Inc. Sec. Litig.*, No. 05-CV-3923 (DRH) (AKT),
  2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ...............................................................22

*In re Vale S.A. Sec. Litig.*, No. 19 CV 526 (RJD) (SJB),
  2020 WL 2610979 (E.D.N.Y. May 20, 2020) ...............................................12, 16, 18

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005)...........................................................15, 17, 19

*In re Veeco Instruments, Inc. Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006) .................................................................................19

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)...........................................................................................24

*Isakov v. Ernst & Young, Ltd.*, No. 10-cv-1517 (MRK),
  2012 WL 951897 (D. Conn. Mar. 19, 2012) ...............................................................19

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)..........................................................................................24

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)........................................................................................................19

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016)..........................................................................15

*Meyer v Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014)..........................................................................................14

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)......................................................................................9, 19

*Patel v. L-3 Commc'ns Holdings, Inc.*, No. 14-cv-6038 (VEC),
  2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016)...............................................................20

*Pirnik v Fiat Chrysler Automobiles, N.V.*, No. 15-CV-7199 (JMF),
2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ......................................................................19, 23

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-CV-3591-GHW,
2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)............................................................................23

*Puddu v. 6D Glob. Techs., Inc.*, No. 15-cv-8061 (AJN),
2021 U.S. Dist. LEXIS 60905 (S.D.N.Y. Mar. 30, 2021) ........................................................1

*Ret. Sys. v. Bank of Am. Corp.*,
874 F. Supp. 2d 341 (S.D.N.Y. 2012).....................................................................................24

*Richman* v. *Goldman Sachs Grp., Inc.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012).....................................................................................25

*SEC v. Penn*,
225 F. Supp. 3d 225 (S.D.N.Y. 2016)......................................................................................20

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019).......................................................................................................14

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
417 F. Supp. 3d 379 (S.D.N.Y. 2019).......................................................................................9

*Strougo v. Barclays PLC*,
105 F. Supp. 3d 330 (S.D.N.Y. 2015).................................................................................11, 13

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*,
531 F.3d 190 (2d Cir. 2008)....................................................................................................24

*Tellabs Inc. v. Makor Issues & Rights*,
551 U.S. 308 (2007)......................................................................................10, 18, 19, 25

*Utesch v. Lannett Co.*,
385 F. Supp. 3d 408 (E.D. Pa. 2019) .......................................................................................23

*Varghese v. China Shenghou Pharm. Holdings*,
672 F.Supp. 2d 596 (S.D.N.Y. 2009).......................................................................................21

*Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15-cv-2106 (ER),
2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) .........................................................................13

## Statutes

15 U.S.C. § 78u–4(b)(1) ................................................................................................................10

PSLRA ..................................................................................................................................9, 10, 19

**<u>Rules</u>**

Fed. R. Civ. P. 9(b) ................................................................................................................9, 19

## PRELIMINARY STATEMENT

To deflect and distract from egregious misconduct they do not deign to deny, Defendants move to dismiss the Amended Class Action Complaint ("Complaint") by proffering arguments riddled with red herrings and mischaracterizations.  The *facts,* however, remain undisputed and suffice to state a securities fraud claim under § 10(b):  for four years HDFC Bank Limited ("HDFC" or the "Company") bundled GPS navigation devices into auto loans, often without borrowers' willing consent, to meet sales targets and to track borrowers for loan collection purposes.  Indeed, Defendants have admitted to the underlying misconduct alleged in the Complaint. ¶¶ 79-80.  Additionally, less than two weeks ago, the Reserve Bank of India ("RBI") issued a press release announcing that it has imposed a monetary penalty on HDFC as a result of this misconduct, having considered the Bank's response to a show cause notice, oral submissions made during a hearing, and an examination of documents HDFC provided to RBI.  Weinrib Decl., Exs. A-B.[1]  Nevertheless, throughout the Class Period Defendants issued statements regarding their vehicle financing business and growth strategies, without revealing their machinations as part of that strategy.  Moreover, Defendants repeatedly issued comprehensive statements regarding HDFC's Fraud Monitoring Committee, internal audit department, Code of Ethics, whistleblower policies, and purportedly effective disclosure and internal controls which collectively and inaccurately portrayed HDFC as a Company committed to detecting and preventing fraud.

Defendants' scienter in issuing their misstatements is evident.  In addition to allegations of motive based on their lucrative compensation and insider sales (though not required to establish scienter), the Complaint sets forth numerous allegations demonstrating a compelling inference of

---

[1] The Court can take judicial notice of the RBI press release and HDFC's SEC filing announcing the monetary penalty imposed. *Puddu v. 6D Glob. Techs., Inc.*, No. 15-cv-8061 (AJN), 2021 U.S. Dist. LEXIS 60905, at *13-14 (S.D.N.Y. Mar. 30, 2021).

Defendants' recklessness that is at least as compelling as any opposing inference.   These allegations include, *inter alia,* the Company's own admissions, the RBI's investigation and adverse findings, the forced retirement and terminations of senior executives including the head of the vehicle financing segment, the Individual Defendants' access to information, and pattern of misconduct inviting regulatory sanctions.

Defendants do not dispute any other element of the Section 10(b) claim.   Bereft of any credible challenge to falsity or scienter, Defendants' motion must therefore fail.

### STATEMENT OF FACTS[2]

HDFC provides banking and financial services in India, Bahrain, Hong Kong, and Dubai. ¶ 19. The Company operates in Treasury, Retail Banking, Wholesale Banking, Other Banking Business, and Unallocated segments, offering, among other services, various types of loans to millions of its retail borrowers, including personal and vehicle financing loans. *Id.*   Revenues generated from HDFC Bank's auto and commercial vehicle loans are reported as part of the Bank's Retail Banking segment. ¶ 20. The vehicle loan unit accounted for approximately 10% of HDFC Bank's loan book throughout the Class Period. *Id.* Moreover, in its annual 20-F filings from 2015 through 2019 the Company reported that auto loans and commercial vehicle loans comprised ***more than a quarter*** of the Bank's "total retail assets."

