UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ASHMI VIG ARORA,                    *    Case No. 20-CV-4140(EK)
                                    *
                                    *
                Plaintiff,          *    Brooklyn, New York
                                    *    January 14, 2022
        v.                          *
                                    *
HDFC BANK LIMITED, et al.,          *
                                    *
                Defendants.         *
                                    *
* * * * * * * * * * * * * * * *

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:              TAMAR A. WEINRIB, ESQ.
                                Pomerantz Haudek Grossman &
                                 Gross, LLP
                                100 Park Avenue
                                New York, NY  10017

For the Defendants:             CAZ HASHEMI, ESQ.
                                SHERYL S. BASSIN, ESQ.
                                Wilson Sonsini Goddrich &
                                 Rosati, PC
                                1301 Avenue of the Americas
                                40th Floor
                                New York, NY  10019

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

(Proceedings commenced at 10:45 a.m.)

THE CLERK:  Civil cause for oral argument, Arora vs. HDFC Bank Limited, et al, Docket No. 20-CV-4140.  Before I ask you to state your appearances, there's just a few things to go over.

First, these proceedings are public.  The recording and/or rebroadcasting of them are not allowed.  We're making an audio recording of today's conference.  So for purposes of a clear record please identify yourself each time you speak, speak slowly, and mute your phone when you're not speaking to eliminate background noises.

Would you all now please state your appearances for the record starting with the plaintiffs.

MS. WEINRIB:  Good morning.  Tamar A. Weinrib from Pomerantz, LLP on behalf of plaintiffs.

MR. HASHEMI:  Good morning, Your Honor.  Caz Hashemi from Wilson Sonsini Goodrich & Rosati on behalf of the defendants.  And I'm joined by my colleague, Sheryl Shapiro Bassin.

THE COURT:  Good morning.

THE CLERK:  That's it, Judge.

THE COURT:  All right.  So good morning, everybody. We're gathered here by telephone today in light of the continuing coronavirus pandemic to hear oral argument on the defendant's motion to dismiss in this case.

3

So, Mr. Hashemi, let's begin with you this morning.

MR. HASHEMI:  Thank you.  And may it please the Court.

Your Honor, to start I would like to note the Second Circuit's 2019 opinion in *Singh v. Cigna*, a case cited by plaintiff in its opposition.

The Second Circuit rejected plaintiff's attempt in that case to plead securities fraud.  "The attempt relies on a simple equation: first, point to banal and vague corporate statements affirming the importance of regulatory compliance; next, point to significant regulatory violations; and voila, you have alleged a prima facie case of securities fraud.  The problem with this equation, however, is that such generic statements do not invite reasonable reliance.  They are not, therefore, material and misleading and so cannot form the basis of a fraud case."  918 F.3d 57.

Your Honor, those words apply with equal or more force to this case since Cigna faced more significant compliance issues than present here.

HDFC is an international bank headquartered in India and provides the --

THE COURT:  What's the reasoning there?

MR. HASHEMI:  Pardon me?

THE COURT:  I mean, you know, just lets start from a common sense perspective.  Obviously, I realize that between

4

Second Circuit pronouncements and common sense the former prevails, but, you know, one of the biggest mortality risks to big banks everywhere is regulatory risk -- you know, we've seen a wave of scandals over the last decade and beyond that -- and why wouldn't it, therefore, be reasonable for an investor to rely on a statement that a bank has a robust compliance and control environment even if those statements are fairly general in nature?

MR. HASHEMI: Well, Your Honor, I believe the Second Circuit and district courts in this circuit have routinely heard that there is no duty to disclose uncharged, unadjudicated misconduct or wrongdoing when the challenged statements are of a generic nature, especially when the issue at hand is clearly immaterial as a matter of law.

So any --

THE COURT: Materiality, I will get to materiality in a second, and I think you may have a much stronger argument there.

But just imagine the following hypo. Imagine a bank made a very generic statement about the robustness of their compliance and control environment, you know, saying something like we have a robust compliance program and control environment and in fact they had no compliance program whatsoever and no internal controls, like, you might have reliance on that statement at least in theory if the gap

rendering that statement false was large enough.

Is that a theoretical matter or is that -- you're saying it's just always the case that generic statements about control environments cannot be relied on as a matter of law?

MR. HASHEMI:  I believe that's the case, Your Honor, especially when plaintiffs fail to identify any specific control that failed, how the controlled environment was structured, or why it was inadequate, let alone statements that its controls were materially false.  That would require every company regardless of size to guarantee perfect compliance by every employee.

