# WILSON SONSINI

Wilson Sonsini Goodrich & Rosati
Professional Corporation

650 Page Mill Road
Palo Alto, California 94304-1050

O: 650.493.9300
F: 650.493.6811

January 26, 2022

The Honorable Eric R. Komitee
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> **Re:** **Defendants' Supplemental Letter in Support of Motion to Dismiss,**
> *Arora v. HDFC Bank Limited et al.*, **No. 2:20-cv-04140-EK-JMW**

Dear Judge Komitee:

On behalf of Defendants HDFC Bank Limited ("HDFC" or the "Bank"), Aditya Puri, and Sashidhar Jagdishan, we respectfully submit this letter to address the Court's questions during the January 14, 2022 hearing on Defendants' Motion to Dismiss (the "Motion").

## I.        The Requested Calculation

Defendants' Motion explained that even if every GPS device referenced in an article pleaded in the Complaint was improperly bundled (which Plaintiff does not allege), the amount of improper gain in Fiscal Year 2020 (FY20) would have been no more than 0.12% of the Bank's auto loans issued that year. *See* Mot. (ECF No. 34) at 2 & n.3, 10-11.  During the hearing, the Court requested that Defendants explain the assumptions and math underlying this number.  Tr. (ECF No. 43) at 17:11-16 ("[L]ay[] out the math on how you get to the 12-basis-point figure[.]").

As an initial matter, it is Plaintiff's burden to plead particularized facts showing a materially false statement.  15 U.S.C. § 78u-4(b)(1); Mot. at 6-7.  The Complaint fails to meet this burden by not alleging the number or value of the GPS devices that were improperly bundled with auto loans.  *See* Mot. at 8-9.  It does, however, incorporate by reference a July 20, 2020 *Economic Times* article, which quotes a source noting GPS devices were "quite a minuscule portion of the banks [sic] portfolio" and estimates (i) the number of GPS devices sold by HDFC each month ("4000-5000" devices); and (ii) the price of each device ("18,000-19,000" Indian Rupees each).  Gross Decl. (ECF No. 35) Ex. 8 at 3; *see also* Compl. (ECF No. 27) ¶ 78.

Defendants' calculation assumed that: (1) 5,000 GPS devices were sold (the highest number in the article's estimated range) each month; (2) every GPS device sold was sold for 19,000 INR (the highest price in the article's estimated range); and (3) every GPS device sold in FY20 was wrongfully "bundled" with an auto loan, which Plaintiff does not allege (and the *Economic Times* does not report).  *See* Mot. at 10-11.  Based on these Plaintiff-friendly assumptions, approximately 95 million INR worth of GPS devices would have been wrongfully bundled (5,000 GPS devices x 19,000 INR = 95M INR) each month.  *See id.*  Annualized, this amounts to approximately 1.140 billion INR each year (95M INR / month x 12 months = 1.140B INR).  On July 20, 2020, the date of the *Economic Times* article, the published exchange rate between Indian Rupees and U.S. Dollars was 74.8 INR / 1 USD.  *Id.* at 11 n.10.  Using this

**WILSON SONSINI**

The Honorable Eric R. Komitee
January 26, 2022
Page 2

exchange rate, converting 1.140 billion INR to USD results in $15.2 million worth of improper bundled GPS devices annually (1.14B INR / FX rate 74.8 = ~$15.2M USD). *Id.* at 11.

To compare the approximate value of bundled GPS devices to the value of the Bank's auto loans and total retail assets, Defendants highlighted a single year, HDFC's FY20 (the Class Period's last full fiscal year). *Id.* at 5, 11. In FY20, the Bank reported the gross book value of its auto loans as $12.628 billion USD, the gross book value of its total retail assets as $95.074 billion USD, and its total assets as $211.724 billion USD. Gross Decl. Ex. 1 at 10, 74. Thus, in FY20, the estimated value of bundled GPS devices is at most **0.12%** of the reported gross book value of auto loans ($15.2M / $12.628B = 0.12%); **0.016%** of the reported gross book value of total retail assets ($15.2M / $95.074B = 0.016%); and **0.007%** of total assets ($15.2M / $211.724B = 0.007%). Mot. at 10-11; Gross Decl. Ex. 1 at 10, 74.[1] There are no allegations in the Complaint to suggest that these percentages would materially differ for prior years. *See* Mot. at 10-11. Courts routinely hold these amounts immaterial at the motion to dismiss stage. *See id.* at 11-12 & n.12 (citing Second Circuit cases); Reply (ECF No. 38) at 5-6. Moreover, no amended pleading can change the fact that the value of bundled GPS devices was immaterial when compared to HDFC's overall financial condition.

