UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

ASHMI VIG ARORA, individually and on
behalf of all others similarly
situated,

              Plaintiff,

           -against-

HDFC BANK LIMITED, ADITYA PURI, and
SASHIDHAR JAGDISHAN,

              Defendants.

-------------------------------------x

**<u>MEMORANDUM & ORDER</u>**
20-CV-4140(EK)(JMW)

ERIC KOMITEE, United States District Judge:

        HDFC Bank Limited is a bank based in Mumbai.  The bank is publicly held; its shares trade primarily in India, but it also has issued American Depositary Shares ("ADS") that are listed on the New York Stock Exchange.  In 2020, the *Economic Times* reported on allegations of improper lending practices and conflicts of interest in HDFC's auto loans department.  HDFC's share price fell modestly on this news.  The *Economic Times* later reported that some bank employees had "forced" customers to purchase GPS navigation devices by bundling them with car loans in order to meet sales targets.  In some cases, according to the *Economic Times*, these customers were not aware that they had purchased the GPS devices until after the loan contracts had been executed.

The lead plaintiff brings this putative class action,[1] alleging that HDFC committed securities fraud by overstating the quality of its internal controls in public disclosures and failing to disclose the "forced bundling" scheme.  Plaintiff also names as defendants two executives, Aditya Puri and Sashidhar Jagdishan — the company's former managing director and CFO, respectively.

Defendants now move to dismiss the suit under Federal Rule of Civil Procedure 12(b)(6).  Because the complaint does not adequately allege the materiality of the misstatements and omissions at issue, the motion is granted.

## I.  Background

The facts described herein are taken from the amended complaint, as well as "statements or documents incorporated into the complaint by reference" and "legally required public disclosure documents filed with the SEC," which are properly considered at the motion to dismiss stage.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).[2]  The allegations are based on "information and belief" as to all

---

[1] Plaintiff Ashmi Vig Arora initiated this action in September 2020. Meitav Dash Provident Funds and Pension Ltd. was appointed as lead plaintiff for the putative class, *see* Order dated Dec. 9, 2020, ECF No. 25, and filed an amended complaint shortly thereafter.

[2] Thus, the Court considers the *Economic Times* articles and HDFC's Forms 20-F filed during the class period, all of which Plaintiff cites and quotes throughout the complaint.

matters outside of Plaintiff and Plaintiff's own acts.  Am.
Compl. 1, ECF No. 27.

HDFC files a Form 20-F with the SEC annually.  The
20-Fs at issue were submitted each July from 2015 through 2019.
*Id.* ¶¶ 1, 30, 39, 48, 56, 64.  In those filings, HDFC and its
executives made numerous statements that Plaintiff alleges were
false or misleading, either for what they said or what they
omitted.  These disclosures stated, among other things, that the
bank had effective internal controls and policies to detect
fraud — including a "Code of Ethics," a whistleblower policy, an
internal audit department, and a "Fraud Monitoring Committee."
*See id.* ¶¶ 30-72.  The complaint acknowledges that the
statements at issue varied in minor ways from year to year; the
following are examples made during the relevant period:

- *Statements About Internal Controls and Policies*

  - "The Bank performed an evaluation of the effectiveness
    of the design and operation of its disclosure controls
    and procedures as of March 31, 2015.  Based on this
    evaluation, our Principal Executive Officer and our
    Principal Financial Officer have concluded that our
    disclosure controls and procedures as defined in
    [Rules promulgated under the Securities Exchange Act]
    are effective."  *Id.* ¶ 35 (emphasis removed) (quoting
    2015 Form 20-F).

  - "Management assessed the effectiveness of our internal
    control over financial reporting as of March 31, 2015.
    . . . Based on its assessment, management has
    concluded that our internal control over financial
    reporting was effective as of March 31, 2015."  *Id.*
    ¶ 36 (emphasis removed) (quoting  2015 Form 20-F).

      o   "We have a written code of ethics applicable to
[senior management].  We believe the code constitutes
a 'code of ethics' as defined in Item 16B of Form
20-F."  *Id.* ¶ 37 (quoting 2015 Form 20-F).

      o   "We also have a whistle blower policy that contains
procedures for receiving, retaining and treating
complaints received . . . regarding questionable
accounting or auditing matters or conduct . . . ."
*Id.* (quoting 2015 Form 20-F).