### Fraud Monitoring Committee

During the Class Period, Defendants falsely assured investors that the Company had a Code of Ethics, whistleblower policies, as well as other policies and procedures in place to detect and prevent fraud. ¶ 21. Indeed, in each of its 20-F filings during the Class Period, Defendants represented that at the direction of the RBI, HDFC created a "Fraud Monitoring Committee,"

---

[2] All ¶ __ references are to the Complaint, filed on February 8, 2021 (Doc. No. 27).

which the Company has explained in its annual 20-F filings is "exclusively dedicated to the monitoring and following up of cases of fraud" and states as its objective, "the effective detection of frauds and immediate reporting of the frauds and actions taken against the perpetrators of frauds to the concerned regulatory and enforcement agencies." *Id.* Toward that end, the Company has made clear that the Fraud Monitoring Committee must:

> a. identify the systemic lacunae, if any, that facilitated perpetration of the fraud and put in place measures to plug the same;
> b. identify the reasons for delay in detection, if any, and report to top management of the Bank and the RBI;
> c. monitor progress of investigation by the Central Bureau of Investigation/Police Authorities and recovery position;
> d. ensure that staff accountability is examined at all levels in all the cases of frauds and staff side action, if required, is completed quickly without any loss of time;
> e. review the efficacy of the remedial action taken to prevent recurrence of frauds, such as strengthening of internal controls; and
> f. put in place other measures as may be considered relevant to strengthen preventive measures against frauds. *Id.*

***Defendant Puri sat on the Fraud Monitoring Committee*** with only five other members, which met at least four times a year. ¶ 22. Defendants have always acknowledged that, "[s]ignificant fraud…would disrupt our revenue generating activities in the short-term and could harm our reputation and adversely impact our revenue-generating capabilities." *Id.*

### Fraudulent Practices in HDFC's Vehicle Financing Business

Despite the aforementioned assurances, ***and as Defendants later admitted***, from 2015-2019 they forcibly bundled GPS navigation devices into borrowers' auto loans often without their knowledge. ¶ 23. These practices enabled the vehicle loan financing unit to hit sales targets as well as to track customers in the event of a loan default. *Id.* Confidential Witness ("CW") 1, a sales manager for used cars employed by HDFC and based out of Jabalpur from July 2016 until December 2018, confirmed receiving instructions to pitch GPS devices to customers and further confirmed that superiors made clear HDFC would use them to aid in loan collections efforts. *Id.*

3

Investors first learned of Defendants' fraud in an *Economic Times* article published on July 13, 2020, which revealed that the Company had conducted an internal investigation into these improper lending practices. ¶ 24.  The Company later admitted to the misconduct on an investor call and in a subsequent 20-F filing. *Id.* Regulatory scrutiny followed. *Id.* Days after the *Economic Times* article, the Reserve Bank of India asked HDFC Bank to turn over all the details of its internal investigation into the improper lending practices in the vehicle financing operation as well as any steps the Bank took to remedy issues identified during the investigation. *Id.*

In the wake of the vehicle financing scandal, HDFC forced Ashok Khanna, the head of the Company's vehicle lending business, to retire in March 2020. ¶ 25.  Though having reached the mandated age of retirement, Khanna had been previously granted two post-retirement extensions and had been under consideration for another extension at the time of his ouster. *Id.* The Company fired at least six other senior and mid-level executives involved in the fraud. *Id.*

Moreover, Defendant Puri did not receive a post-retirement extension, and retired in October 2020, three months after the market learned of Defendants' fraud.  ¶ 26.

<u>**Compensation and Insider Sales**</u>

While engaged in a four-year streak of improper lending practices, Defendants enjoyed lucrative compensation. ¶ 27. Indeed, Defendant Puri is reportedly the highest paid banking executive in India. *Id.* HDFC paid Defendant Puri Rs.151.0 million, Rs. 183.4 million, Rs. 207.9 million, Rs. 192.9 million, Rs. 258.8 million, and Rs. 275.6 million for fiscal years 2015-2020 respectively. *Id.* During the Class Period, Defendant Puri also received net proceeds of approximately ***$22 million*** from sales of HDFC securities. ¶ 28.  Moreover, in July 2020, the same month in which Defendants' fraud in the auto loan business belatedly came to light, ***Defendant Puri sold 95% of his equity stake in the Company for $137.8 million in proceeds***. *Id.*  During the

4

Class Period, Defendant Jagdishan received net proceeds of $5.6 million from sales of HDFC securities. ¶ 29. Ashok Khanna, the head of HDFC's vehicle lending segment, similarly received net proceeds of $3.8 million from insider sales. *Id.*

## Materially False and Misleading Statements

Throughout the Class Period, Defendants issued statements regarding their growth strategy, and in particular relationship building through product offerings.  Defendants failed, however, to reveal that their growth strategy included *forcibly* bundling these product offerings, *i.e.*, GPS devices, into auto loans, often without borrower consent and in contravention of Company policy and relevant regulations prohibiting the Bank from engaging in non-financial business. ¶¶ 31, 40.  Defendants spoke comprehensively regarding HDFC's vehicle financing business, making statements regarding the nature of the loans, marketing strategies and its book value.  ¶¶ 32-33, 41-42, 49-50, 57-58, 65-67.  These descriptions underscored the significance of the auto loan division to the Company's bottom line; during the Class Period the auto loans and commercial vehicle loan book comprised *more than a quarter* of the Company's total retail assets. ¶¶ 33, 42, 50, 58, 65.  Though opting to speaking in depth regarding the auto loan segment of the business, Defendants hid their machinations.