If any employee engages in misconduct, even if the dollar amounts are tiny, then the company's internal controls are ineffective, management certifications are false, and a securities fraud lawsuit should follow.  And I respectfully submit that makes no sense and it's not the law.

I mean, we cited cases, for example, *In re PetroChina*, where Chinese oil company officials engaged in bribery.  The claims about false statements concerning internal controls, stock certifications and disclosure controls were virtually identical to this case.

THE COURT:  You know what's going on -- and I apologize for --

MR. HASHEMI:  Sure.

THE COURT:  -- my own ignorance on this particular

6

case, but I know the *Goldman* class action that's been up and down to the Supreme Court now, I think at least I should say that it's about reasonably comparable subject matter in the sense that the alleged misstatements had to do with the robustness and the existence of Goldman's conflict of interest policies.

And I know that the legal issues that the parties have been fighting about at the Supreme Court have to do with class certification, and reliance, and fraud on the market, and other things, but has the Second Circuit or the Supreme Court said anything in that context about the discrete question of can general statements about, you know, conflicts of interest being something we try assiduously to police being a false statement that induces reliance?

MR. HASHEMI:  Well, first of all, in this case, Your Honor, there is no allegation of conflicts of interest.  The allegations are really focused on, and is based on a simple thing, on an Indian newspaper article claiming that a handful of employees improperly included GPS devices in an unspecified number of auto loans without the (indiscernible) --

THE COURT:  But I thought they did that at least in part having been motivated by the fact that some third party was paying them commissions to do it and that was the conflict of interest.  Right?

MR. HASHEMI:  Well, the allegation in the complaint

7

was that this was allegedly done to meet unidentified sales targets and to track customers for loan collection efforts.

There is a Second Circuit opinion that I think is right on point, Your Honor, if I may reference it since you asked about any Second Circuit opinions.  In August 2021, in *Plumbers and Steamfitters vs. Danske Bank*, that's at 11 4th 90 -- and we've provided this supplemental authority after the papers were filed and I don't believe plaintiff responded to our submission -- in that case, Your Honor, the Danske Bank's Estonia Branch had a history of compliance issues, a whistleblower raised concerns about a money laundering scandal, newspaper articles reported on the eight-year scheme, and the company's investigations revealed over 200 billion in the branch's transactions were suspect and that the bank had inadequate AML procedures and employees were terminated and a CEO resigned.

In addressing the allegations, the Danske Bank's financial statements included revenue from illegal transactions.  The Second Circuit noted the longstanding principle that companies do not have a duty to disclose uncharged, unadjudicated wrongdoing.

And here the allegation is this, Your Honor.  Is that HDFC's statements regarding its auto loan program, such as we seek to establish a relationship with customers and expand it by offering more products, were misleading because

8

HDFC did not disclose that more products included GPS bundling.

And this is the sort of allegation that the Second Circuit rejected in *Danske Bank* in August of 2021 in holding that accurate statements, quote, "Do not automatically become misleading by virtue of the company's non-disclosure of suspected misconduct," end quote.  That's at 11 4th at 99.

And here, Your Honor, in the opposition, the defendants' motion to dismiss, on page 12, the plaintiffs wrote, "The literal accuracy of the financials is not at issue.  The case is about defendants' failure to disclose improper auto lending practices in violation of company policy." They go on.

"The Second Circuit in *Danske Bank* addressed this precise type of argument when it said that the plaintiffs in the *Danske Bank* case did not, "Allege that the financial numbers Danske Bank disclosed were manipulated in any way. Just that they failed to simultaneously disclose the AML issues in Estonia.  But because Danske Bank was under no obligation to self report its growing suspicions regarding those issues, its disclosures of accurate historical data standing alone is not actionable."

And they continued.  One other important point, Your Honor.  The Court continued, "Otherwise every company whose quarterly financial reports include revenue from transactions

that violated AML regulations could be sued for securities fraud. Such a rule would bring within the sweep of the Federal Securities Laws many more routine representations made by companies." 11 F.4th 98 to 99, citing another Second Circuit case.

And the *Danske Bank* Court, forgive me, in the Second Circuit addressed the exact challenged statements here. The challenged statements here have to do with internal controls, fraud monitoring committee, whistleblower policy and ethics code.

And the Second Circuit held that generic statements regarding companies striving to comply with anti-corruption regulations were too general and aspirational to induce reliance and were plainly puffery.

And they held general statements about policies and procedures regarding compliance efforts are not actionable. And that was in a case where there was over 200 billion in AML inadequate procedures and the branch's transactions were suspect.