## II.   The Stock Market's Performance On July 13, 2020

The Complaint alleges that HDFC's share price "fell $1.37 per share, or 2.83%, to close at $47.02 per share on July 13, 2020." Compl. ¶¶ 6, 76.[2] During the hearing, the Court asked, "let me know what the broader market did" on July 13, 2020. Tr. at 17:17-19. The following sets forth the publicly available performance of five stock market indices from closing on July 10 to closing on July 13, 2020: S&P 500 (-0.94%); MSCI World (-0.26%); Wilshire 5000 (-1.10%); Russell 3000 (-1.14%); and S&P 500 Banks Index (+0.80%).[3] These indices are generally understood to capture the "broader market" and/or were noted by the Court (*see* Tr. at 17:19-22).

The price movements of HDFC's ADS in the year preceding July 13, 2020 further minimize the stock price dip at issue here: the closing price moved up or down between trading days by 3% or more over 50 times during that period. *See* Mot. at 5 (citing Gross Decl. Ex. 9).

---

[1] As further context, for the value to reach even 1% of the Bank's total retail assets (which would still be immaterial), HDFC would have needed to sell 3.74 million improperly bundled GPS devices in FY20, over 60 times more than the high-end of the reported range in the *Economic Times* article.

[2] The Second Circuit routinely affirms dismissal of securities class actions with larger stock price drops. *See, e.g.*, *Fogel v. Vega*, 759 F. App'x 18, 21 (2d Cir. 2018) (initial 12.2% drop and further 4.3% drop one day later); *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 203 (2d Cir. 2009) (nearly 19% drop). In response to the Court's question during the hearing regarding the stock price drop in *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330 (S.D.N.Y. 2015), a case cited by Plaintiff (Opp. (ECF No. 36) at 11, 13), the undersigned inadvertently cited the 15% stock price drop in another case cited by Plaintiff, *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 Civ. 2106 (ER), 2017 WL 1169629, at *2 (S.D.N.Y. Mar. 28, 2017) (Opp. at 13). *See* Tr. at 23:16-17, 31:15-16. The initial stock price drop in *Strougo* was 7.83% followed by an additional 1.5% decrease over the next two trading days for a total 8.88% drop. *Strougo*, 105 F. Supp. 3d at 339.

[3] The stock market data is available at https://www.marketwatch.com/. The Court may take judicial notice of well-publicized stock prices. *See* Mot. at 5 n.5; Tr. at 14:9-11.

**WILSON
SONSINI**

The Honorable Eric R. Komitee
January 26, 2022
Page 3

### III.  The *Goldman Sachs* Securities Litigation And The Law On Generic Statements

During the hearing, the Court asked whether the Second Circuit or the Supreme Court considered whether the statements about conflicts of interest alleged in the *Goldman Sachs* securities litigation were actionable.  Tr. at 6:10-14; *see also id.* at 31:1-4.  The Court also inquired more generally about how the Second Circuit and other courts approach generic statements in the context of reasonable reliance.  *Id.* at 29:10-14.  While neither the Second Circuit nor the Supreme Court analyzed the conflicts of interest statements in the *Goldman Sachs* case, subsequent Second Circuit authority consistently recognizes that general statements about controls, codes of ethics, and similar policies are not actionable.

#### A.  Neither the Second Circuit nor the Supreme Court evaluated the actionability of the statements challenged in *Goldman Sachs*, which are different than the statements challenged in this case

The Court asked whether "the Second Circuit or Supreme Court [in *Goldman Sachs*] said anything . . . about the discrete question of can general statements about . . . conflicts of interest . . . be[] a false statement that induces reliance[.]"  Tr. at 6:10-14.  They did not.  Neither addressed whether the challenged statements are actionable.  The question on appeal was whether the generic nature of an alleged misrepresentation is relevant when evaluating price impact at the class certification stage.  *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1958, 1960-61 (2021).