    ■   *Statements About Products and Marketing*

      o   "We seek to establish a relationship with a retail
customer and then expand it by offering more products.
As part of our growth strategy we continue to expand
our distribution channels so as to make it easier for
the customer to do business with us."  *Id.* ¶ 31
(emphasis removed) (quoting 2015 Form 20-F).

      o   "We offer loans at fixed interest rates for financing
new and used automobile purchases. In addition to our
general marketing efforts for retail loans, we market
this product through our relationships with car
dealers, direct sales agents, corporate packages and
joint promotion programs with automobile
manufacturers."  *Id.* ¶ 32 (quoting 2015 Form 20-F).

      o   "In addition to [HDFC Bank's] general marketing
efforts for retail loans, [the Bank] market[s] [its]
offerings at various customer touch points such as
authorized dealers, direct sales agents, [its] banking
outlets and the phone banking channel, and from [its]
digital touch points. [HDFC Bank] believe[s] that [it
is] the leader in the auto loan segment, having
established [its] presence over almost two decades."
*Id.* ¶ 66 (quoting 2019 Form 20-F).

Defendants Puri and Jagdishan certified the disclosures at issue

pursuant to the Sarbanes-Oxley Act.  *Id.* ¶¶ 30, 39, 48, 56, 64.

They also acknowledged their responsibility for maintaining

controls and procedures adequate to ensure the accuracy of the

bank's financial reporting.  *See id.*

The complaint alleges that the revelation of HDFC's forced GPS bundling scheme rendered the above statements "materially false and misleading." *Id.* ¶ 4. At the time the statements were made, the complaint alleges, HDFC "did not have effective internal controls." *Id.* Moreover, "neither the Fraud Monitoring Committee nor the internal audit department operated effectively to prevent or uncover fraud"; "the whistle blower policy did not operate effectively to uncover or prevent fraud"; and "the Individual Defendants and senior management overseeing HDFC Bank's vehicle financing segment did not adhere to the Company's Code of Ethics." *Id.* This litany of reasons why HDFC's statements are "false and misleading" is repeated, largely verbatim and with few additional details, throughout the complaint. *See id.* ¶¶ 38, 47, 55, 63, 72.

Likewise, the complaint alleges that the statements relating to HDFC's products and marketing materially omitted to disclose the bundling scheme. Plaintiff highlights, for example, the following statement in HDFC's 2015 and 2016 Form 20-F: "We seek to establish a relationship with a retail customer and then expand it *by offering more products*." *Id.* ¶¶ 31, 40 (emphasis in original). This statement, Plaintiff alleges, fails to disclose "that with regard to automobiles [sic] loans, 'more products' included GPS devices that [bank employees] forcibly bundled into automobile loans, often without

the borrowers' knowledge, and in contravention of Company policy
. . . ." *Id.*

On July 13, 2020, the *Economic Times* first reported
that HDFC had conducted an internal probe "into allegations of
improper lending practices and conflicts of interests in its
vehicle-financing operation."  Am. Compl. ¶ 73; *see* Mem. Supp.
Defs.' Mot. Dismiss ("Defs. Mot.") Ex. 7 at 2, ECF No. 35-7.[3]  On
this news, the bank's ADS price fell $1.37 to close at $47.02 —
a diminution of 2.83% that the complaint calls a "precipitous
decline."  Am. Compl. ¶¶ 76–77.

In a follow-up article published a week later, the
*Economic Times* reported that some employees in the bank's auto
loans department had "forced customers" to buy GPS devices by
bundling them with their car loans.  Am. Compl. ¶ 78; *see* Defs.
Mot. Ex. 8 at 2, ECF No. 35-8.[4]  An internal HDFC probe had
found, according to the *Economic Times*, "that some customers
were not even aware of purchasing such a product till the loan
documents were checked."  Am. Compl. ¶ 78; *see* Ex. 8 at 2.  HDFC

---

[3] Suvashree Ghosh & Anto Antony, *HDFC Bank probes lending practices at vehicle unit*, Econ. Times (July 13, 2020), https://economictimes.indiatimes.com/industry/banking/finance/banking/hdfc-bank-probes-lending-practices-at-vehicle-unit/articleshow/76931492.cms.