Defendants also spoke repeatedly about policies and procedures the Company purportedly had in place to prevent or detect fraud.  Specifically, Defendants made multiple representations to investors regarding the Company's "Fraud Monitoring Committee" (*see* supra) ¶¶ 21-22, 34, 43, 51, 59, 71, and its internal audit department that was supposed to provide "independent assurance of the effectiveness of governance, risk management and internal controls to achieve the Bank's risk management and control objectives."  ¶¶ 34, 43, 51, 59, 71.  Defendants also touted the Company's "Code of Ethics," which explicitly applied to Defendants Jagdishan and Puri, and the

5

Company's whistle blower policy setting forth procedures "for receiving, retaining and treating complaints received, and procedures for the confidential and anonymous submission by employees of complaints, regarding questionable accounting or auditing matters or conduct which results in a violation of law by the Bank or in a substantial mismanagement of the Bank's resources." ¶¶ 37, 46, 54, 62, 71.  All of these representations publicly painted a false picture of a Company committed to fraud detection and prevention, though in reality neither the Fraud Monitoring Committee, the internal audit department, the Code of Ethics nor the whistle blower policy, operated effectively to timely prevent or uncover fraud.  Unbeknownst to investors, as a result, beginning in 2015, Defendants engaged in improper lending practices in the Bank's vehicle financing business with forced bundling of GPS navigation devices into borrowers' auto loans.

Defendant Jagdishan signed each of HDFC's Class Period 20-F filings, which included a detailed description of the Company's "Controls and Procedures," along with assurances that Defendants Jagdishan and Puri deemed the disclosure controls and procedures as well as the internal control over financial reporting, "effective."  ¶¶ 35-36, 44-45, 52-53, 60-61, 68-70.  Each 20-F also attached certifications that Defendants Jagdishan and Puri signed representing that the filings *do not contain any material misstatements*, that Defendants Jagdishan and Puri personally designed the disclosure controls  to ensure they would be *apprised of all material information* – which includes the matters at issue here, that Defendants Jagdishan and Puri personally designed the internal controls to ensure the *reliability of the information* contained in the financial statements, and personally evaluated the effectiveness of controls. ¶¶ 30, 35, 39, 48, 56, 64.  These statements misled investors because HDFC did not have effective disclosure or internal controls.

6

In misleading investors throughout the Class Period, Defendants not only hid their misconduct but also the foreseeable consequences of that misconduct, *i.e.,* material negative impact on the Bank's financial condition and reputation and/or regulatory scrutiny.

**The Truth Begins to Emerge**

On July 13, 2020, during pre-market hours, *The Economic Times* published an article titled "HDFC Bank probes lending practices at vehicle unit." ¶ 73.  That article reported that HDFC had "conducted a probe into allegations of improper lending practices and conflicts of interests in its vehicle-financing operation involving the unit's former head;" that the Bank "decided against proceeding with an earlier proposal to extend the employment of Ashok Khanna, an 18-year veteran at the bank, after the investigation was completed;" that "[t]he vehicle financing unit [Khanna] headed had outstanding loans of more than Rs 1.2 lakh crore ($16 billion) as of March 31;" that "[t]he result of the investigation isn't public, but it followed issues thrown up by an internal audit of the [B]ank's vehicle-dealer lending, as well as allegations of conflicts of interest in the purchase of global positioning systems for vehicles financed by the [B]ank," according to sources without disclosing what the probe uncovered; and that "Khanna, who was 63 at the time of leaving the bank in March, had been due to step aside at the age of 60 but had been receiving extensions since 2017," which "was due in part to the importance of the unit he headed, which accounts for more than 10% of the total loan book." *Id.  The Economic Times* article also reported that HDFC had acknowledged and confirmed the investigation, stating, in relevant part, that "[a] representative of HDFC Bank confirmed there had been an investigation into the vehicle-financing unit but declined to give details," and that, "[i]n an emailed statement, [the Bank's representative] said Khanna had retired in March in line with the terms of his employment contract." ¶ 74.

On this news, HDFC Bank's ADS price fell $1.37 per share, or 2.83%, to close at $47.02 per share on July 13, 2020. ¶ 76.

**<u>Post-Class Period Developments</u>**

On July 20, 2020, *The Economic Times* published another article titled "Car loan probe: HDFC Bank terminates half a dozen employees for violating the code of conduct." ¶ 78. The article disclosed that HDFC Bank had "terminated at least six senior and mid-level executives after an internal probe revealed that they violated the code of conduct and governance standards by indulging in practices seen as corrupt," citing three people familiar with the matter. *Id.* The article further reported that the terminations "pertain[d] to practices at the auto loans department where some staff allegedly forced customers to buy . . . GPS devices bundling it with the car loan," and that "some customers were not even aware of purchasing such a product till the loan documents were checked." *Id.* According to the article, "[t]hese errant employees started forcefully bundling these products with car loans to meet sales targets and potentially track borrowers in the event of a default." *Id.* HDFC Bank "has a tie-up with Trackpoint GPS to sell these devices," but "did not respond to a detailed questionnaire seeking comments." *Id.*

Other than skeletal statements by Defendant Puri during an investor call on July 18, 2020 admitting to the misconduct in the auto loan business segment, and referencing the termination of employees and "retirement" four months prior of the head of that business segment, Ashok Khanna, Defendants have not provided any additional detail regarding the timing and results of their internal investigation into the matter. ¶ 79. On July 31, 2021, in the Company's 20-F for the fourth quarter and fiscal year 2020, Defendants ***admitted to having already conducted an internal investigation and concluded that there had been fraud in its vehicle lending business by May 2020.*** ¶ 80. The Company has yet to reveal the timing of the investigation, the details of the investigation, or the timing of the whistleblower complaint that led to the investigation:

In May 2020, following an internal inquiry we determined that certain employees received unauthorized commissions from a third-party vendor of GPS products, with whom we have an agreement to offer GPS devices to our auto loan customers. The personal misconduct of these employees is in violation of our code of conduct and governance standards and we have taken disciplinary action with respect to the employees involved, including separation of services of certain employees. *Id.*

## ARGUMENT

### I.   Applicable Standards[3]

To state a claim under § 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379 , 390 (S.D.N.Y. 2019). Though securities fraud claims are subject to Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act's ("PSLRA") heightened pleading standard, plaintiffs need not plead "detailed evidentiary matter," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but merely sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000). Within that context, in ruling on Defendants' Rule 12(b)(6) motion, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in Plaintiffs' favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007). "The issue is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.'" *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003). Thus, to survive a Rule 12(b)(6) motion, the Complaint need only contain sufficient facts "to state a claim to relief that is plausible on its face." *Ashcroft v.*

---

[3] Internal citations and quotations are omitted herein, unless stated otherwise.