So, Your Honor, it does -- the Second Circuit has spoken on this topic. And if their statements like about the bank's internal controls, stock certification, it's code of ethics, and whistleblower policies were false considering the alleged undisclosed GPS bundling misconduct, the Second Circuit and the Court's -- and the district court opinions we

10

cited in our case were involving much more serious issues were

dismissed.  And this is especially --

THE COURT:  Can you just --

MR. HASHEMI:  I'm sorry.

THE COURT:  -- walk me through the math.  When you

say that even if you assume all bundled GPS devices in the

numerator, it's still only 12 basis points --

MR. HASHEMI:  Yes.

THE COURT:  -- of the total auto loan portfolio?

How are you -- what's the denominator there?  It's the face

value of?

MR. HASHEMI:  Sure.  If I could start the big

picture and I'll come down.

Using fiscal 2020 in exhibit 1 to my colleague's

declaration, the numbers are quite telling.  Total retail

assets of 95 billion represented 45 percent of total assets of

211 billion.  In total, auto loans 12.6 billion represented 13

percent of total retail assets and only 6 percent of total

assets.

The July '20 Economic Times article on which the

complaint relies relates only to auto loans and notes that

four to 5,000 GPS devices were sold monthly at about $250 per

device.

If you assume every single device sold was improper,

which the complaint does not do, Your Honor, does not allege

11

that, let's just assume for purpose of argument every single one of them was problematic, for fiscal 2020, that would be about $15 million.  That amounts to 0.12 percent of total auto loans, .016 percent of total retail assets, and .008 percent of total assets.

THE COURT:  On what --

MR. HASHEMI:  And comparable numbers exist for other years.  Forgive me.

THE COURT:  So the denominators in those fractions, when you say total auto loans, that means what, the face value of the loans issued, the -- where they have the auto loans marked on their books as assets, what's -- I'm just not understanding what the denominator fraction is.

MR. HASHEMI:  Sure.  It's the -- it's on -- and just for your reference it will be on exhibit 1 at 10 is an example is a gross book value and percentage share of our retail credit products.  One of the line items is auto loans.  And then there's other line items that add up to total retail assets.

THE COURT:  So this is Exhibit 1 to whose declaration?

MR. HASHEMI:  To my colleague, Paul Gross.

THE COURT:  Okay.

MR. HASHEMI:  And, Your Honor -- and this is a similar type of assumption that was frankly made in a case we

12

cited in --

THE COURT:  By the way, it looks like exhibit 1 to the Gross declaration I think I have as the 20(f)?

MR. HASHEMI:  Correct.

THE COURT:  Okay.  So where am I looking?

MR. HASHEMI:  At 10.  At 10 is the auto loans (indiscernible).

THE COURT:  Yeah.

MR. HASHEMI:  And the 12.6 billion there which adds up to 95 billion with the other line items.

THE COURT:  I see.

MR. HASHEMI:  The second column.

THE COURT:  So this is the fair value they're saying of their auto loans.  We offer loans at fixed interest rates -- okay.

MR. HASHEMI:  And, Your Honor --

THE COURT:  -- at book value.  Got it.

MR. HASHEMI:  The Second Circuit for example found in *ECA vs. J.P. Morgan* an accounting change of 0.3 percent of J.P. Morgan's total assets that was held not to be material to investors.

*Acedo*, another Second Circuit case, found that alleged failure to disclose was immaterial as a matter of law where it affected less than 1 percent of the company's total sales.

13

And then *In re AT&T*, it's the Southern District of New York case from 2020, there were allegations of illicit sales practices in a business segment and it was deemed immaterial.

And those business practices impacted only a segment of a large company with 250,000 employees, here we have 120,000 approximately; 5,000 retail stores, here we have 5400 outlets; and over 50 million subscribers, and here we have over 56 million customers.  And in that case --

THE COURT:  I take it there was no restatement of financials or (indiscernible) as a result of this alleged conduct?

MR. HASHEMI:  No.  There has been no allegation, no public statement regarding any form of restatement, Your Honor.

THE COURT:  Okay.

MR. HASHEMI:   And in that case it was 1.5 percent of monthly accounts.  The judge gave the benefit of the doubt to the plaintiff's allegation, and 1.5 percent was held to be a tiny percentage and immaterial as a matter of law.

THE COURT:  Can you walk me through what you understand to be the evidence of how the stock drops in the trading day following the first Economic Times article that's alleged to have revealed these practices?

And I ask because, you know, I asked my law clerk to

14

tell me what the broader market did, call it the S&P 500, on the day that the 2.83 percent diminution in this bank's stock is alleged to have occurred, and he came back and said I actually don't see the stock dropping by 2.83 percent on the July 13th date in question.