##### 1.  Whether or not the challenged statements in *Goldman Sachs* are actionable never received appellate review

In *Goldman Sachs*, plaintiffs alleged Goldman sold financial products to clients despite undisclosed "clear and egregious conflicts of interest[.]"  *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461 (PAC), 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014).  In three of four CDO transactions at issue, "Goldman affirmatively represented that it held a long position in the equity tranches, without disclosing its substantial short positions."  *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 278 (S.D.N.Y. 2012).  In one of those three transactions, "Goldman stated that it had 'aligned incentives' with investors by 'investing in a portion of equity,' which amounted to $6 Million, without disclosing that it also held 100% of the short position at the same time, which amounted to $2 Billion."  *Id.* at 278-79.  Plaintiffs alleged these actions rendered false Goldman's public statements such as (i) "we increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interest of another client"; (ii) "[w]e have extensive procedures and controls that are designed to . . . address conflicts of interest"; (iii) "[o]ur clients' interests always come first"; and (iv) "[i]ntegrity and honesty are at the heart of our business[.]"  *Id.* at 277.  Goldman ultimately acknowledged it was a mistake not to disclose the conflicts of interest associated with the transactions.  *Id.* at 270.  The lawsuit followed the announcement of an SEC enforcement action and a 13% stock price drop.  *Id.*

**WILSON
SONSINI**

The Honorable Eric R. Komitee
January 26, 2022
Page 4

In June 2012, the district court granted in part and denied in part the defendants' motion to dismiss. 868 F. Supp. 2d at 269. It found that Goldman made material misstatements "in light of its role and conduct in the [four CDO] transactions." *Id.* at 280. In denying reconsideration, the court held that the challenged statements, and specifically statements (i) and (ii) above, were "directly at odds with [Goldman's] alleged conduct" and highlighted that Goldman's service to a specific client and its own short position "'conflict[ed] with the interest of [the] [] other client[s]' investing in those deals." 2014 WL 2815571, at *5. The court subsequently denied Goldman's motion for certification of an interlocutory appeal. *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461 (PAC), 2014 WL 5002090, at *1 (S.D.N.Y. Oct. 7, 2014). As a result, neither the Second Circuit nor the Supreme Court evaluated whether plaintiffs adequately pled a materially false statement.

### 2.    This case is distinguishable from *Goldman Sachs*

This case is different from *Goldman Sachs*. The challenged statements in this case generally disclose that the Bank had internal controls, an ethics code, a fraud monitoring committee, and a whistleblower policy. *E.g.*, Compl. ¶¶ 3, 21, 30, 34-37, 43.[4] They do not describe or address the underlying misconduct, which Plaintiff alleges to be bundling GPS devices with auto loans to meet sales targets and to track customers as part of loan collection efforts. *See* Opp. at 10. In addition, they are not about conflicts of interest, and Plaintiff does not allege or argue that any of the challenged statements are false due to conflicts of interest. *See id*. at 10-18. Plaintiff also does not plead or argue that HDFC touted a lack of conflicts of interest while engaging in transactions "directly at odds with" those statements. *See id.* Finally, Plaintiff does not allege any statements by HDFC concerning conflicts of interest that are "directly at odds with" the GPS bundling misconduct. *See id*.

In fact, the July 20, 2020 *Economic Times* article incorporated into the Complaint (and on which Plaintiff relies for its admission of misconduct allegation) reports that HDFC's then-managing director "denied" any conflict of interest and noted that the internal review "has not brought out any conflict of interest issue nor does it have any bearing on our loan portfolio[.]" Gross Decl. Ex. 8 at 3. This stands in contrast to Goldman's acknowledgement that it had mistakenly failed to disclose conflicts of interest. *Goldman Sachs*, 868 F. Supp. 2d at 270.

### B.    Second Circuit precedent favors dismissal in this case

During the hearing, in connection with the discussion of *Goldman Sachs*, the Court asked "whether any court, either the district court, the Second Circuit, or the Supreme Court, has spoken to the issue of whether . . . relatively generic statements like that can be the subject of reasonable reliance[.]" Tr. at 29:10-14. Subsequent to the *Goldman Sachs* district court's opinions, the Second Circuit addressed generic statements and reasonable reliance in numerous cases, and routinely affirmed dismissals. These recent cases confirm that the statements

---

[4] Plaintiff claims two other statements – "offering more products" and "offer[ing] loans" – were false because the Bank failed to disclose the GPS devices bundling misconduct. Compl. ¶¶ 31-32, 40-41, 49, 57. As reflected in the Motion and Reply, these statements do not say anything about GPS devices or bundling; in any event, the Bank had no duty to disclose the immaterial GPS bundling. *See* Mot. at 17-19; Reply at 2-3.