[4] Saloni Shukla, *Car loan probe: HDFC Bank terminates half a dozen employees for violating the code of conduct*, Econ. Times (July 22, 2020), https://economictimes.indiatimes.com/industry/banking/finance/banking/car-loan-probe-hdfc-bank-terminates-half-a-dozen-employees-for-violating-the-code-of-conduct/articleshow/77076503.cms.

subsequently acknowledged the internal probe and misconduct in a securities filing and investor call.  Am. Compl. ¶¶ 79–80. Plaintiff does not allege any additional decline in share price in the aftermath of either the second *Economic Times* article, or HDFC's SEC filing or investor call.

Plaintiff alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. *Id*. ¶¶ 94, 106.  Plaintiff seeks certification of a class of investors who purchased HDFC securities between July 31, 2015 and July 10, 2020 — the period of time covered by the 2015 to 2019 Forms 20-F prior to the first *Economic Times* article.  *See id*. ¶ 1.

## II.  Legal Standard

To overcome a Rule 12(b)(6) motion, a plaintiff must plead factual allegations sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[5]  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must accept all factual allegations in the

---

[5] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations and internal quotation marks.

complaint as true and draw all reasonable inferences in the
plaintiff's favor.  *See Lundy v. Catholic Health Sys. of Long
Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013).

Securities fraud cases are subject to the "heightened
pleading requirements imposed by" both Federal Rule of Civil
Procedure 9(b) and the Private Securities Litigation Reform Act
("PSLRA").  *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166
(2d Cir. 2021).  Rule 9(b) requires a party to "state with
particularity the circumstances constituting fraud."  Fed. R.
Civ. P. 9(b).  "Allegations that are conclusory or unsupported
by factual assertions are insufficient."  *ATSI Commc'ns*, 493
F.3d at 99.  The PSLRA further requires a plaintiff to "specify
each statement alleged to have been misleading, the reason or
reasons why the statement is misleading, and, if an allegation
regarding the statement or omission is made on information and
belief, . . . state with particularity all facts on which that
belief is formed."  15 U.S.C. § 78u-4(b)(1).  Thus, a plaintiff
"must do more than say that the statements were false and
misleading; they must demonstrate with specificity why and how
that is so."  *Carpenters Pension Tr. Fund of St. Louis v.
Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).

### III.  Discussion

Section 10(b) of the Exchange Act makes it unlawful to
"use or employ, in connection with the purchase or sale of any

security . . . any manipulative or deceptive device or
contrivance in contravention of such rules and regulations as
the [Securities and Exchange] Commission may prescribe." 15
U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b-5,
provides that it is unlawful "[t]o make any untrue statement of
a material fact or to omit to state a material fact necessary in
order to make the statements made, in light of the circumstances
under which they were made, not misleading." 17 C.F.R
§ 240.10b-5.

The elements of a 10b-5 claim are: "(1) a material
misrepresentation or omission by the defendant; (2) scienter;
(3) a connection between the misrepresentation or omission and
the purchase or sale of a security; (4) reliance upon the
misrepresentation or omission; (5) economic loss; and (6) loss
causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

Plaintiff alleges that HDFC's statements contained
material misrepresentations and omissions. For an omission-based claim, a plaintiff must plead that a statement made
without disclosure of certain facts was "*misleading* as to a
*material* fact." *Matrixx Initiatives, Inc. v. Siracusano*, 563
U.S. 27, 38 (2011). An omission is actionable when disclosure
of the information is "necessary to make statements made, in the

light of the circumstances under which they were made, not misleading." *Id.* at 44 (quoting Rule 10b-5).

This case rises and falls on the first element: the complaint does not adequately plead a *material* misrepresentation or omission. *See, e.g., Singh v. Cigna Corp.*, 918 F.3d 57, 62–63 (2d Cir. 2019) (affirming dismissal of complaint that failed to allege materially false statement). Whether a misstatement or omission is material "depends on whether there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009). To be material, "a statement must, in the view of a reasonable investor, have *significantly altered* the total mix of information made available." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 100–01 (2d Cir. 2021) (emphasis added).

Thus, materiality is an objective test, undertaken from the perspective of the reasonable investor. In a variety of contexts, the SEC staff has cautioned that assessments of materiality should take both quantitative and qualitative factors into account. *E.g.*, SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150, 45150–52 (Aug. 19, 1999) ("SAB No. 99"); *ECA*, 553 F.3d at 197–98; *see also* Paul Munter, SEC Acting Chief Accountant, Assessing Materiality: Focusing on the Reasonable

10

Investor When Evaluating Errors (March 9, 2022).  Thus, the
magnitude of the stock price drop following a corrective
disclosure is relevant to the analysis, but not the only
relevant factor.  *Geiger v. Solomon-Page Grp., Ltd.*, 933 F.
Supp. 1180, 1188 (S.D.N.Y. 1996); *see United States v.
Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991).