*Iqbal*, 556 U.S. 662, 697 (2009).  The Complaint satisfies this standard.  Defendants concede as much as to four elements of the §10(b) claim, and only dispute (wrongly) falsity and scienter.

## II.    The Complaint Adequately Alleges Falsity

As the PSLRA requires, the Complaint identifies each misleading statement, identifies who made the statement, and explains in detail why it was misleading.  ¶¶ 30-72; 17 C.F.R. § 240.10b-5; *Tellabs Inc. v. Makor Issues & Rights,* 551 U.S. 308, 321 (2007); 15 U.S.C. § 78u–4(b)(1)).  Specifically, the Complaint alleges that Defendants made statements regarding their growth strategies, including product offerings, without revealing that they forcibly bundled one such product offering, GPS navigational devices, into their auto loans as part of their *undisclosed* growth strategy to meet sales targets and to track borrowers so as to facilitate collection efforts.  Defendants also repeatedly assured investors that they had a robust system in place to detect and prevent fraud. These assurances included comprehensive descriptions of a Fraud Monitoring Committee, on which Defendant Puri sat, an internal audit department, the Company's Code of Ethics, and the Company's whistleblower policy—which included concrete steps the Company purportedly followed to make sure that no fraudulent conduct slipped through the cracks.  *See, e.g.,* ¶¶ 21, 34, 37.   Unbeknownst to investors, these committees and policies did not operate effectively to detect or prevent fraud.  The auto loan fraud continued undeterred for ***four years***.

All the while, and nevertheless, Defendants made statements describing disclosure and internal controls, that Defendants Jagdishan and Puri personally designed so they'd be apprised of all material matters addressed in the Company's 20-F filings, and not only certified the effectiveness of those controls but explicitly stated that none of the Class Period 20-Fs "contain any untrue statement of material fact or omit to state a material fact necessary to make the

10

statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report."

The falsity of Defendants' statements is beyond dispute given that Defendants **admitted to the underlying misconduct**. ¶¶ 79-80.  Defendants therefore resort to mischaracterizations and red herring arguments that highlight their inability to escape this unalterable truth.[4]

### A.  The Complaint Adequately Alleges Materiality

Bespeaking the frailty of their motion, Defendants lead off their falsity challenge with a materiality argument.  It is well accepted that the issue of materiality is fact intensive and inappropriate for adjudication at the pleading stage.  *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 348 (S.D.N.Y. 2015).  Regardless, "[t]he materiality requirement poses a very low burden . . . .Thus, the trier of fact usually decides the issue of materiality."  *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 181 (S.D.N.Y. 2010).  The allegations set forth in the Complaint provide an ample basis to conclude that Defendants' misstatements "significantly alter[ed] the 'total mix' of information," which is all that is required to demonstrate materiality.  *Strougo*, 105 F. Supp. 3d at 349.  Defendants' four years of misconduct occurred in HDFC's vehicle financing segment, which comprised **more than a quarter** of its overall retail assets and **at least ten percent** of its overall loan book.  Nefarious tactics that put more than a quarter of a company's total retail assets at risk is undeniably material. Additionally, the Company has acknowledged that the very reason Khanna did not retire at the mandatory age of 60 "was due in part **to the importance of the unit he headed** which accounts for more than 10% of the total loan book." ¶ 73; emphasis added.

---

[4] Given Defendants' admissions, it is irrelevant that the Complaint does not specify the precise number of employees involved, the precise number of GPS devices, the precise number of auto loans, or the precise number of customers involved. Def. Br. at 8.  In any event, these precise numbers are uniquely in Defendants' possession pre-discovery, particularly given that Defendants suspiciously opted to hide the details and full results of their internal investigation.

Defendants' argument that the Complaint does not allege the precise "sales targets" Defendants hoped to reach, or the total GPS charges for the Class Period, is one of their many red herrings. Def. Br. at 9-10. *First*, Plaintiff is not obligated to allege this level of detail at this stage, particularly given that because Defendants chose to hide this information from the market, these numbers are uniquely in Defendants' possession pre-discovery. *Second*, Defendants admitted to the misconduct. Those admissions alone nullify Defendants' position. *Third*, Defendants are wrong that the Complaint does not allege "how the improper GPS sales caused those sales targets," if logic is to prevail. Forcing borrowers to pay for GPS devices necessarily inflates Defendants' sales. *Fourth*, Defendants' argument ignores the allegation that Defendants forcibly bundled GPS devices into their auto loans not only to inflate sales, but also to facilitate their loan collection efforts by allowing them to use those devices to track HDFC's auto loan borrowers.

Moreover, aiming their arrow at the wrong target, Defendants argue that that the Complaint does not "plead facts demonstrating the GPS rendered the Bank's statements about its financial condition false." Def. Br. at 10. However, the literal accuracy of the financials is not at issue. This case is about Defendants' failure to disclose improper auto lending practices in violation of Company policy and RBI regulations, and the ineffectiveness of HDFC's purported efforts to detect and prevent fraud. In any event, "[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers. . . . Some literally accurate statements can, through their context and manner of presentation, [become] devices which mislead investors." *In re Vale S.A. Sec. Litig*., No. 19 CV 526 (RJD) (SJB), 2020 WL 2610979 , at *12 (E.D.N.Y. May 20, 2020).