And it may be that something happened after the market closed and, therefore, we're looking at the next trading day or something, but how do you understand -- you're not contesting the 2.83 percent allegation?  And obviously stock prices are something the Court could take judicial notice of.  How do you see that 2.83 percent drop happening?

MR. HASHEMI:  Yes, Your Honor.  At the motion to dismiss stage, of course we are confined by the complaint's allegation.  The complaint does allege that the stock price decreased by 2.83 percent after the July -- I think actually July 13th Economic Times analysis.  The allegation in the complaint is that it dropped $1.37 dollars or 2.83 percent and closed at 47.02.  We did note, however, Your Honor, five days later the stock price --

THE COURT:  No.  I understand that.  But all I'm asking in this question is is it true that the HDFC American Depository Shares in fact fell by 2.83 percent on July 13th of 2020?  Because I haven't looked at it.  My law clerk came back with a different number.

MR. HASHEMI:  I'm looking at --

THE COURT:  And I do think that even on a motion to dismiss again we're in the realm of judicial notice here I think.

MR. HASHEMI:  Yes.  So on page -- it's exhibit 9 to my colleague's declaration.  On July 10th the stock closed at 48.39, and it then closed on July 13th at 47.02, Your Honor.  So that's a drop of 1.3 percent -- $1.37 or 2.83 percent.

THE COURT:  Oh.

MR. HASHEMI:  So if you look on page 6, Your Honor, on the middle of the page --

THE COURT:  Okay.  It may be that we were looking at the prices in India rather than the ADS price or ADR price in New York.

But do you -- I think it's going to be very, very hard -- just to make this transparent to everybody -- I think it's going to be very hard for the plaintiffs to argue that they've carried their burden on materiality here.

But are you aware of cases that say that the materiality of any diminution in stock price should be assessed against what's happening with stock prices in the broader market?

Like a 5 percent drop in stock price in one day might be, you know, very material or it might be evidence that some revelation was very material unless the -- you know, every bank stock was also down 5 percent that day, in which

16

case you might conclude that the bank was down 5 percent on whatever broader market conditions were doing, not the particular revelation at issue.

Do you see that observation in the case law anywhere?

MR. HASHEMI:  The observation we see is that the stock price drop is one element courts take into account in assessing materiality.  I've seen cases where there was a significant stock price drop that the Court noted in its analysis of materiality in similarly if there was obviously smaller stock price drops.  I think the case here counters (indiscernible) --

THE COURT:  Do you understand my question?  I'm not asking so much about the --

MR. HASHEMI:  I know.

THE COURT:  -- drop in the price of the stock at issue so much as the relative performance of that stock to the broader market during the period in question.

MR. HASHEMI:  I read a lot of materiality cases, Your Honor, recently and I can cite them to you.  I'm not aware of one with that precise analysis you're asking for, but we can obviously take it under submission.

But it is telling -- so to answer your direct question, it is telling here though that this stock price for this company is volatile and that should be taken into

17

account, as we noted, and moved up or down by at least 3 percent more than 50 times in the proceeding 12 months.  And on 25 days changed by 5 percent or more.  And that's -- you could take judicial notice of that, and that's reflected in exhibit 9.

But your precise question, Your Honor, I think it's -- usually it's one of the elements in the analysis of materiality.

THE COURT:  Okay.

MR. HASHEMI:  And I know -- I'm happy to --

THE COURT:  Let me know if you would -- if you could just put in a very short letter that does two things that I'm thinking of so far.  One lays out the math on how you get to the 12-basis-point figure, which, you know, may be very simple for you to do in two sentences, but I just want to make sure I have your assumptions right.

And two, just let me know what the broader market did on the day the 2.83 percent drop is alleged to have occurred.  And I leave it to you to decide what you think the comparatory is there.  Is it the S&P 500?  is it some bank index?  Is it the MSCI World?  You choose and just let me know why you chose what you chose.

Because, again, I think we may be, you know, really far from the world of materiality here, and so this may be more academic than anything else, but my law clerk I think

18

turned up the fact that the S&P 500 itself was down 1.5 percent on the day that this 2.83 percent drop happened and that's a pretty big move for the S&P, all things considered, and it tends to minimize even further, you know, what you can -- what you can read into what the plaintiffs are calling a precipitous decline in the stock price.

Does that -- is that clear enough?

MR. HASHEMI:  Very clear, Your Honor, and I would be happy to do that as soon as early next week.

THE COURT:  Terrific.

MR. HASHEMI:  I would say, Your Honor, that we are very far from -- agree with the Court -- that we're very far from materiality on this and that's why we started that argument, so we're -- the defense is happy to submit that letter.