WILSON
SONSINI

The Honorable Eric R. Komitee
January 26, 2022
Page 5

challenged here are not actionable under prevailing Second Circuit authority (none of which cites to any relevant Supreme Court authority).

General statements that businesses have "established policies and procedures to comply with applicable requirements," such as those challenged here, are not actionable. *See Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 104 (2d Cir. 2021) (affirming dismissal order) (ECF No. 39) (quoting *Singh v. Cigna Corp.*, 918 F.3d 57, 60, 63 (2d Cir. 2019)); *see also* Tr. at 7:3-10:2; Mot. at 15 & n.17 (summarizing challenged statements). In August 2021, the Second Circuit in *Danske Bank* held that generic statements regarding efforts to comply with international anti-corruption regulations were too general and aspirational to induce investor reliance. 11 F.4th 90 at 103-04. Indeed, even though the defendant admitted that one of its international branches had deficiencies and insufficient processes to prevent money laundering where over $200 billion in transactions were suspect, the Second Circuit held that statements that the defendant "condemns . . . money laundering" and "takes the steps necessary to comply with internationally recognized standards" were not actionable because "[n]o reasonable investor . . . would weigh these generic statements in its investment calculus." *Id.*

Similarly, the Second Circuit held in 2019 that a company's statements on its goal to comply with an internal code of ethics were "too general to cause a reasonable investor to rely upon them." *Singh*, 918 F.3d at 63 & n.25 (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)). In *Singh*, plaintiffs challenged the company's code of ethics statements that it had "a responsibility to act with integrity" and statements that it "expect[s] to continue to allocate significant resources" to compliance efforts. *Id.* at 60-61. Plaintiffs claimed securities fraud arising from a series of compliance failures noted by regulators. The Second Circuit held that these "generic assertions" were not actionable because "a reasonable investor would not rely on the challenged statements as representations of regulatory compliance." *Id.* at 60, 64 (affirming dismissal order).[5]

Other recent Second Circuit opinions are in accord. *See Fogel*, 759 F. App'x at 23 (affirming dismissal relating to Wal-Mart de Mexico bribery scheme; "General statements about honesty and integrity, including those about general compliance with the law, are not sufficient to state a claim" absent allegations that "lift these generalized claims of honesty and integrity above the level of mere puffery"); *see also Asay v. Pinduoduo Inc.*, No. 20-1423, 2021 WL 3871269, at *3 (2d Cir. Aug. 31, 2021) ("vague and generalized language" describing "strict" compliance not actionable); *In re Liberty Tax, Inc. Sec. Litig.*, 828 F. App'x 747, 750-51 (2d Cir. 2020) (statement that "[o]ur compliance task force was very successful" was too general and "no reasonable investor would rely [on it] in making investment decisions"). Accordingly, under prevailing Second Circuit authority, the Complaint here should be dismissed.

---

[5] *Meyer v. JinkoSolar*, 761 F.3d 245 (2d Cir. 2014) is distinguishable. In *Meyer*, the company publicly detailed its compliance efforts to investors, including statements about 24-hour monitoring, advanced pollution abatement equipment, and its process for treating industrial waste. *Id.* at 247-48. At the same time, the company sent reports of environmental failures to a China environmental agency. *Id.* at 249. The Second Circuit held that the statements were actionable, noting the detailed public statements "gave comfort to investors" regarding the specific environmental regulations at issue when in fact the company knew those regulations were violated. *Id.* at 251; *see Singh*, 918 F.3d at 63-64 (distinguishing *JinkoSolar*). Here, the challenged statements are not specific or detailed.

**WILSON
SONSINI**

The Honorable Eric R. Komitee
January 26, 2022
Page 6

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*s/ Caz Hashemi*
Caz Hashemi

*Counsel for Defendants HDFC Bank Limited,
Aditya Puri, and Sashidhar Jagdishan*

cc:      All Counsel of Record (via CM/ECF)