      As noted above, Plaintiff challenges a litany of
statements in HDFC's Forms 20-F.  *See* Am. Compl. ¶¶ 30-72.  The
statements can be categorized into two groups: (1) statements
regarding internal controls, policies, and certifications; and
(2) statements regarding HDFC's products and marketing
practices.

**A.   HDFC's Statements Regarding Its Internal Controls,
       Policies, and Certifications**

      The majority of statements at issue concerned HDFC's
internal controls and policies.  Many such statements merely
noted the *existence* of these policies, like the statements
concerning HDFC's code of conduct and whistleblower policy.  *See*
Am. Compl. ¶¶ 30, 34, 37, 39, 43, 46, 48, 51, 54, 56, 59, 62,
64, 68-70.  HDFC's executives certified, among other things,
that they had responsibility for "establishing and maintaining
disclosure controls and procedures . . . and internal control
over financial reporting."  *Id.* ¶ 30.  Among other controls and
procedures, HDFC had "a written code of ethics," *id.* ¶ 37;

"whistle blower policy," *id.*; an "internal audit department," *id.* ¶ 34; and a "Fraud Monitoring Committee," *id.*

Other statements went some distance further, attesting to the *effectiveness* of certain controls and procedures. *Id.* ¶¶ 35–36, 44–45, 52–53, 60–61, 69. Each year, for example, HDFC's Form 20-F stated that its executives "concluded that our disclosure controls and procedures . . . are effective." *Id.* ¶¶ 35, 44; *see id.* ¶¶ 52, 60, 69. Similarly, HDFC's management "assessed" and "concluded that our internal control over financial reporting was effective." *Id.* ¶¶ 36, 45, 53, 61. These certifications were made in compliance with Section 302 of the Sarbanes-Oxley Act. *See* 15 U.S.C. § 7241.

The statements in both categories were "false and misleading," Plaintiff alleges, because the existence of the GPS bundling scheme meant that HDFC did not have effective controls; neither the Fraud Monitoring Committee, internal audit department, nor the whistle blower policy "operated effectively"; and the defendants "did not adhere to the Company's Code of Ethics." *Id.* ¶ 47. As explained below, however, Plaintiff fails to allege materiality as to either category of statements.

1.   Statements Regarding the Existence of HDFC's Policies

"To be 'material' within the meaning of [Section] 10(b), the alleged misstatement must be sufficiently specific

for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a [Section] 10(b) fraud claim." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014). As the Second Circuit has explained, "[i]t is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them." *Id.* at 183.

Still, "[a]ssertions of satisfactory regulatory compliance can be materially misleading if the descriptions of compliance efforts are detailed and specific." *Danske Bank*, 11 F.4th at 103. In *Meyer v. Jinkosolar Holdings Co.*, for example, the defendant company's prospectus assured investors of its environmental compliance efforts by referencing specific pollution-abatement equipment and 24-hour monitoring teams. 761 F.3d 245, 247-49 (2d Cir. 2014). In the context of those detailed disclosures, a trier of fact could find it misleading for the defendant not to have disclosed that these efforts "were then failing to prevent serious ongoing pollution problems" — resulting in "substantial violations" of the applicable regulations. *Id.* at 250-51. A reasonable investor could find such omissions material, moreover, because this "substantial

non-compliance" — which the prospectus itself identified as a
specific risk to the enterprise — could "constitute a
substantial threat to earnings, if not to the entire venture."
*Id.* at 247–48, 251–52 (noting the company's disclosures
regarding the risks of fines, suspension of operations, and
facilities closures from such violations).

HDFC's statements about its Code of Ethics,
whistleblower policy, Fraud Monitoring Committee, and internal
audit department are the sort of vague statements that the
Second Circuit and district courts have held to be "too general"
for a reasonable investor to rely on.  *See Danske Bank*, 11 F.4th
at 104.  For example, when referring to the whistleblower
policy, the 20-Fs informed investors simply that the company had
"a whistle blower policy that contains procedures for receiving,
retaining and treating complaints received" and that its
"employees are encouraged to report questionable accounting
matters or any fraudulent financial information."  Am. Compl.
¶ 37.  The plaintiff does not allege that any of these
statements — which were included with other generic disclosures
— were affirmatively untrue.  With respect to the Code of
Ethics, the 20-Fs stated only that HDFC has "a written code of
ethics applicable to" senior management and that it would
provide a copy of the code to any person who requested it.  *Id.*
Unlike the "specific" and "detailed" descriptions of the

14

company's environmental compliance efforts in *Meyer*, *see* 761
F.3d at 247-48, none of these statements provided detail
regarding the mechanics of the policies or make any
representations that would induce reliance as to their efficacy.