Defendants' reliance on the July 22, 2020 *Economic Times* article's reference to a self-serving quote from an unnamed HDFC "official," characterizing GPS devices as a "minuscule

12

[sic] portion of the banks portfolio…,"  Def. Ex. 8, and citation to distinguishable restatement cases (this is not a restatement case), also miss the mark.  Not only do Defendants disregard the large percentage of HDFC's overall business that the vehicle financing segment comprises, which their misconduct put at risk-- and disregard the Company's own acknowledgement of the importance of that segment to the overall business – which led them to overrule Khanna's mandated retirement at age 60, they disregard that the scheme also facilitated *loan collection efforts* which the official quoted in the *Economic Times* article conveniently did not address, much less quantify. Moreover, the Second Circuit has "consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation."  *Strougo*, 105 F. Supp. 3d at 349.  Indeed, in *Strougo*, Judge Scheindlin found defendants' statements material even though "***LX's revenue in relation to the overall revenue of Barclays PLC is far below the five percent threshold***" because the misstatements "call into question the integrity of the company as a whole" and the company had consistently touted its integrity.  *Id*. (emphasis added); *see also Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15-cv-2106 (ER), 2017 WL 1169629 , at *12 (S.D.N.Y. Mar. 28, 2017) (financial underreporting amounting to only 0.5% of average annual income and 0.8% of its average annual paid income tax found material because revelation of the fraud caused a drop in the value of defendant's securities, regulatory penalties, and reputational harm).

Indeed, quantitative impact is not the only way to allege materiality.  Both quantitative and qualitative factors are considered in evaluating materiality.  *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago. v. JP Morgan Chase Co.*, 553 F.3d 187, 203-04 (2d Cir. 2009).  "[V]arious '[q]ualitative factors may cause misstatements of quantitatively small amounts to be material.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 163 (2d Cir. 2000).  The Second Circuit has expressly rejected the application of a numerical or percentage benchmark in order to determine the

13

materiality of a company's financial misstatement, instead holding that materiality must be assessed in context, and both quantitative and qualitative factors must be analyzed. *Id*.

### B. Defendants' Statements Regarding Their Vehicle Financing Business and Growth Strategies Misled Investors and are Actionable.

The Complaint alleges that Defendants made statements describing HDFC's vehicle financing segment and growth strategies, which included offering more products, but failed to reveal that a key component of the growth strategy included forcibly bundling GPS navigation devices into its loan products for at least four years to inflate sales numbers and to facilitate loan collection efforts by tracking borrowers. Defendants have admitted to this misconduct, which led to a regulatory investigation (and ultimately a monetary penalty), necessitated an internal investigation, led to the forced retirement of Ashok Khanna who led the vehicle financing segment throughout the Class Period (an extension of Khanna's employment had been under review when the truth came out), and the termination of at least six other senior and mid-level executives. Faced with these damning undisputed allegations, Defendants cling to the snippets of their Class Period misstatements they can argue are literally true, *e.g.,* that they did in fact want to expand their relationship with clients by offering more products or that they did in fact want to make it easier for their customers to do business. Def. Br. at 18. This argument misses the point entirely. It is well settled that the issue of whether a statement is misleading is "evaluated not only by 'literal truth,' but by 'context and manner of presentation.'" *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). *See Meyer v Jinkosolar Holdings Co., Ltd.,* 761 F.3d 245, 250–51 (2d Cir. 2014) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context").

Defendants also wrongly argue that the Complaint inaccurately alleges that the phrase "offering more products" referred to GPS devices, when in fact the Complaint alleges the complete

14

opposite. Def. Br. at 18. Indeed, the parties seemingly agree that when Defendants spoke about their growth strategy of "offering more products," they *did not reveal* or refer to the fact that they had forcibly bundled one such product--- GPS navigational devices--- into auto loans.

Defendants claim they had no duty to disclose their uncharged misconduct. Def. Br. at 19, fn. 21. However, by choosing to speak about the success of HDFC's vehicle financing segment along with detailed discussion of growth strategies that included product offerings, they incurred a duty to speak completely so as not to mislead innocent investors. *See Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016) ("duty to disclose uncharged wrongdoing can arise when a corporation puts the reasons for its success at issue, but 'fails to disclose that a material source of its success is the use of improper or illegal business practices[]'"); *see also In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 399-401 (S.D.N.Y. 2005) (holding statements that failed to disclose certain revenue was generated by illegal practices would "significantly alter the mix of available information").

### C. Defendants' SOX Certifications and Statements Regarding the Effectiveness of Internal Controls Misled Investors and are Actionable

Once again disregarding the Complaint's allegations entirely, Defendants wrongly argue that the Complaint includes "nothing to suggest the Bank's internal controls were inadequate" or that they did not actually evaluate the effectiveness of the disclosure controls and procedures pursuant to SOX. Def. Br. at 9, 13. The Complaint alleges that Defendants' auto loan machinations, which ultimately necessitated an internal investigation, prompted regulatory scrutiny (and ultimately an adverse ruling and sanctions), led to the forced retirement of the head of the auto loan unit, and led to the termination of at least six other senior and mid-level executives, *spanned a period four years*. These undisputed facts, the omission of which rendered Defendants' Class Period statements misleading, demonstrate that HDFC did not have effective internal

15

controls during that time and either did not adequately perform evaluations of both internal controls and disclosure controls, or did the evaluation, and then had to have known they did not operate effectively. Indeed, as set forth below, at the time Defendants "profess[ed] [their] opinion that the company's internal controls were effective," they knew or recklessly disregarded the egregious fraud that infected the vehicle financing segment of the business for at least four years. *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380-81 (S.D.N.Y. 2015).

However, the Court need not rely on logical conclusions. Defendants have acknowledged that incidents of misconduct suggest deficiencies in HDFC's internal controls. *See, e.g.,* Weinrib Decl., Ex. C. Specifically, Defendants' penchant for misconduct is not limited to improper lending. In mid-2016, June 2019, and January 2020, HDFC had to pay monetary penalties imposed by RBI for violations of regulations including the Banking Regulation Act, "Know Your Customer, Anti-Money Laundering, and fraud reporting standards." *Id.* In each instance, Defendants admitted they needed to strengthen internal controls mechanisms but failed to reveal that they had not done so adequately as the forcible bundling of GPS devices into auto loans to increase sales numbers and track borrowers for loan collecting efforts continued unabated. *Id.*

An auditor report stating internal controls were effective does not negate falsity, especially given the Company's own admissions that this was not the case. *See In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 392 (S.D.N.Y. 2007) (finding falsity as to defendants' SOX certifications despite auditor imprimatur). This is particularly so given that the auditor was not privy to Defendants' multi-year misconduct when issuing its report and relied on information provided to it by the Company (which is presently accused of fraudulently issuing misleading statements to the market for four years). *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979 , at \*13 ("…third-party certifications 'gave [false] comfort to investors' when they were allegedly tainted

16

by Vale's meddling…").   Defendants' generic warning that "internal control over financial reporting *may* not prevent or detect misstatements" similarly fails to exculpate, Def. Br. at 13, because Defendants knew or recklessly disregarded when they issued their statements that internal control over financial reporting *did not* prevent or detect misstatements.  *Van der Moolen,* 405 F. Supp. 2d at 400; *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 193.