THE COURT:  Okay.  Let me turn to the plaintiffs and then I'll give the defense the last few minutes in rebuttal since it's your motion.

MS. WEINRIB:  Good morning, Your Honor.  Is there a particular issue that you'd like me to start with or should I just begin my presentation and I'll go from there?

THE COURT:  I think materiality is the big one here.

MS. WEINRIB:  Sure.

THE COURT:  But I leave it to you.

MS. WEINRIB:  Your Honor, defendants did make much

19

of materiality in their motion, and I know this is a strong subject of conversation today as well, so I'd just like to start off by saying that materiality is generally not an appropriate basis for dismissal at this stage.  It's a very fact-intensive issue.  It's usually left for the trier of fact at a later juncture in the litigation.

However, I just want to address a few of the points that defendants raise.

Firstly, their calculation as to whether the cost of the GPS navigation devices is material relative to some metric that they have come up with, the one thing I want to point to is that the calculation that they did was based on one year of supposed GPS navigation device purchases.

But we allege that the thought here occurred starting in 2015, and the end of the class period is in 2020, so we're talking about years' worth of this bundling, not one year.  That's first.

Second, it's not just the cost of the GPS devices that's at issue here.  We allege that the -- one of the purposes of bundling these GPS devices into the auto loans was to track borrowers for purposes of loan collection efforts.

And we further allege that the --

THE COURT:  Sorry.  Explain to me how that works.

MS. WEINRIB:  Your Honor, when a customer defaults on a loan, one of the things that a bank has to do in order to

collect find the borrower.

And we allege based on the Economic -- based on the Economic Times article, which the allegations therein which defendants do not dispute -- and again there are company admissions post class period to the misconduct alleged here -- that the GPS devices were placed into these auto loans to enable tracking of these borrowers to aid in loan collection efforts. So the amount of loans that they collected on would be relevant.

And Your Honor also mentioned at the beginning of this hearing --

THE COURT: So you're saying -- but you're bringing a securities class action here, right? You're not suing on behalf of the borrowers.

And it might be that the borrowers are somehow victimized in the way that you're describing because it's easier for the bank to find them after they default than it would have been absent a GPS device in their car, if I understand what you're saying, but that's a positive for shareholders, right, in that the bank is if anything more likely to collect on loans when they can find the borrower than they would be otherwise.

And so that just leads back into the more nebulous realm of, well, this is bad conduct and bad conduct is bad for shareholders. Is that -- am I missing something there?

21

MS. WEINRIB:  Well, Your Honor, that is exactly the point.  The point is that while a company increasing their revenue might be beneficial for shareholders if they're increasing their revenue by improper tactics that's negative for shareholders.  Otherwise --

THE COURT:  Okay.  But what's -- so what's the best case then for you -- I think what you're saying is, Judge, don't worry about the specific dollar losses at issue here, and maybe don't even worry about the specific diminution in the stock price, the real harm to shareholders here is that you've got a company that's saying on the one hand trust us, we have a robust compliance program, and conflict of interest policies, and internal controls, and all this stuff and, you know, when in truth in fact they don't.

And when shareholders learn that, you know, it breaks their trust across the board and, therefore, it's kind of material in a more, you know, big picture way.

And, you know, maybe I'm paraphrasing that fairly, maybe I'm not, but like can you just tell me what the best case is from your perspective --

MS. WEINRIB:  Sure, Your Honor.

THE COURT:  -- for the notion -- you know, the defense is citing all these cases that say, look, generic statements about compliance policies are not, you know, do not as a matter of law induce reasonable reliance.  What's the

22

best case to the contrary?

MS. WEINRIB:  Your Honor, there are a couple of different issues raised by your question, but I'll start with the materiality issue.

And I would say that one of the strongest cases in support is the *Strougo vs. Barclays* case, which was decided by Judge Scheindlin.

And, Your Honor, in that case, Judge Scheindlin made clear first of all that quantitative materiality is not the only way to show materiality and that the Second Circuit has, quote, "Consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation."

In that case, Your Honor, the misrepresentation concerned Barclays' LS Dark Pool which accounted for less than 1 percent of the bank's overall assets, but the misrepresentations at issue call into question the integrity of the company as a whole.

Now, defendants point out in their motion that in the *Barclays*' instance the reason why that was important was because there was a history of scandal there, there was a LIBOR scandal and that's why the Court held as it did.

We have a very similar situation here.  We have HDFC Bank who was the -- which was the subject of multiple regulatory actions and penalties over the years, including in 2016, including in 2019, including in January of 2020, and the

23

issue, all of these statements during the class period about their robust fraud monitoring committee, about their internal audit department, about their code of ethics, about their whistleblower policies, all of which were described in detail, and all of which included comprehensive steps that the company takes to ensure that there is no fraudulent activity that occurs. Nevertheless, it was occurring during the entirety of the class period.