Instead, these disclosures are the kind of generic,
immaterial statements the Second Circuit has consistently
concluded cannot sustain a 10b-5 claim at the motion to dismiss
stage. *See, e.g.*, *Danske Bank*, 11 F.4th at 103 (concluding that
statements that defendant-bank "takes the steps necessary to
comply with internationally recognised standards, including Know
Your Customer procedures, and has procedures for customer due
diligence, reporting, and communications" were insufficiently
detailed to constitute material statements); *Singh*, 918 F.3d at
60 (concluding that defendant company's statement that it
"established policies and procedures to comply with applicable
requirements" was too general to invite reliance); *ECA*, 553 F.3d
at 205-06 (statements that company had "risk management
processes that are highly disciplined" were not actionable
because they "were merely generalizations" and "did not, and
could not, amount to a guarantee that its choices would prevent
failures in its risk management practices"). These statements
are not material under the securities laws because no reasonable
investor "would weigh these generic statements in its investment
calculus." *Danske Bank*, 11 F.4th at 104.

In this way, the allegations regarding the existence of HDFC's corporate policies follow a formula that the Second Circuit rejected in *Singh*.  Plaintiff attempts to allege a *prima facie* case of securities fraud by first "point[ing] to banal and vague corporate statements affirming" the existence and "importance of regulatory compliance," and then "point[ing] to significant regulatory violations."  *Singh*, 918 F.3d at 60.  But because these types of "generic statements do not invite reasonable reliance," they are not "*materially* misleading."  *Id.*

2.   Statements Regarding the Effectiveness of HDFC's
     Internal Controls and Procedures

The complaint similarly fails to allege sufficiently that HDFC's statements about the *effectiveness* of its internal controls and financial reporting were materially false or misleading.  Conclusory allegations that a company made false or misleading statements that its controls were effective because a later-revealed instance of impropriety indicates otherwise — absent specific allegations about how or why those controls were ineffective — do not state a claim for securities fraud.  *See, e.g.*, *Rex & Roberta Ling Living Trust u/a Dec. 6, 1990 v. B Cmcc'ns Ltd.*, 346 F. Supp. 3d 389, 405 (S.D.N.Y. 2018); *In re*

*Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 648
(S.D.N.Y. 2017).

In *Rex & Roberta Ling*, for example, the defendant
stated in its SEC filings that its internal disclosure and
financial-reporting controls were "sufficient" to ensure both
the reliable disclosure of information about the company and the
accuracy of its financial calculations.  346 F. Supp. 3d at 398.
These statements regarding the "adequacy" of its controls were
misleading, the plaintiffs alleged, in light of a later-
disclosed report of inaccurate cash flow numbers and non-
compliance with Israeli law.  *Id.* at 398, 405.  But such
allegations were insufficient because the complaint did not
"describe [defendant's] system of internal controls, let alone
identify why that system was inadequate."  *Id.* at 405.  This
rejection of pleading by hindsight is especially appropriate
when the statements in question "do not purport to guarantee
that the controls will perform perfectly in every instance, but
instead speak to reasonable assurance or reasonable certainty."
*Id.*

Such is the case here.  Plaintiff alleges that HDFC's
certifications of "effective" internal controls were false and
misleading because they did not prevent or detect the GPS
bundling scheme.  These allegations, however, neither describe
the internal controls that HDFC had in place, nor explain how or

17

why they were deficient in a way that enabled the scheme to occur.  Simply put, Plaintiff has not said anything specific about the nature of the alleged deficiencies in HDFC's control environment.  It asks the Court instead to infer that HDFC's statements "*must* have been deficient because they may have failed to detect some weaknesses in its financial reports or disclosures in some instances."  *In re Banco Bradesco S.A.*, 277 F. Supp. 3d at 648 (emphasis added).  Without more specifics, these conclusory allegations about the bank's internal controls cannot survive.