Defendants' reliance on *In re Deutsche Bank Aktiengesellschaft Securities Litigation* is misplaced.  Def. Br. at 14-15.  There, the Court found internal controls statements not actionable because defendants had merely stated they had internal control policies in place and plaintiff did not plead the policies did not exist but that they were ineffective.  *In re Deutsche Bank Aktiengesellschaft Sec. Litig*., No. 16CIV3495ATBCM, 2017 WL 4049253, at \*6 (S.D.N.Y. June 28, 2017).   Here, the Complaint alleges that that Defendants misled investors precisely by representing that its internal controls were effective.

### D. Defendants' Statements Regarding the Fraud Monitoring Committee, Internal Audit Department, Code of Ethics, and Whistleblower Policies Collectively Misled Investors and are Actionable

The sheer number of strategies Defendants claimed to employ to detect and prevent fraud, and the many times they repeated their descriptions of such efforts, rise above puffery. "While some of the alleged statements, viewed in isolation, may be mere puffery, nonetheless, when (as here alleged) the statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company."  *In re Petrobras Sec. Litig*., 116 F. Supp. 3d at 381 (collecting sources). Defendants' comprehensive descriptions of the concrete steps the Fraud Monitoring Committee and internal audit department supposedly undertook, as well as the comprehensive details provided regarding the Code of Ethics and whistleblower policies purportedly in place for

17

the same purpose, are "sufficiently specific to survive a motion to dismiss given their context and clear inaccuracy." *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at \*10.

Defendants made "specific representations about its then-existing practices[5]…that an investor could reasonably rely upon in assessing the strength" of HDFC's efforts to prevent and detect misconduct. Their statements are "neither aspirational nor vague" (Def. Br. at 16). *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at \*11. "Indeed, if credited by the factfinder, [given that on a 12(b)(6) motion the court must accept all factual allegations as true], it may just as easily be called a lie." *Id.* Plaintiff sufficiently alleges that Defendants' oft repeated statements regarding the Fraud Monitoring Committee, internal audit department, Code of Ethics, ***and*** whistleblower policies read collectively and considered in conjunction with assurances regarding disclosure and internal controls, "lull[ed] the reader into a false sense of security" as to the strength of HDFC's system of fraud prevention and detection. *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at \*12 (finding that even if defendant's statements are considered "generic, because it repeatedly emphasized its commitment to such priorities," it "put the topic at issue such that the Court cannot say that, as a matter of law, investors would not find [certain] representations material.")[6]

## III.    The Complaint Adequately Alleges Scienter

The scienter inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs,* 551 U.S. at 324. It need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*;

---

[5] Defendants' citation to HDFC's 20-F stating that, "***projections*** of any evaluation of effectiveness for ***future periods*** are subject to the risks that controls ***may become*** inadequate..." widely misses the mark. Def. Br. at 15. This case is about "then-existing practices" that failed to detect or prevent "then-existing" misconduct.

[6] Unable to credibly challenge the falsity of their statements, Defendants instead resort to arguing that the Complaint contains a few block quotes and incorrectly argues that the Complaint does not "show how they were false," ignoring that each alleged misstatement is followed by a lengthy paragraph explaining *precisely* how the preceding statements misled the market. *See, e.g.,* ¶¶ 38, 47, 55, 63, 72. *See In re NTL, Inc. Sec. Litig*., 347 F. Supp. 2d 15 (S.D.N.Y 2004) (declining to dismiss a complaint, even when portions of long quotes were not identified as misleading, because plaintiffs identified the date, source, speaker and why the statements were misleading).

18

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011).  Even if a plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation, "the tie . . . goes to the plaintiff."  *In re Salix Pharms., Ltd.*, No. 14-cv-8925 (KMW), 2016 WL 1629341, at \*13 (S.D.N.Y. Apr. 22, 2016).  While scienter must be pled with particularity, "[n]either *Iqbal*, *Twombly*, Rule 9(b), nor the PSLRA require detailed factual allegations."  *Isakov v. Ernst & Young, Ltd.*, No. 10-cv-1517 (MRK), 2012 WL 951897 , at \*4 (D. Conn. Mar. 19, 2012).  When evaluating scienter, a court must "accept all factual allegations in the complaint as true," *Tellabs*, 551 U.S. at 322, and must review all allegations holistically.  *Matrixx*, 563 U.S.  at 48.

## A.  The Complaint Adequately Alleges Defendants' Recklessness

Recklessness is a sufficiently culpable mental state for securities fraud.  *Pirnik v Fiat Chrysler Automobiles, N.V.,* No. 15-CV-7199 (JMF), 2016 WL 5818590, at \*6 (S.D.N.Y. Oct. 5, 2016).  "Although this is a highly fact-based inquiry, the Second Circuit has held that where the complaint alleges that defendants had knowledge of facts or access to information contradicting their public statements, recklessness has been adequately pled." *In re Forest Labs. Sec. Litig.*, No. 05-cv-2827 (RMB), 2006 WL 5616712, at \*10 (S.D.N.Y. July 21, 2006).  The Second Circuit has also stated that "recklessness" is an "egregious refusal to see the obvious, or to investigate the doubtful," like ignoring "obvious signs of fraud."  *Van Der Moolen*, 405 F. Supp. 2d at 404-05; *Novak*, 216 F.3d at 308.  "[T]o survive dismissal, plaintiffs must ***minimally*** allege that the defendants' conduct falls within the definition for recklessness."  *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 231 (S.D.N.Y. 2006) (emphasis added).