Those statements, which maybe even in isolation if we were talking about one general type of statement, you could argue perhaps that it's puffery, but we have a series of misstatements that concern multiple steps the company supposedly took to convince investors of its integrity which is particularly relevant given their history of regulatory infractions.

THE COURT: Okay. What was -- what was the stock price drop in the *Barclays* case if you know?

MS. WEINRIB: I don't have it offhand, but I can find it, Your Honor.

THE COURT: Okay.

MR. HASHEMI: I have it, Your Honor.

THE COURT: If that was defense counsel, it's here in rebuttal in that case, but thank you.

So what -- for plaintiff's counsel, what is it specifically that you are alleging was inadequate about the

24

company's policies or control environment?

MS. WEINRIB:  Your Honor, just to begin with, the underlying misconduct here is undisputed, right?  And defendants in fact admitted to the underlying misconduct here.

We also have --

THE COURT:  Admitted to whom?

MS. WEINRIB:  I'm sorry.  Admitted to the market in an investor call and in its (indiscernible) post class period.  And we also have a Reserve Bank of India investigation and monetary penalty based on the underlying misconduct here.

And they reached their conclusions after reviewing HDFC's full response to an order to show cause, after reviewing HDFC's own documents, after all submissions during the hearing.

There is no dispute.  And defendants, if you read through their motion papers, they don't dispute that the underlying conduct occurred.  There has never been a question that this occurred.

And during the class period plaintiffs allege that there were a series of misleading statements that sugared a duty to disclose that misconduct.

We have comprehensive statements regarding HDFC's full strategy in their vehicle financing business which discussed causes of the company's success, and also discusses specific, concrete steps that they were taking to grow the

25

bank, but they left out that a part of that was engaging in regulatory violations. They didn't (indiscernible) --

THE COURT: I mean, put yourself for a moment in the position of the lawyer representing the company after this -- after these revelations come out.

Besides -- so you've got these like line people who are selling loans. And as I understand the allegation they were, quote, "Forcibly" -- and I'm interested in what the word forcibly means -- but they're selling borrowers these GPS devices that the borrowers are not asking for and may not I gather even understand that they're getting at least at the time they sign the loan agreement.

So, you know, for purposes of the motion to dismiss, it's beyond question that you've got those loan officers engaging in misconduct, acting under conflicts of interest, maybe committing fraud doing whatever they're doing, what I'm asking is what is the failure in the control environment?

What should the company, you know, its compliance department, its executive management, what are you alleging that they did or did not do that renders their representations about having a control environment false?

And the reason I ask just to tee this up is because if you're not saying that there was something specifically that the company should have been doing in order to render those -- their general statements true, then I think what

26

you're saying is, okay, every single infraction at every single bank -- even if they've 100,000 employees -- renders their generic statements about having a control environment per se false? And I don't think you want to be in that latter category, right?

So what is it specifically that management should have been doing differently in order to render those statements true in your view?

MS. WEINRIB: Your Honor, the whole purpose of having controls in place, of not only having controls in place, but having a fund monitoring committee in place, and having an audit department in place, and having a code of ethics and whistleblower policies is to prevent rampant fraud. We're not talking about instances of, you know, one individual taking --

THE COURT: But you're not alleging that they said they had a committee in place and they didn't, right?

MS. WEINRIB: We're alleging they (indiscernible) in place that was supposed to be undertaking a comprehensive list of tasks that are covered in the SEC filings in order to prevent fraud, a committee on which defendant clearly sat, and --

THE COURT: Is there a specific task that you say they represented that they were undertaking and yet they weren't?

27

MS. WEINRIB:  Yes, Your Honor.  Effective detecting and recording of funds.  That's for one.  And --

THE COURT:  I mean, that's a conclusion, right?  That's not a -- that's like telling an investor in the stock market that they should buy low and sell high, right?  That's not an instruction about how to actually do your job.

MS. WEINRIB:  Well, no, Your Honor.  If a monitoring committee was created at the direction of the Reserve Bank of India, they were required to have effective policies in place to detect fraud.  And yet in --

THE COURT:  Right.  And so I say again what policy should they have had that they didn't?  Or what practice or what monitoring policy should they have had but they didn't?

MS. WEINRIB:  But we're not -- I'm sorry, Your Honor.

THE COURT:  No.  Go ahead.

MS. WEINRIB:  We're not alleging that there was a policy they should have had in place that they didn't.  We're saying that they didn't follow the policies they purported to have in place.