Other district courts have dismissed similar claims based on similar fact patterns.  *See, e.g.*, *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 757-58 (S.D.N.Y. 2017); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013); *see also City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10-CV-2835, 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011) ("[P]laintiffs have not alleged any facts pertaining to the Company's internal structure for financial reporting, much less that [defendant] lacked adequate internal controls."); *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015) (rejecting Section 10(b) claim based on effectiveness certifications because, among other things, the complaint did not allege "how or why PetroChina's internal controls were inadequate").

In *In re Braskem S.A.*, shareholders brought claims against a Brazilian petrochemical company for representing that it had "disclosed all significant deficiencies" and "any fraud in connection with financial reporting" and that its "financial statements were accurate," while simultaneously failing to disclose that it was able to negotiate lower prices for a specific chemical because employees were paying bribes.  246 F. Supp. 3d at 743, 757.  Such "statements regarding Braskem's internal controls," the district court concluded, were "not actionable under [Section] 10(b)."  *Id.* at 757.  Instead, the allegations "founder[ed] because there [were] no concrete factual allegations in the [complaint] that made those statements false or misleading."  *Id.*  To the contrary, the complaint was "devoid of *any* allegations indicative of undisclosed control deficiencies affecting Braskem's financial reporting."  *Id.*  Here, too, Plaintiff's complaint leaves the reader in the dark as to what specific control-related deficiencies HDFC materially misrepresented or omitted.

Similarly, in *In re Gentiva*, the proposed class alleged that the defendant health care provider's "SOX Certifications" were materially false or misleading — after the company became subject to a congressional investigation for a Medicare reimbursement scheme — because its "disclosure controls and procedures and internal controls over financial reporting

were not 'effective.'"   932 F. Supp. 2d at 362, 370.   The
district court rejected claims based on these certifications
because the complaint did not allege "any facts pertaining to
the Company's internal structure for financial reporting, much
less that Gentiva lacked adequate internal controls."   *Id.* at
371.   Instead, those allegations, the district court added, "are
conclusory assertions without any factual support."   *Id.*   The
same is true here.

    Plaintiff relies on *In re Petrobras Securities
Litigation*, 116 F. Supp. 3d 368 (S.D.N.Y. 2015), in arguing that
HDFC's statements about its internal controls and the
effectiveness of its compliance operations should survive a
motion to dismiss.   Pl.'s Mem. Opp'n Mot. ("Pl.'s Opp'n") 16–17,
ECF No. 36.   But *Petrobras* is distinguishable on several
grounds.   First, the complaint in that case alleged that "at the
time the Company's management was professing its opinion that
the company's internal controls were effective, that same
management was well aware of the extensive corruption in the
Company's procurement activities."   *Id.* at 380-81.   Here, the
complaint does not allege that the executives who certified
HDFC's controls were themselves aware of the GPS bundling
scandal at the time.   In *Petrobras*, moreover, the allegedly
false or misleading statements were "made repeatedly" during a
period in which the company was "engaged in rampant corrupt

activities." *Id.* at 377, 381.  By contrast, the instant complaint includes no specific facts about the scope of the GPS bundling scheme, much less plausible allegations that it constituted "rampant" corruption on the order of magnitude of the entire bank.

Finally, it bears noting that, in addition to the *qualitative* issues with materiality discussed above, a one-day stock-price drop of 2.83% — the only specific *quantitative* measure the complaint offers — is not unusually large.  *See, e.g.*, *In re Eaton Corp. Sec. Litig.*, 318 F. Supp. 3d 659, 670 (S.D.N.Y. 2018) (dismissing claims because alleged misstatements were not material, despite 8% stock-price decline on day after disclosure), *aff'd sub nom. S.C. Ret. Sys. Grp. Tr. v. Eaton Corp. PLC*, 791 F. App'x 230 (2d Cir. 2019); *cf., e.g.*, *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 282 (S.D.N.Y. 2012) (holding alleged misstatements stated claim, where stock dropped 13% after fraud charges were filed).  And Plaintiff's complaint contains few, if any, objective allegations that would help explain the significance of that price change in context. For example, a 2.8% drop would, for obvious reasons, constitute a more persuasive indication of materiality on a day when bank stocks — or even the broader market — rose substantially than it would on a day when the broader market was down 2.8%.