The Complaint alleges ample evidence establishing a strong inference that Defendants knew or recklessly disregarded a four-year spate of improper lending in the vehicle financing department whereby the Company forcibly bundled GPS navigation devices into auto loans—

19

often without borrower knowledge or consent--- to inflate sales numbers and facilitate loan collection efforts by tracking borrowers.  These allegations include, *inter alia,* the Company's own admissions, the forced retirement and terminations of senior executives, the Individual Defendants' access to information, and pattern of misconduct inviting regulatory sanctions.[7]

### 1.  Company Admissions Support the Inference of Scienter

HDFC has already admitted to the improper lending practices in its vehicle financing segment, "in violation of [its] code of conduct and governance standards." ¶ 80.  Suspiciously, the Company has never revealed the timing of its internal investigation into the matter, the timing of the whistleblower complaint that purportedly instigated the internal investigation and the related regulatory investigation, the details of the investigation, nor the details of its results. When a company admits to the alleged misconduct, the inference of scienter is far more compelling than any opposing inference.  *See SEC v. Penn*, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016) ("admissions satisfy Rule 10b-5's scienter requirement"); *Patel v. L-3 Commc'ns Holdings, Inc.*, No. 14-cv-6038 (VEC), 2016 WL 1629325 , at *14 (S.D.N.Y. Apr. 21, 2016).

### 2.  The RBI's Finding of Misconduct Supports the Inference of Scienter

On May 28, 2021, RBI announced that it imposed "a monetary penalty of ₹10.00 crore (Rupees ten crore only) on HDFC Bank Limited (the bank) for contravention of provisions of section 6(2) and section 8 of the Banking Regulation Act, 1949 (the Act)" for the underlying misconduct alleged in this Action. RBI explained that it based its decision regarding HDFC's "deficiencies in regulatory compliance" on "the bank's reply to the show cause notice, oral submissions made during the personal hearing and examination of further clarifications/documents

---

[7] That these allegations are not set forth in a section titled, "Facts Demonstrating Scienter," is not relevant.  All that matters is that these allegations are pled in the Complaint.  Defendants' argument that formatting should form a basis for dismissal underscores the frailty of their motion.

furnished by the bank." Weinrib Decl., Exs. A-B.  Courts have held that the mere existence of a government investigation supports an inference of scienter. *See, e.g., In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 353, 380 (E.D.N.Y. 2013). Here, not only did Defendants' misconduct prompt a regulatory investigation, but led to an adverse finding and the imposition of a monetary penalty.

### 3.   Forced Retirements and Terminations Support the Inference of Scienter

In the wake of the vehicle financing scandal, HDFC forced Ashok Khanna, the head of the Company's vehicle lending business, to retire in March 2020. ¶ 25.  Though having reached the mandated age of retirement years earlier, Khanna had been previously granted two post-retirement extensions and had been under consideration for another extension at the time of his ouster. *Id.* The Company also fired at least six other senior and mid-level executives involved in the fraud. *Id.*  Moreover, Defendant Puri did not receive a post-retirement extension, and retired in October 2020, three months after the market learned of Defendants' fraud.   ¶ 26.  The nature and timing of Khanna's retirement, Defendant Puri's retirement, as well as the terminations of multiple senior and mid-level executives as a result of the misconduct in the vehicle lending segment that Defendants hid from investors throughout the Class Period contribute to the compelling inference of scienter. *See In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017) ("timing and circumstances of individual defendants' resignations may add some further weight to an overall inference of scienter") (citation omitted); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 523-24, 534 (S.D.N.Y. 2009) (crediting resignations of executives two weeks after fraud revealed); *Varghese v. China Shenghou Pharm. Holdings,* 672 F.Supp. 2d 596, 608 (S.D.N.Y. 2009) (director resignation and CEO removal contributed to inference) (citation omitted).

### 4.   A Pattern of Misconduct Supports the Inference of Scienter

Defendants' proclivity for misconduct drawing regulatory sanctions is not limited to their machinations in its vehicle financing business.  ¶ 81. As set forth above, RBI also fined HDFC in

mid-2016, June 2019, and January 2020, for violations of regulations including, *inter alia,* the Banking Regulation Act, "Know Your Customer, Anti-Money Laundering, and fraud reporting standards." Weinrib Decl, Ex. C.   Moreover, on December 2, 2020, RBI issued an order with regard to "certain incidents of outages in internet banking/mobile banking/payment utilities of the bank over the past two years..." ¶ 82.  The RBI order requires HDFC to stop all launches of digital business generating activities planned under its program Digital 2.0, stop other proposed business generating IT applications, and stop sourcing of new credit card customers.  RBI also insisted HDFC examine the lapses and fix accountability. *Id.* Banks in India are required to have business continuity processes in place to deal with outages like this. *Id.* Nevertheless, the November 2020 outage was not the only such outage HDFC customers suffered.  *Id.* Similar outages occurred in December 2019 and November 2018. *Id.*  **Despite Company assurances**, Defendants failed to adequately fix these "technical glitches," ultimately necessitating the intervention of regulator RBI. *Id.* Yet another example of how Defendants misled the market. Then on January 22, 2021, HDFC announced that SEBI (the Securities Exchange Board of India) levied a fine against it for violating the regulator's interim directions when it invoked securities pledged by stockbroker BRH Wealth Kreators.  ¶ 83. The penalty included Rs 1 crore and a direction to transfer Rs 158.68 crore along with 7% interest per annum into an escrow account until the issue is reconciled. *Id.*