We're saying they claimed to have all of these policies, and codes of ethics, and audit departments, and fraud monitoring committees, but that they didn't operate effectively to do what the company said they were tasked to do.  And that if they had been, they would not have been able

28

to continue this rampant fraud undeterred for the amount of years that they did.

THE COURT:  Okay.

MS. WEINRIB:  And that is particularly so because, Your Honor, the company -- this is not the first time the company has run up against regulatory violations.

THE COURT:  I understand that.  What do you make of the assertion by the defense that highly general statements about the existence of a compliance program and a control environment cannot be the subject of reasonable reliance?

Do you have a case where -- do you have a case that specifically says the opposite?

MS. WEINRIB:  Well, Your Honor, there are cases that say that -- for example, the *Petrobras* case and the *Vale* case, which we cite in our opposition brief, which say that statements like this, you know, especially when there are -- when they are made repeatedly and comprehensively in order to assure the market about the integrity of a company, and especially when that company has had a history of misconduct, that those can be the subject of securities fraud liability.

THE COURT:  Hold on just one second.  So my law clerk was emailing me while we've been on the phone here about the *Goldman* case that I brought up at the outset.  This is the *ABACUS* case I think.

And what the plaintiffs are alleging there the false

29

statements and misrepresentations at issue are about conflict of interest policies and business practices, and specifically the plaintiffs quote Goldman saying we have extensive procedures and controls that are designed to identify and address conflicts of interest. That's one alleged misstatement. Misstatement two, our clients' interests always come first. And three, integrity and honesty are at the heart of our business.

Do you know -- I know there's been all this fighting over class certification, do you know whether any court, either the district court, the Second Circuit, or the Supreme Court, has spoken to the issue of whether, you know, relatively generic statements like that can be the subject of reasonable reliance?

I would have thought that if the defense position was correct that you can't have reasonable reliance on generic statements like that that the case would have been dismissed on that ground before all this fighting about class certification, but I just don't know the answer.

MS. WEINRIB: Correct, Your Honor. It would have been dismissed in that instance if those cases were found -- if those statements were found to be inactionable.

I don't have the district court's opinion on the motion to dismiss in front of me. I'm happy to submit something to the Court following this hearing.

But I think that the main point to take away from here is that it's a very case-specific inquiry. So if you have a case by *Goldman Sachs* or a case like *Barclays* or a case like this one where you have not just one statement but many types of statements repeatedly made in -- at multiple points throughout the class period that collectively are meant to convince investors of the company's integrity, whether it's talking about their business practices, or conflicts of interest, or fraud detection, whatever it may be, if those statements are made repeatedly and often and in multiple ways, particularly if the company has a history of misconduct, then in those instances they're not merely generic puffery, but are actionable.

THE COURT: Yeah. I'm not sure puffery is the word I would use. It's no -- puffery makes it sound like, oh, this is the kind of thing that, you know, people just say to make themselves look good but nobody ever means it, and it's just, you know, it's salesmanship.

I don't -- I wouldn't characterize these statements as that, but I would characterize them as fairly general, and that's why I bring up the *Goldman* case because I do think at least some of the misstatements at issue there fall into that same category of generality.

And so I'm going to ask the -- you know, I've already the defense to submit a short supplemental letter on a

31

couple of issues.  I'm going to ask them to, you know, speak to this issue if there's something to be said about it of, you know, what's been said up and down the chain in the *Goldman* case about this issue of reliance on generic statements and I'll leave it at that.

So why don't we just hear for a few minutes in rebuttal from the defense.

MR. HASHEMI:  Thank you, Your Honor.  Caz Hashemi again.

Just real quick on materiality and argument and left for trier of fact, courts routinely do it at the motion to dismiss stage.  We cited cases from the Second Circuit, *J.P. Morgan* and *Acedo*.  I believe the *In re AT&T* district court case is instructive.

To answer Your Honor's question about *Strougo vs. Barclays*, that was a 15 percent stock price drop, Your Honor.

To address the allegation about there was only one year of information provided, Your Honor, it is the plaintiff's burden to plead those facts.  That is why the Reform Act was enacted 25 years ago.  It is the plaintiff's burden to plead particularized facts showing a materially false statement and they have failed to meet their burden.

With respect to internal controls, Your Honor --

THE COURT:  Sorry.  Say that last point again.

MR. HASHEMI:  It is the plaintiff's burden under the

32

Reform Act to --

THE COURT:  So what case are you distinguishing here?

MR. HASHEMI:  Oh, sorry.  I was moving on to the argument where there was the comment that we only addressed one year of the GPS devices, and that's because that's what the allegation complaint was.  There was only one year I think.