**B.   HDFC's Statements Regarding Its Products and Marketing**

In its Forms 20-F for the years 2015 through 2019, HDFC also made various statements about its products and marketing practices.  *See* Am. Compl. ¶¶ 32, 41, 49, 57. Plaintiff focuses, in particular, on the statement that HDFC "seek[s] to establish a relationship with a retail customer and then expand it by offering more products."  *Id.* ¶ 31 (emphasis omitted).  The complaint does not, however, allege that any of these statements were false on their face.  Instead, Plaintiff alleges that these statements were misleading because they failed to disclose — that is, materially omitted — the GPS bundling scheme.  *Id.* ¶ 57; *see also* Pl.'s Opp'n 14–15.

Generally, "the securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct."  *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012).  A corporation has a duty to disclose, however, when the alleged omissions "are sufficiently connected to defendants' existing disclosures to make those public statements misleading."  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016). As relevant here, a "duty to disclose uncharged wrongdoing can arise when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices."

22

*Menaldi v. Och-Ziff Cap. Mgmt. Grp.*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016).

In *Das v. Rio Tinto PLC*, the plaintiff alleged that statements discussing the defendant mining company's work with the Government of Guinea had "materially omitted the fact that [the company's] success was made possible by a bribe." 332 F. Supp. 3d 786, 808 (S.D.N.Y. 2018). Because the statements did not attribute the company's successes in securing mining concessions to any particular cause, however, the defendants had no "freestanding legal duty to disclose the bribery scandal." *Id.* Similarly, in the *Sanofi* class action, the plaintiffs challenged statements by a pharmaceutical company touting its diabetes group as a "growth platform," on the basis that it failed to disclose the "alleged illegal marketing scheme used to achieve" such growth. *In re Sanofi*, 155 F. Supp. 3d at 394. The court granted the motion to dismiss, holding that the statement in question was not actionable because Sanofi did not "attribute the growing sales of diabetes products to pharmacies implicated in the alleged illegal kickback scheme." *Id.* at 404. The omission of the marketing scheme therefore was not "sufficiently connected to defendants' existing disclosures to make those public statements misleading." *Id.*

In *In re Grupo Televisa Securities Litigation*, by contrast, the defendant company's statements that the company

held "the rights to the next three soccer World Cup's [sic] that
are extremely relevant for Mexico" and that it "in no way knew
of, or condoned, any bribe or other improper conduct" did
trigger a duty to disclose its role in bribing FIFA officials.
368 F. Supp. 3d 711, 721 (S.D.N.Y. 2019).  By speaking about
these topics and "put[ting] its source of revenue at issue" —
that is, the revenue generated by the broadcasting rights as
made possible by the bribery — the company had an obligation to
disclose the illegal conduct underlying its success.  *Id.*

        Here, HDFC's general statements about its auto loan
products and growth strategy did not trigger an obligation to
disclose the GPS bundling scheme.  As with the statements at
issue in *Rio Tinto* and *In re Sanofi*, the challenged statements
here did not attribute HDFC's success or growth to product
sales.  The complaint certainly does not suggest, for example,
that HDFC touted the GPS devices as a source of revenue growth,
while failing to disclose that customers had "purchased" them
unwittingly.  Instead, the highly generalized statements about
auto loans were simply too attenuated from the alleged omission
— the bundling scheme — to render those statements materially
misleading.  *See In re ITT Educ. Servs., Inc.*, 859 F. Supp. 2d
at 579 (holding connection between statements about the source
of company's revenue and growth and the alleged omission, the
nondisclosure of predatory business practices, was "too tenuous"

to make statements misleading).  Plaintiff thus fails to
adequately plead that the scheme was a "material source of
[HDFC's] success" so as to render its non-disclosure misleading.
*Menaldi*, 164 F. Supp. 3d at 581.

Indeed, the complaint omits any serious attempt to
quantify the impact of the forced bundling scheme on HDFC's
overall revenues.  The SEC Bulletin on materiality cited above,
SAB No. 99, which the Second Circuit has "repeatedly cited with
approval, counsels that 5% falsity for statements . . . may
provide a preliminary assumption of materiality."  *Fed. Hous.
Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am.,
Inc.*, 873 F.3d 85, 147 (2d Cir. 2017); *see ECA*, 553 F.3d at 204.
Conversely, "[w]here misstatements implicate less than 5% of an
entity's revenue, the misstatements are not likely to be
material."  *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
988 F. Supp. 2d 406, 422–23 (S.D.N.Y. 2013).