Defendants ongoing pattern of misconduct contributes to the strong inference of scienter. *In re Symbol Techs., Inc. Sec. Litig.*, No. 05-CV-3923 (DRH) (AKT), 2013 WL 6330665, at *10 n.3 (E.D.N.Y. Dec. 5, 2013) (finding that defendants' "prior misconduct establishes a pattern of culpable conduct…which supports a strong inference of scienter.").   Moreover, Defendant Puri sat on HDFC's Fraud Monitoring Committee with only five other members.  Given, the multiple instances of Company transgressions and regulatory sanctions, Defendant Puri should have been

22

vigilant in ferreting out misconduct and ensuring strict regulatory compliance across all business segments, and particularly ones comprising ***over a quarter of the Company's retail assets.***

### 5. Defendants' Professed Knowledge and Access to Information Supports an Inference of Scienter

In HDFC's annual 20-F's Defendants spoke about their vehicle finance segment, growth strategies, the Fraud Monitoring Committee, internal audit department, Code of Ethics, whistleblower policies, internal and disclosure controls repeatedly and comprehensively, thus putting themselves forth as knowledgeable on those subjects. Speaking with detail and "certitude" contributes to the inference of scienter. *Utesch v. Lannett Co.*, 385 F. Supp. 3d 408, 422 (E.D. Pa. 2019). If they did not possess that knowledge, then they were reckless in speaking on those issues.

Additionally, the statements contained in Defendants' SOX certifications contribute to the compelling inference of scienter because they represented that they personally designed the disclosure controls and procedures to "ensure that material information...***is made known to us***," relevant to the filings, i.e., the matters at issue in this action. ¶¶ 30, 39, 48, 56, 64 (emphasis added). *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-CV-3591-GHW, 2020 WL 1877821, at \*14 (S.D.N.Y. Apr. 14, 2020). In other words, they had access to relevant information contradicting their public statements throughout the Class Period. In any event, as this Court recently held, and contrary to Defendants' arguments (Def. Br. at 20), Plaintiffs need not allege Defendants' awareness of particular documents. *See Pirnik*, 2016 WL 5818590, at \*7 ("Plaintiffs do not need to show that the individual Defendants were *personally involved* with each Safety Act violation or even aware of any *particular* violation.") (emphases in original).

### 6. The Internal Investigation Does Not Negate Scienter

That HDFC had to conduct an internal investigation, and disciplined certain executives once news of its fraud came to light, does not whitewash Defendants' glaring Class Period

misstatements or the strong inference of scienter.  *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 88, 96-97 (2d Cir. 2016) (cooperating with regulators' investigations and conducting an internal investigation did not negate scienter).  The egregious misconduct in the vehicle financing operation went on for ***four years*** before the Company did anything about it.  HDFC has also been curiously silent as the to the timing of the whistleblower complaint that necessitated the internal investigation and as to the timing of the investigation itself.[8]

### B.  The Complaint Adequately Alleges Corporate Scienter

Corporate scienter is adequately pled if the "facts [] create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009). Significantly, "an individual whose knowledge is imputed to the corporation [need not] also 'make' the material misstatement or omission at issue." *Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012). Thus, even if the Court determined that the "misconduct by some bad actors" (Def. Br. at 24) did not include the Individual Defendants themselves (despite their acknowledgement as to the importance of this business segment and though lack of direct involvement does not mean they did not know about it, as per the allegations of recklessness set forth above) the Complaint adequately alleges Ashok Khanna's scienter.  Given his role as head of the vehicle financing operation and his ouster in the wake of the scandal, Khanna's scienter is properly imputed to the Company. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177-78 (2d Cir. 2015).

---

[8] Defendants also once again proffer a materiality argument to challenge scienter which is fact-intensive and inappropriate for consideration at this stage, as set forth above.

## C. The Complaint Adequately Alleges Defendants' Motive

Although Plaintiff is not required to plead motive to establish scienter, it has done so. *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 371 (S.D.N.Y. 2012). While engaged in a four-year streak of improper lending practices, Defendants enjoyed lucrative compensation. ¶ 27. Defendant Puri is the highest paid banking executive in India. *Id.* HDFC paid Defendant Puri Rs.151.0 million, Rs. 183.4 million, Rs. 207.9 million, Rs. 192.9 million, Rs. 258.8 million, and Rs. 275.6 million for fiscal years 2015-2020 respectively. *Id.* Defendant Puri's lucrative compensation supports a finding of motive. *Tellabs*, 551 U.S. at 325 (allegations of "personal financial gain may weigh heavily in favor of a scienter inference").

Additionally, the "motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high, while selling their own shares at a profit." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 74. During the Class Period, Defendant Puri received net proceeds of approximately ***$22 million*** from sales of HDFC securities. ¶ 28. Moreover, in July 2020, the same month in which Defendants' fraud came to light, ***Defendant Puri sold 95% of his equity stake in HDFC for $137.8 million in proceeds***. *Id.* Defendant Jagdishan received net proceeds of $5.6 million from sales of HDFC securities. ¶ 29. Ashok Khanna received net proceeds of $3.8 million from insider sales. *Id.* Lucrative compensation and insider sales while engaged in misconduct suffice to establish motive—and thus scienter.[9]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should each be denied in its entirety.

---

[9] Because the Complaint pleads a Section 10(b) claim, the Section 20(a) control person claim should stand. *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 284 (S.D.N.Y. 2012).

Dated:  June 8, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ Tamar A. Weinrib*
Jeremy A. Lieberman
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
taweinrib@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

POMERANTZ LLP
Jennifer Pafiti
(*pro hac vice* application forthcoming)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Facsimile: (917) 463-1044
jpafiti@pomlaw.com

POMERANTZ LLP
Eitan Lavie
Orly Guy
HaShahar Tower
Ariel Sharon 4, 34th Floor
Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240
Facsimile:  +972 (0) 3 624 0111

*Attorneys for Plaintiff*

COHEN & MIZRAHI LLP
Daniel C. Cohen
Edward Y. Kroub

26

Moshe O. Boroosan
300 Cadman Plaza West, 12th Floor
Brooklyn, New York 11201
Telephone: (929) 575-4175
Facsimile: (929) 575-4195
dan@cml.legal
edward@cml.legal
moshe@cml.legal

*Additional Counsel*