On the internal controls point, Your Honor, I would just say, you know, it is plaintiff's burden, as the Court was suggesting in argument -- or at least asking, forgive me -- to identify the specific control that failed, how that control environment was structured or why it was inadequate, and they don't do that, let alone the bank's statements about its control were materially misleading.

And, again, if cases like *In Re: Deutsche Bank*, and *In re PetroChina*, which involved bribery and money laundering -- and *Deutsche Bank*, they had a history of non-compliance with money laundering policies and procedures -- very similar disclosures that the plaintiffs challenge here were rejected and it did not get past the motion to dismiss stage.

And I would respectfully submit the statement that rampant fraud existed at HDFC is a bit of an overstatement.

And then finally, Your Honor, I would say the Second Circuit has spoken on these issues pretty clearly in the *Singh*

33

*v. Cigna* case, that's the 2019 Second Circuit case, the *Danske Bond* case that came in in 2021 after the briefing in this case, and also *ECA vs. J.P. Morgan*. And of course this all started with the *City of Pontiac* case years ago in 2014 where again general statements --

The one thing I would add is plaintiff's case --

THE COURT: Sorry. What's your takeaway from the *City of Pontiac* case?

MR. HASHEMI: There there was statements about reputation, integrity and compliance with ethical norms are inactionable and explicitly aspirational. That's a case where they had a misreporting of a residential market-backed security portfolio which resulted in a write-down of 48 billion.

The cases cited by plaintiff just on this last point of failure to disclose were past the motion to dismiss, Your Honor. If you read them carefully, whether it's the *Petrobras* case or the *Vale* case, there companies provided detailed descriptions of specific compliance efforts on the very issue at hand, or specific statements about the practices to give comfort to investors, or statements intended to reassure investors about the company's --

THE COURT: So walk me through *Petrobras*. So what's the specific statement --

MR. HASHEMI: Sure.

34

THE COURT:  -- regarding a specific practice?

MR. HASHEMI:  Sure.  So *Petrobras*, a 2015 case from the Southern District of New York, is a Brazilian owned company and certain executives engaged in a large corruption scheme involving kickbacks and involved corrupt Petrobras executives.  There were detailed allegations of senior executives' awareness of corrupt activities.  On materiality, the Court noted a dramatic stock price drop of 80 percent as a factor.

And here we don't have anything of the sort regarding senior executives awareness of corrupt activities, or continually attempting to reassure the investing public on integrity, or a stock price even remotely close to that.

And in the *Vale* case, Your Honor, that plaintiffs cited -- it's an Eastern District of New York case from 2020 -- defendants made several statements related to dam safety practices after a prior dam had collapsed and killed 19 people, and another dam collapse and killed 270 people.  They made statements about the inspections, the data gathered, the maintenance conducted, they made specific representations about then existing practices that were material and not puffery.

And by the way that court dismissed statements that were purely aspirational and generic warnings of risk, statements that acknowledged no legal obligations, and the

35

existence of committees.  That court dismissed those types of statements.  And the ones that went through were very specific.

So it goes to the point that we've been discussing. Where are the specific statements?  Where are -- these are just generic statements that are being, you know, trying to push it into a securities fraud case based on allegations of misconduct, you know, completely unrelated to those challenged statements.

Thank you for your time.  And we will submit those in the letter you request, Your Honor.

THE COURT:  Okay.  And you heard my question about the *Goldman* saga?

MR. HASHEMI:  Yes.

THE COURT:  All right.  Thank you, all.  This has been informative for me.

If we could have the defense letter first, call that a week from this coming Wednesday, and the plaintiff's letter a week thereafter.  In each case five pages or less let's say. I think that will -- that will put us on the path towards getting an order out in due course.  Thank you, everyone.

MR. HASHEMI:  Your Honor, would we be able to get a chance for a short reply to plaintiff's letter or --

THE COURT:  I think one letter each is going to be sufficient.  We're drilling down to the bedrock here as it is.

36

But rest assured that we'll drill down ourselves on anything they say in response.

MR. HASHEMI:  Okay.

THE COURT:  So thank you, all.  Stay safe in the current circumstances, and we will be in touch in the near future.

MS. WEINRIB:  Thank you, Your Honor.

MR. HASHEMI:  Thank you so much, Your Honor.

MS. WEINRIB:  Stay safe as well.

(Proceedings concluded.)

I, CHRISTINE FIORE, court-approved transcriber and certified electronic reporter and transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_Christine Fiore_

_____        January 17, 2022

Christine Fiore, CERT