HDFC offers retail banking, wholesale banking, and
treasury operations services.  While the complaint is silent on
the breakdown among these services, the 20-Fs at issue indicate
that roughly 80% of net revenues were attributable to retail
banking throughout the class period.  Plaintiff then asserts
that the bank's "vehicle loan unit accounted for approximately
10% of [its] loan book" and that the bank's auto and commercial
vehicle loan book values constituted "*more than a quarter*" of

its "total retail assets" — not revenues.  Am. Compl. ¶ 20; *see also id.* ¶ 73.  While the allegations begin and end there, the materiality analysis does not.  Of these auto loans, some had GPS devices improperly bundled, but Plaintiff does not allege how many.  Nor does the complaint contain any indication of HDFC's profit margins on bundled GPS devices.  Thus, the Court has no way even to begin to assess the proportions by which the bank's revenue or profit figures may have been inflated by the alleged scheme.

Defendants, on the other hand, marshal the existing record to demonstrate that the forced bundling practice was immaterial.  According to the July 20, 2020 *Economic Times* article, a total of "4000-5000" GPS devices were sold per month at a price of "Rs 18,000-19,000."  Defs. Mot. Ex. 8 at 3.  Assuming that *all* of the GPS devices were wrongfully bundled (which the complaint does not allege), and that each device cost the upper-limit price of 19,000 INR, the bundled devices in Fiscal Year 2020 would still have "represented a mere one-tenth of one percent (0.12%) of the Bank's Total Auto Loans and less than two-one-hundredths of one percent (0.016%) of Total Retail Assets."  Defs. Mot. 10-11, ECF No. 34.  Plaintiff does not meaningfully dispute the accuracy of these estimates as

calculated.  *See* Pl.'s Opp'n 12–13.[6]  And contrary to Plaintiff's assertions, the complaint does not plausibly allege how or why this wrongdoing put the entire auto loan book "at risk."  Pl.'s Opp'n 11, 13.  Absent any plausible allegations as to the materiality of HDFC's statements regarding its auto loan business, Plaintiff's claims here must also be dismissed.

*    *    *    *    *

At bottom, none of the alleged misstatements, when taken together or in isolation, can survive a motion to dismiss. Thus, Plaintiff's claims under Section 10(b) and SEC rule 10b-5 are dismissed.

## C.   Section 20 Claims Against Individual Defendants

Plaintiff also brings claims against the individual defendants under Section 20 of the Exchange Act, which establishes liability for individuals exercising control over

---

[6] Plaintiff's attempts to undermine these calculations are unpersuasive. Plaintiff first takes issue with Defendants' reliance on the "self-serving" statement from an unnamed HDFC official, as quoted in the *Economic Times* article, which included the number of GPS devices sold and their cost.  *Id.* The complaint, however, incorporates by reference that article (including by directly quoting passages attributed to unnamed "people familiar with the matter").  Am. Compl. ¶ 78; Defs. Mot. Ex. 8 at 2; *see Cohen v. Cap. One Funding, LLC*, 489 F. Supp. 3d 33, 44 (E.D.N.Y. 2020) ("Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss.").  The GPS device price range identified in that article, moreover, mirrors that alleged by Plaintiff.  *See* Am. Compl. ¶ 23 (identifying the cost as "approximately Rs 18,000-Rs 19,500").

Additionally, Plaintiff's assertion that these calculations fail to address how the forced bundling scheme "facilitated loan collection efforts," *see* Pl.'s Opp'n 13 (emphasis removed), misses the mark.  Nowhere does the complaint describe in any detail these loan collection efforts, or allege how they rendered the statements at issue false or misleading.

"any person liable" under the Exchange Act or any rule or regulation promulgated pursuant to the Act.  15 U.S.C. § 78t(a). "In order to establish a *prima facie* case of liability under [Section] 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).

Because Plaintiff has failed to allege any misstatements or omissions by HDFC or the individual defendants that survive a motion to dismiss — and therefore no primary violation — the control person liability claims against the individual defendants must also be dismissed.  *See ECA*, 553 F.3d at 206-07 (affirming dismissal of Section 20 claims "for want of a primary violation").

## IV.  Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted without prejudice.  Plaintiff may seek leave to file a further amended complaint within thirty days from the date this Order is filed; otherwise, the claims will be dismissed with prejudice.

SO ORDERED.


___/s/ Eric Komitee_____
ERIC KOMITEE
United States District Judge


Dated:    May 1, 2023
          Brooklyn, New York